Richard W. Hill
1549 Heather Lane
Riverside, CA 92504
Phone: 951-776-9175
Email: rwhill8588@yahoo.com

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## EASTERN DIVISION

| | |
|---|---|
| Richard W. Hill, | Case No.: **5:19-cv-00110-JGB (SPx)** |
| **Plaintiff,** | **AMENDED COMPLAINT** |
| v. | **WRONGFUL FORECLOSUURE** |
| US Bank, N.A. Successor Trustee to Bank of America, N.A., as trustee, Successor in Interest to LaSalle Bank NA, as Trustee on behalf of the holders of the WAMU Mortgage Pass-Through Certificates, Series 2007-0A6; National Default Servicing Corporation; Select Portfolio Servicing, Inc. | **FRAUD/VIOLATION OF CALIFORNIA CIVIL CODE § 1572** |
| | **VIOLATIONS OF CALIFORNIA CIVILCODE §§2924(a)(6), 2924.17and 2934(a)** |
| **Defendant.** | **INTENTIONAL INFLICTION OF EMOTIONAL DSTRESS** |
| | **DECLARATORY JUDGEMENT** |

COMES NOW Richard W. Hill, Plaintiff, *Pro se*, and files the above captioned Amended Complaint.

1
PLAINTIFF'S ORIGINAL COMPLAINT

## JURISDICTIONAL STATEMENT

1.    Jurisdiction of this Court arises under 28 U.S.C. § 1332(a) as there is diversity of citizenship among the parties and the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interests and costs.

2.    Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over the subject matter of the claims asserted by the Plaintiff' in the State of California in this action because those claims are also related to the claims asserted by the Plaintiff in that they form part of the same case or controversy, and because those claims arise out of the same transactions or occurrences as the action brought by the Plaintiff.

3.    This Court has personal jurisdiction over the Defendant because the Defendant have transacted business in this District and the State of California and because the Defendant have committed acts herein detailed in this District and the State of California.

4.    At all times prior to this action, Plaintiff has owned the Property located 1549 Heather Lane, Riverside, CA 92504, also hereinafter referred to as the "Property.

### VENUE

5.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), 1331, 2201, and 2202.

### THE PARTIES

### PLAINTIFF

2

PLAINTIFF'S ORIGINAL COMPLAINT

6.      Richard W. Hill, the Plaintiff, hereinafter also referred to as "Hill" is a natural person that owns, prior to the illegal sale complained of herein, the real property in Riverside, CA which is subject to the controversy.   Plaintiff is a citizen of the State of California.  Plaintiff has suffered damages due to the action(s) of the Defendants which are detailed herein.

## DEFENDANTS

7.      Defendant U.S. Bank, N.A, Successor Trustee to Bank of America, N.A., as trustee, on behalf of the holders of the WAMU Mortgage Pass-Through Certificates, Series 2007-0A6 ("US Bank"). US Bank, the business name of US Bancorp, was incorporated in Delaware and has its principal place of business in Minneapolis, Minnesota.

8.      Defendant National Default Servicing Corporation ("NDSC"). NDSC performs default related service, is incorporated in Arizona and has its principal place of business in Phoenix, Arizona.

9.      Defendant Select Portfolio Servicing, Inc, ("SPS"). SPS is a loan servicing company incorporated in Utah and has its principal place of business in Salt Lake City, Utah.

## INTRODUCTION

3
PLAINTIFF'S ORIGINAL COMPLAINT

10.     This is an action brought by Plaintiff for wrongful foreclosure, fraud, violations of California Civil Code §§ 1572, 2924(a)(6), 2924.17 and 2934(a),  Intentional Infliction of Emotional Distress, and Declaratory Judgment and for compensatory, special, punitive, and general damages.

11.     Plaintiff, Richard W. Hill, disputes the title and ownership of the real property in question, which is the subject of this action, in that the originating mortgage lender, and others alleged to claim ownership of Plaintiff's Promissory Note and/ or Deed of Trust, have unlawfully sold, assigned and/or transferred their ownership and security interest in a Promissory Note and Deed of Trust related to the Plaintiff's property, and thus, do not have lawful ownership or a security interest in Plaintiff's home which is further described in detail herein.

## BACKGROUND

12.     On or about May 5, 2007, Plaintiff entered into a consumer credit transaction with Washington Mutual Bank FA ("WaMu"), by obtaining a $956,250.00 mortgage loan secured by the Property.  Plaintiff executed a Promissory Note ("Note")[1] as part of the Loan transaction. This Note was secured by a Deed of Trust[2] on the Property to WaMu.

13.     There is a document purporting to be an "Assignment of Deed of Trust", dated October 20, 2010 and filed in the Official Records of the Riverside County Recorder's

---

[1] See Exhibits B and C to the Affidavit of Joseph R. Esquivel Jr. attached hereto as **EXHIBIT 1**.
[2] See Exhibit E to the Affidavit of Joseph R. Esquivel Jr. attached hereto as **EXHIBIT 1**.

4

PLAINTIFF'S ORIGINAL COMPLAINT

Office on October 21, 2010 as instrument # 2010-0503463, signed by Colleen Irby as Officer and notarized October 20, 2010 by Jessica Erin Snedden, California Notary Commission #1858851, where JPMorgan Chase Bank, National Association grants, assigns, and transfers to Bank of America, National Assocation successor by merger to LaSalle Bank NA as trustee for WaMu Mortgage Pass-Through Certificates Series 2007-OA6 all beneficial interest under a Deed of Trust dated May 05, 2007 and filed in the Official Records of the Riverside County Recorder's Office on May 16, 2007 as instrument # 2007-0326394.

14.     On January 31, 2018, a Substitution of Trustee was recorded whereby US Bank by its attorney-in-fact SPS substituted NDSC as the new trustee under the Deed of Trust.

15.     On January 31, 2018, a Notice of Default was filed by NDSC acting as Trustee for the purported beneficiary, US Bank, N.A. Successor Trustee to Bank of America, National Assocation successor by merger to LaSalle Bank NA as trustee for WaMu Mortgage Pass-Through Certificates Series 2007-OA6.

16.     On May 8, 2018, NDSC filed a Notice of Trustee Sale setting the sale of the Property for June 12, 2018.

17.     The Property was sold on February 15, 2019.

## FIRST CAUSE OF ACTION

## WRONGFUL FORECLOSURE

18.     Plaintiff alleges that Defendant US Bank, through its agent, NDSC, caused an illegal, fraudulent and willfully oppressive sale of the Property pursuant to the power of sale clause in the Deed of Trust.  By this action Plaintiff was prejudiced and harmed. Since Plaintiff is alleging that the Assignment of the Deed of Trust is void and is attacking the validity of the debt to Defendant US Bank, it would be inequitable to require tender and therefore tender in the amount of the purported indebtedness is excused.

19.     As more fully explained below, Defendants illegal, fraudulent and willfully oppressive sale is evidenced by the following:

20.     The copies of the Note and Deed of Trust supplied by Defendant US Bank through Defendant SPS to support its claim to collect mortgage payments, appoint a Substitute Trustee and direct a filing of a Notice of Default and Notice of Trustee Sale contained signatures of Plaintiff that were forged.

21.     Further, in addition to the forged Note and Deed of Trust, Defendant US Bank never received any interest in the loan entitling it to foreclose due to an invalid endorsement of the Note and a void Assignment of Deed of Trust by J.P. Morgan Chase which had no interest.

22.     Plaintiff is entitled to all consequential damages as a result of the wrongful foreclosure, including infliction of emotional distress (discussed below) to be proved at trial but are in excess of $75,000.00.

6
PLAINTIFF'S ORIGINAL COMPLAINT

## SECOND CAUSE OF ACTION

## FRAUD/VIOLATION OF CALIFORNIA CIVIL CODE §1572

23.    Plaintiff incorporates and re-alleges every allegation set forth in  paragraphs 1 - 22.

24.    Plaintiff alleges that the Note and Deed of Trust, supplied by SPS on behalf of US Bank, used to support the claim of the right to foreclose under the power of sale clause of the Deed of Trust, were not signed by Plaintiff and contain signatures of Plaintiff that were forged.

25.    Plaintiff was recently introduced to and engaged the services of forensic handwriting and document examiner expert Curt Baggett. Mr. Baggett is a leading handwriting expert in the United States, a skilled authority in document examination and has been an expert witness in over 5,000 cases.

26.    Mr. Baggett prepared a Handwriting Expert Report, attached as **EXHIBIT 2**, dated October 29, 2018, in which he declares under oath and the threat of perjury, that the copies of Adjustable Rate Note and Deed of Trust provided by SPS  and examined by Mr. Baggett were not signed by Plaintiff  and are the product of a forgery. The findings of Mr. Baggett are proof of Forgery and Fraud beyond any reasonable doubt.  The most compelling evidence in Mr. Baggett's reports are in Section 3 of the report.

27.    With regards to Plaintiff's alleged signatures on the Adjustable Rate Note, and Deed of Trust, Mr. Baggett states that he examined the  signatures and initials on the

PLAINTIFF'S ORIGINAL COMPLAINT

Adjustable Rate Note and Deed of Trust against known signatures of Plaintiff and concluded:

> Based on a significant number of differences of identifiable handwriting characteristics among the questioned and known signatures, it is my professional expert opinion that a different person wrote the initials and name of Richard Wayne Hill on the questioned documents. Someone did indeed forge the signatures of Richard Wayne Hill on the "Q1" and "Q2" documents. I have a duty to the Court to present the truth and evidence to the best of my ability.

*See* **EXHIBIT 2,** Section 3, Detailed Report Basis for Opinion, Conclusion. The Q1 and Q2 documents are identified as the Adjustable Rate Note and Deed of Trust.

28.    Mr. Baggett is fully prepared to testify in court with respect to his findings. Mr. Baggett will be able to support the findings that are found in his report and will state under cross-examination in any court, and to the highest degree of certainty, that the documents were not signed by Plaintiff and were forged and fraudulently created by someone other than Plaintiff.

29.    The copies of the Adjustable Note and Deed of Trust examined by Mr. Baggett were received by Plaintiff by way of a December 20, 2017 letter from Diana Toailoa, Consumer Ombudsman Specialist for SPS. Plaintiff also received copies of the Adjustable Note and Deed of Trust by way of a May 5, 2017 letter from Geoffrey Nelson, Consumer Ombudsman Specialist for SPS.

30.    Defendants US Bank and SPS, misrepresented to Plaintiff that the Adjustable Note and Deed of Trust were copies of those documents executed by Plaintiff. In fact, the

signature on those documents was forged.  A forged Note cannot prove an essential element to proceed under the power of sale clause under the Deed of Trust to show that Defendant US Bank was the holder of the Note and Deed of Trust entitled to enforce the Note and foreclose as a forged Note is a nullity.

31.     Further Defendant US Bank cannot use the assignment of a forged Deed of Trust to appoint a Substitute Trustee as a forged Deed of Trust is a nullity and void on its face.

32.     The use of forged documents is direct violation of Ca. Civ. Code §1572:

> Actual fraud, within the meaning of this Chapter, consists in any of the following acts, committed by a party to the contract, or with his connivance, with intent to deceive another party thereto, or to induce him to enter into the contract:
>
> 1. The suggestion, as a fact, of that which is not true, by one who does not believe it to be true;
>
> 2. The positive assertion, in a manner not warranted by the information of the person making it, of that which is not true, though he believes it to be true;
>
> 3. The suppression of that which is true, by one having knowledge or belief of the fact;
>
> 4. A promise made without any intention of performing it; or,
>
> 5. Any other act fitted to deceive.

.

33.     Such use is also a violation of U.S. Code, Title 18 § 484:

> Whoever so places or connects together different parts of two or more notes, bills, or other genuine instruments issued under the authority of the United States, by any foreign government, or corporation, as to produce one instrument, with intent to defraud, shall be guilty of forgery in the same manner as if the parts so put together were falsely made or forged, and shall be fined under this title or imprisoned not more than 10 years, or both.

9
PLAINTIFF'S ORIGINAL COMPLAINT

34.    The representation that the Adjustable Rate Note and Deed of Trust were copies of those documents executed by Plaintiff was made for the purpose of convincing Plaintiff that Defendant US Bank had the right to foreclose, appoint a Substitute Trustee and to use the power of sale clause in the Deed of Trust in order to prosecute the foreclosure action. Those documents were intentionally and deliberately presented with malicious intent to illegally take possession of the property of Plaintiff.

35.    Plaintiff relied on the misrepresentation and had a right to rely on the misrepresentation. Plaintiff had no reason to believe (nor would it normally occur to any reasonable person) that Defendants would use forged documents to support the foreclosure action.

36.    Plaintiff has been damaged by Defendant's filing of forged documents used to support the sale of Plaintiff's property. Defendant's damages are in excess of $75,000.00

### THIRD CAUSE OF ACTION

### VIOLATIONS OF CALIFORNIA CIVILCODE §§2924(a)(6), 2924.17and 2934(a)

37.    Plaintiff incorporates and re-alleges every allegation set forth in  paragraphs 1– 36.

38.    California laws governing foreclosure require that the Trustee of the beneficiary of the Deed of Trust follow certain procedures in order to enforce a power of sale in a Deed of Trust. All of the actions flow from the beneficiary of the Deed of Trust.

PLAINTIFF'S ORIGINAL COMPLAINT

39.     The loan in question is a first lien Deed of Trust, owner-occupied, residential real property containing no more than four dwelling units.

### Violation of Ca. Civ. Code §2924(a)(6)

40.     First, the holder of the beneficial interest of the Deed of Trust is the party to direct the trustee under the Deed of Trust to initiate foreclosure procedures.

Ca. Civ. Code §2924(a)(6):

(6) No entity shall record or cause a notice of default to be recorded or otherwise initiate the foreclosure process unless it is the holder of the beneficial interest under the mortgage or deed of trust, the original trustee or the substituted trustee under the deed of trust, or the designated agent of the holder of the beneficial interest. No agent of the holder of the beneficial interest under the mortgage or deed of trust, original trustee or substituted trustee under the deed of trust may record a notice of default or otherwise commence the foreclosure process except when acting within the scope of authority designated by the holder of the beneficial interest.

41.     Defendant US Bank claims to be the beneficiary to whom the debt is owed. However, this is not the case.

42.     First, Plaintiff has been supplied with two purported true and correct copies of the Note. One with an endorsement in blank signed by Cynthia Riley, received from SPS May 18, 2017, the second with no endorsements, received from SPS on December 20, 2017. *See* Affidavit of Richard W. Hill, Exhibit D to Affidavit of Joseph Esquivel attached hereto as Exhibit 2.

43.     The endorsement on the Note received on May 18, 2017was executed by Cynthia A. Riley as Assistant Vice President of WaMu.  Upon information and belief, Ms. Riley was not employed by WaMu during the time period between the origination of the Note and the time WaMu was closed by the Office of Thrift Supervision on September 25, 2008.  Ms. Riley was deposed on January 15, 2013 in *JP Morgan Chase Bank, N.A. v. Orozco*, Case No. 09-29997 CA (11), 11th Judicial Circuit in and for Miami-Dade County, Florida.  In this deposition, taken under oath, Ms. Riley stated that she was laid off by WaMu in November 2006.  There is no way that Ms. Riley had any authority to endorse Plaintiff's Note on behalf of WaMu since Plaintiff's Note was executed on May 5, 2007 after Ms. Riley had been terminated by WaMu.  Ms. Riley's endorsement is therefore void.

44.     Plaintiff alleges that his original Note, as evidenced by the copy received December 20, 2017 was not endorsed to any other party or in blank, therefore no transfer of the Note occurred. Further, the signatures on this purported copy of the original Note are forged.

45.     For these reasons, JP Morgan Chase had no interest in the Note to transfer to Defendant US Bank.

46.     Second, JP Morgan Bank executed an Assignment of Deed of Trust on October 20, 2010.

47.    Presumably through this Assignment, JP Morgan Bank is asserting some rights in Plaintiff's loan and Deed of Trust.

48.    On September 25, 2008 WaMu was closed by the Office of Thrift Supervision. The Federal Deposit Insurance Corporation ("FDIC") was named receiver. JP Morgan Bank entered into a Purchase and Assumption Agreement on September 25, 2008 to acquire WaMu assets. Exhibit 1 at ¶ 25.

49.    There is no mortgage schedule attached to the Purchase and Agreement identifying the specific loans that were being purchased. Exhibit 1 at ¶ 28.

50.    Further,

> Lawrence Nardi, Operations Unit Manager and mortgage officer for JP Morgan Chase, who was previously employed by Washington Mutual and thereafter by JP Morgan Chase, in sworn deposition testimony under oath and subject to the penalties of perjury, testified that there was NEVER a mortgage loan schedule as to any mortgage loans "purchased" by JP Morgan Chase, NA from the FDIC pursuant to the Purchase and Asset Agreement (PAA) between the FDIC and JPM dated September 25, 2008.  Pertinent testimony from the 330-page deposition is as follows: (See Exhibit "H" attached within)

> *Q: (page 57, beginning at line 19): Okay. The — are you aware of any type of schedule of loans that would have been created to represent the — either the loans that were asset loans or the loans that were serviced by WAMU? Are you — was the --- do you know if there is a schedule or database of loans like that?*

> *A: (page 58, beginning at line 1): I know that there was a schedule contemplated in certain documents related to the purchase. That schedule has never materialized in any form. We've looked for it in countless other cases. We've never been able to produce it in any previous cases. It would certainly be a wonderful thing to have, but it's — as far as I know, it doesn't exist, although it was — it was contemplated in the documents.*

13
PLAINTIFF'S ORIGINAL COMPLAINT

*Q: (beginning at page 260, line 18): Have you ever in your duties of being a loan analyst — a loan operations specialist, have you ever seen an FDIC bill of sale or a receiver's deed or an assignment of mortgage or an allonge?*

*A: (page 260, beginning at line 23): For loans, I'm assuming you're talking about the WaMu loan that was subject to the purchase here.*

*Q: (page 261, line 1): Right.*

*29.     A: (page 261, beginning at line 2): No there is no assignments of mortgage. There's no allonges. There's no — in the thousands of loans that I have come into contact with that were a part of this purchase, I've never once seen an assignment of mortgage. There is simply not — they don't exist. Or allonges or anything transferring ownership from WAMU to Chase, in other words. Specifically, endorsements and things like that.*

Exhibit 1 at ¶ 30.
,

51.   Further, according to the US Senate Permanent Subcommittee on Investigations:

*"" the mortgages issued by Washington Mutual and listed as "assets" were sold off before the ink was dry. So the fact is that thousands of the mortgages that J.P. Morgan Chase is now claiming the right to foreclose on were sold by Washington Mutual long before J.P. Morgan Chase acquired the assets of Washington Mutual that means that J.P. Morgan Chase never acquired thousands of the notes they now claim to own is a purchaser of Washington Mutual' s assets"*

Exhibit 1 at ¶ 27.

52.   Since it cannot be shown that JP Morgan Bank obtained Plaintiff's loan through the Purchase and Assumption Agreement or there is any documentation to show that ownership was transferred from WaMu to JP Morgan Bank, JP Morgan Bank had no rights to transfer to Defendant US Bank by way of assignment. Therefore, the October 10, 2010 Assignment is void *ab initio.*

14
PLAINTIFF'S ORIGINAL COMPLAINT

53.     For all the above reasons, Defendant US Bank is not the holder of the Note or the beneficiary of the Deed of Trust and is not entitled to cause a Notice of Default to be filed or otherwise commence the foreclosure process.

**Violation of Cal. Civ. Code § 2924.17**

54.     Defendants NDSC and SPS have violated Cal. Civ. § 2924.17 which requires:

> **2924.17.** (a) A declaration recorded pursuant to Section 2923.5 or, until January 1, 2018, pursuant to Section 2923.55, a notice of default, notice of sale, assignment of a deed of trust, or substitution of trustee recorded by or on behalf of a mortgage servicer in connection with a foreclosure subject to the requirements of Section 2924, or a declaration or affidavit filed in any court relative to a foreclosure proceeding shall be accurate and complete and supported by competent and reliable evidence.
>
> (b) Before recording or filing any of the documents described in subdivision (a), a mortgage servicer shall ensure that it has reviewed competent and reliable evidence to substantiate the borrower s default and the right to foreclose, including the borrower s loan status and loan information.

55.     Clearly NDSC and SPS have violated this section since any review of the claim that Defendant US Bank was the purported beneficiary of the Deed of Trust would have revealed that there was no competent and reliable evidence of the right to foreclose in that the assignment to Defendant US Bank was void *ab initio* as JP Morgan Chase had no interest to assign.

**Violation of Cal. Civ. Code § 2934(a)**

PLAINTIFF'S ORIGINAL COMPLAINT

56.     Defendant US Bank has violated Cal. Civ. Code § 2934(a) in that Defendant is not the beneficiary under the Deed of Trust and has no authority to make a substitution of the Trustee.

57.     A Trustee under the Deed of Trust may be substituted as long as the substitution is done in accordance with Ca. Civ. Code §2934a which requires filing by the beneficiary under the Deed of Trust.

58.     The original Trustee under the Deed of Trust is California Reconveyance Corporation. Defendant NDSC is the Trustee named in the Notice of Default and Notice of Sale.

59.     Since Defendant US Bank is not the beneficiary under the Deed of Trust and has no authority to make a substitution of the Trustee, NDSC has not been properly substituted as Trustee. Therefore, all actions taken by the NDSC are void *ab initio*. A Trustee must be authorized by the beneficiary of the Deed of Trust to act under the power of sale in the Deed of Trust.

60.     As a result of the above wrongs, Plaintiff has suffered general damages of at least $75,000.00 and special damages in an amount to be determined at trial.

## **FOURTH CAUSE OF ACTION**

## **INTENTIONAL INFLICTION OF EMOTIONAL DSTRESS**

61.     Plaintiff incorporates and re-alleges every allegation set forth in  paragraphs 1 –60.

16
PLAINTIFF'S ORIGINAL COMPLAINT

62.   The actions of Defendants US Bank, NDSC and SPS, as set forth herein, have resulted in the Plaintiff facing the imminent loss of his property This outcome has been created without any right or privilege on the part of Defendants US Bank, NDSC and SPS, and, as such, its actions constitute outrageous and reckless conduct on the part of Defendants US Bank, NDSC and SPS.

63.   Defendant US Bank, knowingly and recklessly misrepresented that it was the beneficiary under the Deed of Trust and thus, was entitled to exercise the power of sale provision contained in Deed of Trust.  In fact, Defendant US Bank was not entitled to do so and has no legal, equitable, or actual beneficial interest whatsoever in the Property.

64.   Defendants NDSC and SPS failed in their duty to ascertain whether there was competent and reliable evidence to ascertain the truth of the claims of Defendant US Bank.

65.   Defendants' conduct is so outrageous and extreme that it exceeds all bounds which is usually tolerated in a civilized community especially in light of the continuing foreclosure crisis in California.

66.   Such conduct was undertaken with the specific intent of inflicting emotional distress on the Plaintiff, such that Plaintiff would be so emotionally distressed and debilitated that he would be unable to exercise legal rights in the Property, the right to title of the Property, the right to cure the alleged

PLAINTIFF'S ORIGINAL COMPLAINT

default, right to verify the alleged debt that Defendant US Bank was asserting, and right to clear title to the Property such that said title will regain its marketability and value.

67.     At the time Defendants US Bank and NDSC began their exercise of the power of sale in the Deed of Trust, Defendants US Bank and NDSC were not acting in good faith while attempting to foreclose on the Subject Property.  Defendants US Bank and NDSC committed the acts set forth above with complete, utter and reckless disregard of the probability of causing Plaintiff to suffer severe emotional distress.

68.     As an actual and proximate cause of Defendants US Bank, NDSC and SPS actions, Plaintiff has suffered severe emotional distress, including, but not limited to, many sleepless nights, severe depression, lack of appetite, and most everything related to physical, mental and emotional health, including damaged relationships with family and friends.

69.     Due to Defendants US Bank, NDSC and SPS outrageous conduct, Plaintiff has been living under the constant emotional nightmare of losing the Property and the nightmare is about to come true.

70.     The conduct of Defendants US Bank, NDSC and SPS, as herein described, was so vile, base, contemptible, miserable, wretched, and loathsome that it would be looked down upon and despised by ordinary people.  Plaintiff is therefore entitled to punitive damages in an amount appropriate to punish Defendants US Bank, NDSC and SPS and to deter others from engaging in similar conduct.

## DECLARATORY JUDGMENT

71.   Plaintiff incorporates and re-alleges every allegation set forth in  paragraphs 1 –70.

72.   Plaintiff has proved beyond any reasonable doubt the subject of Plaintiff's Complaint that Defendants have acted wrongfully prior and leading the "sale" of the Property, contrary to the conditions precedent of the terms of the subject Deed of Trust, the Cal. Civ.  Code. Therefore, Plaintiff requests Declaratory Judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

73.   Defendants have exploited and abused their alleged authority to sell the  property in fact and deed, using the so-called "sale" as a tool and instrument of fraud.  Under these circumstances this Honorable Court should give no credence whatsoever to the alleged "sale" of Plaintiff's property, the result of a carefully designed fraud and conclusively powerless to stand the scrutiny to be effective at no time.

74.   Declaratory Relief is necessary and appropriate at this time because without judicial resolution all Parties herein will remain unclear and in dispute as to their respective rights, interests, and obligations.  Furthermore, a determination is necessary as to whether the  Assignments of Deed of Trust factually or legally amounted to assign anything whatsoever, whether the Notice of Default and Notice of Sale are void, and further whether it exists as a "Cloud" on Plaintiff's Land Record/Real Property and hence these records should be removed.

PLAINTIFF'S ORIGINAL COMPLAINT

75.    The Property is at risk of being further influenced, impacted, and/or wrongfully sold, transferred and/or assigned by and through Defendants named herein, any of the Agents or other individuals or Entities claiming, but factually and legally not qualifying held to, or determined as *Bona Fide* Purchases ("BFP)", individuals and/or Entities.

76.    Plaintiff will suffer irreparable harm in absence of the requested relief because the Property has been illegally sold.  The original *status quo* was and is unique and valuable, the loss of which cannot be fully compensated by money damages.

77.    Plaintiff herein further alleges, that an actual controversy has arisen, and now exists and remains unresolved between Plaintiff and Defendants and any of its Agents as well as other individuals claiming, but factually and legally could not qualify, held to, or determined as BFP, and other such claiming "BFPs", individuals and/or business entities concerning the legal effect and true nature of the Assignment of the Deed of Trust, Notice of Default and Notice of Trustee Sale as being a "Cloud" on Plaintiff's Land Record/Real Estate Property, all of whom are relying on the validity and legality of the subject Assignment.

78.    As such legally and equitably the Assignment of the Deed of Trust, Notice of Default and Notice of Trustee Sale referenced above should be Cancelled and Expunged from Plaintiff's Land Record/Real Property Title.

## **DEMAND FOR JURY TRIAL**

PLAINTIFF'S ORIGINAL COMPLAINT

Plaintiff demands a trial by jury of all claims so triable as a matter or right and law.

**WHEREFORE,** for all the foregoing reasons, Plaintiff requests this Honorable Court:

A) For Declaratory Relief by way of a Judicial Determination as follows:

That the recordation of the Assignment of the Deed of Trust, Notice of Default and Notice of Trustee Sale are void and therefore a **"Cloud"** on Plaintiff's Land Record/Real Property Title;

B) For an Order, Decree and or Judgment thereby "Canceling" and "Expunging" the recordation of the Assignment of the Deed of Trust, Notice of Default and Notice of Trustee Sale from Plaintiff's Land Record/Real Property Title held, maintained and currently on record with the Riverside County California Recorder's Office;

C) For an Order, Decree and or Judgment thereby granting Plaintiff damages in the amount of Ten Million Dollars ($10,000,000) as general, special, statutory and punitive damages due and requested in First through Fourth Causes of Action.

Respectfully presented by Plaintiff the 28th day of February 2019.

**Richard W. Hill**
1549 Heather Lane
Riverside, CA 92504
Phone: 951-776-9175
Email: rwhill8588@yahoo,com

21
PLAINTIFF'S ORIGINAL COMPLAINT

**VERIFICATION**

Plaintiff has read the **AMENDED COMPLAINT** and know the contents thereof to be true; and the same is true of Plaintiff's own knowledge, except to the matters which are therein stated on our information and belief and as to those matters, Plaintiffs believe them to be true. The foregoing is true, correct, complete and not misleading.

Sealed by the voluntary act of my own hand on this 28th day of February, in the Year of our Lord, two thousand and Nineteen.

**Richard W. Hill**
1549 Heather Lane
Riverside, CA 92504

Either known to me or having proper identification, Affiant personally came before me and having been duly sworn did state and affirm the above statements.

On this the 1ˢᵗ day of March 2019. FEBRUARY 28ᵗʰ 2019 RH

NOTARY

State of California
County of Riverside

SEAL:



TAMI K. BROWN
COMM. # 2138651
NOTARY PUBLIC·CALIFORNIA
RIVERSIDE COUNTY
My Comm. Exp. January 27, 2020

PLAINTIFF'S ORIGINAL COMPLAINT

# JURAT

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California

County of *Riverside*

Subscribed and sworn to (or affirmed) before me on this *28th* day of *February*,
20 *19*. by *Richard W. Hill*,

proved to me on the basis of satisfactory evidence to be the person(s) who appeared before me.

_____
Signature                                    (Seal)

TAMI K. BROWN
COMM. # 2138651
NOTARY PUBLIC•CALIFORNIA
RIVERSIDE COUNTY
My Comm. Exp. January 27, 2020
GSN1

---

## OPTIONAL INFORMATION

### INSTRUCTIONS

The wording of all Jurats completed in California after January 1, 2015 must be in the form as set forth within this Jurat. There are no exceptions. If a Jurat to be completed does not follow this form, the notary must correct the verbiage by using a jurat stamp containing the correct wording or attaching a separate jurat form such as this one with does contain the proper wording. In addition, the notary must require an oath or affirmation from the document signer regarding the truthfulness of the contents of the document. The document must be signed AFTER the oath or affirmation. If the document was previously signed, it must be re-signed in front of the notary public during the jurat process.

DESCRIPTION OF THE ATTACHED DOCUMENT

*Amended Complaint*
(Title or description of attached document)

*Wrongful Foreclosure*
(Title or description of attached document continued)

Number of Pages *23* Document Date_____

_____
Additional information

- State and county information must be the state and county where the document signer(s) personally appeared before the notary public.
- Date of notarization must be the date the signer(s) personally appeared which must also be the same date the jurat process is completed.
- Print the name(s) of the document signer(s) who personally appear at the time of notarization.
- Signature of the notary public must match the signature on file with the office of the county clerk.
- The notary seal impression must be clear and photographically reproducible. Impression must not cover text or lines. If seal impression smudges, re-seal if a sufficient area permits, otherwise complete a different jurat form.
  - ❖ Additional information is not required but could help to ensure this jurat is not misused or attached to a different document.
  - ❖ Indicate title or type of attached document, number of pages and date.
- Securely attach this document to the signed document with a staple.

1

**CERTIFICATE OF SERVICE**

2

I HEREBY CERTIFY that on this 28th day of February 2019, I served a copy of

3

the foregoing, by US Mail, postage prepaid to:

4

5
Steven M. Dailey
Rebecca Wilson
6
KUTAK ROCK LLP
5 Park Plaza, Suite 1500
7
Irvine, CA 92614-8595

8

9
_____

10
**Richard W. Hill**

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFF'S ORIGINAL COMPLAINT

# EXHIBIT 1

24

After Recording Return to:
Richard Wayne Hill
1549 Heather Lane
Riverside, CA 92504

## AFFIDAVIT OF JOSEPH R. ESQUIVEL JR.

I, Joseph R. Esquivel Jr. declare as follows:

1.  I am over the age of 18 years and qualified to make this affidavit.

2.  I am a licensed private investigator of in the State of Texas, License # A20449.

3.  I make this affidavit based on my own personal knowledge.

4.  I make this affidavit in support of *Mortgage Compliance Investigations* Chain Of Title Analysis & Mortgage Fraud Investigation prepared for Richard Wayne Hill regarding the Security Instrument and the real property located at 1549 Heather Lane, Riverside, CA 92504, as referenced in the Riverside County Record.

5.  I have no direct or indirect interest in the outcome of the case at bar for which I am offering my observations.

6.  I have personal knowledge and experience in the topic areas related to the securitization of mortgage loans, real property law, Uniform Commercial Code practices, predatory lending practices, assignment and assumption of securitized loans, creation of trusts under deeds of trust, pooling and servicing agreements, issuance of asset-backed securities and specifically mortgage-backed securities by special purpose vehicles in which an entity is named as trustee for holders of certificates of mortgage backed securities, the foreclosure process of securitized and non-securitized residential mortgages in both judicial and non-judicial states, and the various forms of foreclosure-related fraud.

*25*

7.  I perform my research through the viewing of actual business records and Corporate/Trust Documents.

8.  I use professional resources to view these records and documents.

9.  I have the training, knowledge and experience to perform these searches and understand the meaning of these records and documents with very reliable accuracy.

10. I am available for court appearances, in person or via telephone for further clarification or explanation of the information provided herein, or for cross examination if necessary.

11. My research through professional services and the viewing of actual business records and Corporate/Trust Documents, determined that an interest in the Richard Wayne Hill Mortgage Loan Instrument was sold sometime shortly after May 05, 2007 to multiple classes of the WaMu Mortgage Pass-Through Certificates Series 2007-OA6.

12. Per the Prospectus Supplement (To Prospectus dated April 17, 2007) for the WaMu Mortgage Pass-Through Certificates Series 2007-OA6 Trust, the transaction participants of the WaMu Mortgage Pass-Through Certificates Series 2007-OA6 are: (1) **Sponsor/Seller**, Washington Mutual Bank, FA. (2) The **Depositor**: WaMu Asset Acceptance Corp., the depositor, is a Delaware corporation and a wholly owned subsidiary of the sponsor (3) Issuing Entity: The Depositor formed the WaMu Mortgage Pass-Through Certificates Series 2007-OA6, a statutory trust formed under the laws of the State of Delaware pursuant to a trust agreement. (4) **Trustee**: LaSalle Bank National Association, is a national banking association formed under the federal laws of the United States of America.  The Trust closed on or about June 26, 2007 (see, PROSPECTUS at the SECURITY EXCHANGE COMMISSION'S ("SEC") website http://www.secinfo.com/dScj2.u5az.htm  see also, annexed Exhibit "A," pages 1 thru 7 of the PROSPECTUS for the convenience of the reader).

26

13. I have looked at a two (2) copies of instruments that purport a to be true and correct copy of the Richard Hill Note dated May 05, 2007, regarding a loan for $955,250.00. The Original Lender of the May 05, 2007 Hill loan is Washington Mutual Bank, FA. (See Exhibits "B and C" attached within).

14. In a Verified document by Richard Hill entitled Affidavit and dated May 12, 2018, Richard Hill stated the following, regarding the Note. (See Exhibit "D" attached within)

    a. On May 18, 2017 I received a purported true and correct copy of the ADJUSTABLE RATE NOTE dated May 05, 2007 that I signed at closing in the City of Corona California with Washington Mutual Bank, FA, from Select Portfolio Servicing Inc. This copy of the note while it did look like the ADJUSTALBLE RATE NOTE that I signed at closing it did not have the initials of the party sitting across from me at the time of closing, on the document who initialed the documents after I signed them. (See Exhibit "A" attached within)

    b. This copy of the Note also had a stamping on the bottom of page 6 of the Note with the words "Pay to the order of" however No payee was named, and this stamping was signed by Cynthia A. Riley.

    c. On December 20, 2017 I received another purported true and correct copy of the ADJUSTABLE RATE NOTE dated May 05, 2007 that I signed in the city of Corona California with Washington Mutual Bank, FA, from Select Portfolio Servicing however this copy did have the initials on the bottom of every page of the document, however what was missing was the stamping that was on the other copy of the Note that I have received from Select Portfolio Servicing Inc., on May 18, 2017. At the time of closing on May 05, 2017 in the city of Corona California, when I was signing the documents I remember the party that was sitting across from me was initialing all the documents that I was signing, and, on this copy, there were initials but no stamping that was signed by Cynthia A. Riley. (See Exhibit "B" within)

*Page 3 of 11  Factual Affidavit of Joseph R. Esquivel Jr for- Richard Wayne Hill – 1549 Heather Lane, Riverside, CA 92504*

27

15. Note withstanding which Note represents the Original Note, the multiple classes of the WaMu Mortgage Pass-Through Certificates Series 2007-OA6 are not named in any way on the Richard Wayne Hill Note.

    a. WaMu Asset Acceptance Corp. is not named or referenced in any way on the Richard Wayne Hill Note.

    b. LaSalle Bank National Association is not named or referenced in any way on the Richard Wayne Hill Note.

    c. Copy "B" of the Richard Wayne Hill Note has an incomplete stamping on the Note itself from Washington Mutual Bank, FA, signed by Cynthia A. Hiley as Vice President, made payable to an as of yet unnamed payee.

16. The Richard Wayne Hill Note states, "In return for a loan that I have received, I promise to pay ..." This verbiage refers to a "loan" that occurred in the past. Between the Note and the Deed of Trust, neither state or even indicate *who* gave a "loan," *when* the "loan" happened, *how* much was given for the "loan," *how* did the "loan" take place, and *what* was "loaned" – "credit" or "money," and if credit, *where* did the "credit" come from, and whether the "credit was backed by "money." Without this information in the Note and Deed of Trust, there is no proof in the Richard Wayne Hill Note and Deed of Trust that shows "consideration" was given to Richard Wayne Hill for a "loan." The Richard Wayne Hill Note and the Deed of Trust do not say that Washington Mutual Bank, FA, gave Richard Wayne Hill a "loan" or any consideration of any kind.

17. Per the language in the Note, the Note and the "loan" are two different matters. Neither provides *proof/evidence* as to *who* gave the alleged "loan," *when* the alleged "loan" happened, *how* much was given for the alleged "loan," *how* did the alleged "loan" take place, and *what* was "loaned" – "credit" or "money," and if it was credit, *where* did the "credit" come from, and whether the "credit was backed by "money." The Note and the Deed of Trust do not say that Washington Mutual Bank, FA, gave Richard Wayne Hill a "loan" or any consideration of any kind.

*28*

18.     Without the *factually unsupported* clause in the Note, "*In return for a loan I have received ...*", there is *nothing* in the Note or the Deed of Trust that states that any kind of "loan," as defined by State Law or Black's Law Dictionary, or any other consideration was given to Richard Wayne Hill.

19.     The Richard Wayne Hill Note is not evidence of a "loan" given by Washington Mutual Bank, FA, to Richard Wayne Hill.

20. I have looked at a Deed of Trust of Richard Wayne Hill, dated May 05, 2007 and filed in the Official Records of the Riverside County Recorder's Office on May 16, 2007 as ins# 2007-0326394. (See Exhibit "E" attached within)

   a.  The multiple classes of the WaMu Mortgage Pass-Through Certificates Series 2007-OA6 are not named in any way to the Richard Wayne Hill Deed of Trust

   b.  WaMu Asset Acceptance Corp is not named or referenced in any way on the Richard Wayne Hill Deed of Trust

   c.  LaSalle Bank National Association is not named or referenced in any way on the Richard Wayne Hill Deed of Trust

21. I have looked at the Riverside County Record relating to the Richard Wayne Hill Deed of Trust dated May 05, 2007. The Riverside County Record shows an "Assignment of Deed of Trust", dated October 20, 2010 and filed in the Official Records of the Riverside County Recorder's Office on October 21, 2010 as ins# 2010-0503463, signed by Colleen Irby as Officer and notarized October 20, 2010 by Jessica Erin Snedden, California Notary Commission #1858851, where JPMorgan Chase Bank, National Association grants, assigns, and transfers to Bank of America, National Association successor by merger to LaSalle Bank NA as trustee for WaMu Mortgage Pass-Through Certificates Series 2007-OA6. (See Exhibit "F" attached within).

*Page 5 of 11 Factual Affidavit of Joseph R. Esquivel Jr for- Richard Wayne Hill – 1549 Heather Lane, Riverside, CA 92504*

29

22. The Richard Wayne Hill Assignment of Deed of Trust was recorded on October 21, 2010, which is three (3) years *after* the Trust closed on or about June 26, 2007, with, allegedly, Richard Wayne Hill's Note and Deed of Trust already in the Trust.

23.     There is no sale of the Richard Wayne Hill Mortgage Loan caused through the Richard Wayne Hill Assignment of Deed of Trust.

24.     At the time of the filing and recording of this document purporting to be an Assignment of Security Deed into the Walton County record JPMorgan Chase Bank National Association was the servicer for the Reyes loan

25. On September 25, 2008 Washington Mutual Bank ("WaMu") was closed by the Office of Thrift Supervision. The Federal Deposit Insurance Corporation ("FDIC") was named Receiver and JPMorgan Chase Bank National Association acquired the rights to service the Reyes Loan through a "Voluntary Purchase and Assumption Agreement". (See Exhibit "G" attached within)

26. The FDIC as the receiver of the failed depository institution Washington Mutual Bank by operation of law acquired all rights titles and powers of the failed insured depository institution and title to the books, records and assets of any previous conservator or other legal custodian. However, any assets that WaMu still owned and the transfer of those WaMu's assets from the FDIC to Chase does not take place by operation of law since Chase Acquired WaMu's assets in a voluntary transaction.

27. When Chase acquired an interest of any loan through a voluntary purchase agreement with the FDIC, the mortgage was not acquired by operation of law and the subsequent mortgagee Chase needed to comply with the provisions of states recording statutes, further any defect or irregularity in a foreclosure proceeding would result in a voidable foreclosure. According to the US Senate Permanent Subcommittee on Investigations:

*Page 6 of 11  Factual Affidavit of Joseph R. Esquivel Jr for- Richard Wayne Hill – 1549 Heather Lane, Riverside, CA 92504*

30

*"" the mortgages issued by Washington Mutual and listed as "assets" were sold off before the ink was dry. So the fact is that thousands of the mortgages that J.P. Morgan Chase is now claiming the right to foreclose on were sold by Washington Mutual long before J.P. Morgan Chase acquired the assets of Washington Mutual that means that J.P. Morgan Chase never acquired thousands of the notes they now claim to own is a purchaser of Washington Mutual's assets"*

28. I have looked at a copy of the Purchase and Assumption Agreement between JPMorgan Chase Bank, National Association and the Federal Deposit Insurance Corporation dated September 25, 2008 and there is no mortgage schedule or database in any form stating specific loans that were being purchased. (See Exhibit "G" attached within)

30.   I have looked at a copy of the deposition of Lawrence Nardi regarding the matter of JPMorgan Chase Bank National Association Bank v. Waisome, filed into the Florida 5th Judicial Circuit Case No. 2009-CA-005717. Lawrence Nardi, Operations Unit Manager and mortgage officer for JP Morgan Chase, who was previously employed by Washington Mutual and thereafter by JP Morgan Chase, in sworn deposition testimony under oath and subject to the penalties of perjury, testified that there was NEVER a mortgage loan schedule as to any mortgage loans "purchased" by JP Morgan Chase, NA from the FDIC pursuant to the Purchase and Asset Agreement (PAA) between the FDIC and JPM dated September 25, 2008. Pertinent testimony from the 330-page deposition is as follows: (See Exhibit "H" attached within)

*Q: (page 57, beginning at line 19): Okay. The — are you aware of any type of schedule of loans that would have been created to represent the — either the loans that were asset loans or the loans that were serviced by WAMU? Are you — was the — do you know if there is a schedule or database of loans like that?*

*A: (page 58, beginning at line 1): I know that there was a schedule contemplated in certain documents related to the purchase. That schedule has never materialized in any form. We've looked for it in countless other cases. We've never been able to produce it in any previous cases. It would certainly be a wonderful thing to have, but it's — as far as I know, it doesn't exist, although it was — it was contemplated in the documents.*

*Q: (beginning at page 260, line 18): Have you ever in your duties of being a loan analyst — a loan operations specialist, have you ever seen an FDIC bill of sale or a receiver's deed or an assignment of mortgage or an allonge?*

*Page 7 of 11  Factual Affidavit of Joseph R. Esquivel Jr for- Richard Wayne Hill – 1549 Heather Lane, Riverside, CA 92504*

31

*A: (page 260, beginning at line 23): For loans, I'm assuming you're talking about the WaMu loan that was subject to the purchase here.*

*Q: (page 261, line 1): Right.*

29. *A: (page 261, beginning at line 2): No there is no assignments of mortgage. There's no allonges. There's no — in the thousands of loans that I have come into contact with that were a part of this purchase, I've never once seen an assignment of mortgage. There is simply not — they don't exist. Or allonges or anything transferring ownership from WAMU to Chase, in other words. Specifically, endorsements and things like that.*

30. The transfer and sale of all Beneficial Interest of the Richard Wayne Hill Deed of Trust to WaMu Mortgage Pass-Through Certificates Series 2007-OA6 should have been done on or before the June 26, 2007 of the WaMu Mortgage Pass-Through Certificates Series 2007-OA6 which was June 26, 2007. The requirements for defining a REMIC from IRS can be found at 26 USCA §860 A thru G and by going to https://www.gpo.gov/fdsys/pkg/USCODE-2009-title26/html/USCODE-2009-title26-subtitleA-chap1-subchapM-partIV-sec860D.htm which mean that the WaMu Mortgage Pass-Through Certificates Series 2007-OA6 is unable to have any other assets put into the WaMu Mortgage Pass-Through Certificates Series 2007-OA6 after the June 26, 2007 of June 26, 2007. The Assigning of a defective obligation to the REMIC also goes against what is required (Verbatim provided in pertinent part below)

USCA stands for United States Code Annotated.

   Title 26 is the Internal Revenue Code

      Subchapter M includes Regulated Investment Companies and Real Estate Investment Trusts.

*26 U.S.C. 860D*

*United States Code, 2009 Edition*

*Title 26 - INTERNAL REVENUE CODE*

*Subtitle A - Income Taxes*

*PART IV - REAL ESTATE MORTGAGE INVESTMENT CONDUITS*

*Sec. 860D - REMIC defined*

*From the U.S. Government Printing Office, www.gpo.gov*

32

*§860D. REMIC defined*

*(a) General rule*

*For purposes of this title, the terms "real estate mortgage investment conduit" and "REMIC" mean any entity—*

*(4) as of the close of the 3rd month beginning after the startup day and at all times thereafter, substantially all of the assets of which consist of <u>qualified mortgages and permitted investments,</u>*

31. The Assignment of Deed of Trust dated October 20, 2010 and filed in the Official Records of the Riverside County Recorders' Office on October 21, 2010 assigned a defective obligation to the WaMu Mortgage Pass-Through Certificates Series 2007-OA6 as this loan was in default when the assignment was filed. This information can be found by going to the website https://www.gpo.gov/fdsys/pkg/USCODE-2009-title26/html/USCODE-2009-title26-subtitleA-chap1-subchapM-partIV-sec860G.htm

    .26 U.S.C. 860G(a)(4)(B)(ii)

    (a) Definitions

    (4) Qualified replacement mortgage

    The term "qualified replacement mortgage" means any obligation—

    (A) which would be a qualified mortgage if transferred on the startup day in exchange for regular or residual interests in the REMIC, and

(ii) a defective obligation within the 2-year period beginning on the startup day.

32. I have looked at the Riverside County Record relating to the Richard Wayne Hill Deed of Trust dated May 05, 2007. The Riverside County Record shows no record of a reconveyance of the Deed of Trust as required in covenant 23 of the Deed of Trust which states. "**Reconveyance,** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. …" This has not happened.

*33*

33.     The Richard Wayne Hill Deed of Trust does not distinguish how "payment of all sums secured by this Security Instrument" should be made or by whom. When the sale of the Richard Wayne Hill Note to the Depositor of the WaMu Mortgage Pass-Through Certificates Series 2007-OA6 took place, that payment for the Richard Wayne Hill Note satisfied **Covenant 23** of the Richard Wayne Hill Deed of Trust.

34.     The Richard Wayne Hill Deed of Trust is not an enforceable security instrument/lien since the Richard Wayne Hill Deed of Trust became void when Washington Mutual Bank, FA, sold the "loan" to the Depositor of the WaMu Mortgage Pass-Through Certificates Series 2007-OA6.

34

The above statements are affirmed by the affiant penalty of perjury under the laws of the state of Texas to be true and correct to the best of my knowledge and belief, are based on my own personal knowledge, and I am competent to make these statements.

FURTHER THE AFFIANT SAYETH NAUGHT

By _____    Executed on _____

    Joseph R Esquivel, Jr
    Private Investigator License # A20449
    Mortgage Compliance Investigations LLC

STATE OF TEXAS    §

COUNTY OF TRAVIS    §

Subscribed and sworn before me,

Notary Public, on this _____ day of _____, 2018 by

_____ Proven to me on the basis of satisfactory evidence to be the person who appeared before me, WITNESS my hand and official seal.

_____
Notary Public



EXHIBIT "A"

Prospectus Supplement to Prospectus Dated April 17, 2007

# WaMu Mortgage Pass-Through Certificates, Series 2007-OA6

### WaMu Asset Acceptance Corp.
Depositor

### Washington Mutual Bank
Sponsor and Servicer

### $1,420,586,100
(Approximate)

**Consider carefully the risk factors beginning on page S-21 in this prospectus supplement and page 5 in the accompanying prospectus.**

The certificates will represent interests only in the issuing entity which is WaMu Mortgage Pass-Through Certificates Series 2007-OA6 Trust and will not represent interests in or obligations of Washington Mutual Bank, WaMu Asset Acceptance Corp., Washington Mutual, Inc. or any of their affiliates.

**Neither these certificates nor the underlying mortgage loans are guaranteed by any agency or instrumentality of the United States.**

This prospectus supplement may be used to offer and sell the offered certificates only if accompanied by the prospectus.

**The WaMu Mortgage Pass-Through Certificates Series 2007-OA6 Trust will issue sixteen classes of offered certificates and three classes of privately placed certificates. Each class of offered certificates will be entitled to receive monthly distributions of interest, principal or both, beginning on July 25, 2007. The certificate interest rate for some classes of offered certificates will be variable, and will be based in part on the one-year MTA index, the COFI index or the one-month LIBOR index, as described in this prospectus supplement. The table on page S-6 of this prospectus supplement contains a list of the classes of offered certificates, including the initial class principal balance, certificate interest rate, and special characteristics of each class.**

**The primary asset of the Trust will be a pool of first lien single-family residential mortgage loans whose interest rates (after an initial fixed-rate period) adjust monthly and which include a negative amortization feature. The Trust will also contain other assets, which are described on page S-42 of this prospectus supplement.**

## Offered Certificates

| | |
|---|---|
| Total principal amount (approximate) | $1,420,586,100 |
| First payment date | July 25, 2007 |
| Interest and/or principal paid | Monthly |
| Last payment date | July 25, 2047 |

*37*

Credit enhancement for the offered certificates is being provided by three classes of privately offered certificates, which have an aggregate principal balance of approximately $27,514,298. Additional credit enhancement for the offered senior certificates is being provided by eight classes of offered subordinate certificates. Some senior certificates will have the benefit of payments, if any, from Bear Stearns Financial Products Inc. pursuant to a yield maintenance agreement. Losses otherwise allocable to some senior certificates will instead be allocated to other senior certificates.

The underwriter listed below will offer the offered certificates at varying prices to be determined at the time of sale. The proceeds to WaMu Asset Acceptance Corp. from the sale of the offered certificates will be approximately 100.36% of the principal balance of the offered certificates plus accrued interest, before deducting expenses. The underwriter's commission will be the difference between the price it pays to WaMu Asset Acceptance Corp. for the offered certificates and the amount it receives from the sale of the offered certificates to the public.

**Neither the SEC nor any state securities commission has approved or disapproved of the offered certificates or determined that this prospectus supplement or the prospectus is accurate or complete. Any representation to the contrary is a criminal offense.**

*Underwriter*

# WaMu Capital Corp.

June 22, 2007

---

### Important Notice About Information Presented in this
### Prospectus Supplement and the Accompanying Prospectus

We provide information to you about the offered certificates in two separate documents that progressively provide more detail: (a) the accompanying prospectus, which provides general information, some of which may not apply to your series of certificates, and (b) this prospectus supplement, which describes the specific terms of your series of certificates.

**You should be certain to review the information in this prospectus supplement for a description of the specific terms of your certificates.**

We include cross-references in this prospectus supplement and the accompanying prospectus to captions in these materials where you can find further related discussions. The following table of contents and the table of contents included in the accompanying prospectus provide the pages on which these captions are located.

You can find a listing of the pages where some of the capitalized terms used in this prospectus supplement and the accompanying prospectus are defined under the caption "Index of Terms" on page S-134 in this prospectus supplement and under the caption "Glossary" beginning on page 143 in the accompanying prospectus. Capitalized terms used in this prospectus supplement and not otherwise defined in this prospectus supplement have the meanings assigned in the accompanying prospectus.

### European Economic Area

In relation to each Member State of the European Economic Area which has implemented the Prospectus Directive (each, a "Relevant Member State"), the underwriter has represented and agreed that with effect from and including the date on which the Prospectus Directive is implemented in that Relevant Member State (the "Relevant Implementation Date") it has not made and will not make an offer of certificates to the public in that Relevant Member State prior to the publication of a prospectus in relation

*38*

to the certificates which has been approved by the competent authority in that Relevant Member State or, where appropriate, approved in another Relevant Member State and notified to the competent authority in that Relevant Member State, all in accordance with the Prospectus Directive, except that it may, with effect from and including the Relevant Implementation Date, make an offer of certificates to the public in that Relevant Member State at any time:

    (a) to legal entities which are authorized or regulated to operate in the financial markets or, if not so authorized or regulated, whose corporate purpose is solely to invest in securities;

    (b) to any legal entity which has two or more of (1) an average of at least 250 employees during the last financial year; (2) a total balance sheet of more than € 43,000,000 and (3) an annual net turnover of more than € 50,000,000, as shown in its last annual or consolidated accounts; or

    (c) in any other circumstances which do not require the publication by the issuer of a prospectus pursuant to Article 3 of the Prospectus Directive.

For the purposes of this provision, the expression an "offer of certificates to the public" in relation to any certificates in any Relevant Member State means the communication in any form and by any means of sufficient information on the terms of the offer and the certificates to be offered so as to enable an investor to decide to purchase or subscribe to the certificates, as the same may be varied in that Member State by any measure implementing the Prospectus Directive in that Member State and the expression "Prospectus Directive" means Directive 2003/71/EC and includes any relevant implementing measure in each Relevant Member State.

### United Kingdom

The underwriter has represented and agreed that:

    (a) it has only communicated or caused to be communicated and will only communicate or cause to be communicated an invitation or inducement to engage in investment activity (within the meaning of Section 21 of the Financial Services and Markets Act) received by it in connection with the issue or sale of the certificates in circumstances in which Section 21(1) of the Financial Services and Markets Act does not apply to the issuer; and

    (b) it has complied and will comply with all applicable provisions of the Financial Services and Markets Act with respect to anything done by it in relation to the certificates in, from or otherwise involving the United Kingdom.

S-2

---

### TABLE OF CONTENTS

| | Page |
|---|---|
| SUMMARY INFORMATION | S-5 |
| Transaction Participants | S-5 |
| What You Own | S-5 |
| Information About the Mortgage Pool | S-5 |
| The Certificates | S-6 |
| The Offered Certificates | S-6 |
| The Non-Offered Certificates | S-11 |

*39*

| | |
|---|---|
| Relationship Between Loan Groups and the Offered Certificates | S-12 |
| Initial Principal Balance of the Certificates | S-12 |
| Last Scheduled Distribution Date | S-12 |
| Distributions on the Certificates | S-12 |
| Monthly Distributions | S-12 |
| Distributions of Interest | S-13 |
| Compensating Interest and Interest Shortfalls | S-15 |
| Distributions of Principal | S-15 |
| Cross-Collateralization | S-17 |
| The Class R Certificates | S-17 |
| Credit Enhancements | S-17 |
| Yield Maintenance Agreement | S-17 |
| Allocation of Losses | S-18 |
| Optional Termination | S-18 |
| Yield Considerations | S-18 |
| Book-Entry Registration | S-19 |
| Denominations | S-19 |
| Legal Investment | S-19 |
| ERISA Considerations | S-19 |
| Federal Income Tax Consequences | S-19 |
| Ratings | S-20 |
| RISK FACTORS | S-21 |
| THE SPONSOR | S-38 |
| General | S-38 |
| The Sponsor's Origination Channels | S-38 |
| STATIC POOL INFORMATION | S-39 |
| UNDERWRITING OF THE MORTGAGE LOANS | S-39 |
| General | S-39 |
| Evaluation of the Borrower's Credit Standing | S-39 |
| Evaluation of the Borrower's Repayment Ability | S-40 |
| Evaluation of the Adequacy of the Collateral | S-40 |
| Documentation Programs | S-41 |
| Exceptions to Program Parameters | S-41 |
| Automated Underwriting System | S-41 |
| Quality Control Review | S-42 |
| THE DEPOSITOR | S-42 |
| THE TRUST | S-42 |
| General | S-42 |
| Assignment of the Mortgage Loans and Other Assets to the Trust | S-42 |
| Restrictions on Activities of the Trust | S-43 |
| Discretionary Activities With Respect to the Trust | S-43 |
| THE TRUSTEES | S-45 |

The Trustee ........................................................................................... S-45
   General ............................................................................................ S-45
   Material Duties of the Trustee ......................................................... S-45
   Events of Default Under the Pooling Agreement ........................... S-46
The Delaware Trustee .......................................................................... S-46
Limitations on the Trustees' Liability .................................................. S-46
Resignation and Removal of the Trustees ............................................ S-46
THE SERVICERS ..................................................................................... S-47
  General ................................................................................................. S-47
  The Servicer ......................................................................................... S-47
   The Servicer's Servicing Experience ............................................. S-47
   Servicing Procedures ...................................................................... S-48
   Flow of Payments ........................................................................... S-50
   The Servicer's Quality Control Procedures .................................... S-52
  The Administrative Agent .................................................................... S-53
   The Administrative Agent's Servicing Experience ........................ S-53
   Services Performed by the Administrative Agent ........................... S-53
   The Administrative Agent's Quality Control Procedures ............... S-54
  The Custodian ...................................................................................... S-54
  Special Servicing Agreements ............................................................. S-55
AFFILIATIONS AND RELATED TRANSACTIONS ............................... S-55
DESCRIPTION OF THE MORTGAGE POOL ........................................ S-56
  The Indexes .......................................................................................... S-59
  Additional Information ......................................................................... S-61
  Representations and Warranties Regarding the Mortgage Loans ......... S-62
  Criteria for Selection of Mortgage Loans ............................................ S-63
DESCRIPTION OF THE CERTIFICATES ............................................... S-64
  General ................................................................................................. S-64
  Book-Entry Registration ...................................................................... S-66
  Definitive Certificates ......................................................................... S-66
  Priority of Distributions ....................................................................... S-66
  Distributions to the Class 1X-PPP and Class 2X-PPP Certificates ..... S-70
  Distributions of Interest ....................................................................... S-71
  Calculation of LIBOR .......................................................................... S-79
  Calculation of Indexes for MTA and COFI Certificates ..................... S-80
  Cross-Collateralization ........................................................................ S-81
  Distributions of Principal ..................................................................... S-82

S-3

| | Page |
|---|---|
| General | S-82 |

41

Group 1 Senior Principal Distribution Amount — S-83
Group 2 Senior Principal Distribution Amount — S-84
Subordinate Principal Distribution Amount — S-84
Principal Prepayments — S-86
Subordination and Allocation of Losses — S-87
The Class R Certificates — S-90
Available Distribution Amount — S-90
Last Scheduled Distribution Date — S-91
Optional Termination — S-91
Amendment of the Pooling Agreement — S-92
Payment of Fees and Expenses — S-92
Reports and Other Information — S-94
YIELD AND PREPAYMENT CONSIDERATIONS — S-96
General — S-96
Principal Prepayments and Compensating Interest — S-97
LIBOR Certificates — S-98
Rate of Payments — S-98
Prepayment Assumptions — S-98
Lack of Historical Prepayment Data — S-102
Yield Considerations with Respect to the Right of the Class 1X-PPP and Class 2X-PPP Certificates to Receive Prepayment Penalties — S-103
Yield Considerations with Respect to the Class X Certificates — S-103
Yield Considerations with Respect to the Senior Subordinate Certificates — S-105
Additional Yield Considerations Applicable Solely to the Class R Certificates — S-108
CREDIT ENHANCEMENTS — S-108
Subordination — S-108
Shifting of Interests — S-109
YIELD MAINTENANCE AGREEMENT — S-109
MATERIAL FEDERAL INCOME TAX CONSEQUENCES — S-110
Special Tax Considerations Applicable to the Class A and Class B Certificates — S-111
Taxation of the Cap Agreement Portion of the Class 1X-PPP and Class 2X-PPP Certificates — S-112
Taxation of the Class 1X-PPP and Class 2X-PPP Component Portions of the Class 1X-PPP and Class 2X-PPP Certificates — S-113
Special Tax Considerations Applicable to the Residual Certificates — S-115
CERTAIN LEGAL INVESTMENT ASPECTS — S-116
ERISA CONSIDERATIONS — S-117
METHOD OF DISTRIBUTION — S-119
LEGAL MATTERS — S-119
CERTIFICATE RATINGS — S-119
APPENDIX A: DECREMENT TABLES — S-121
APPENDIX B: MORTGAGE LOAN TABLES — S-122

42

SCHEDULE I: YIELD MAINTENANCE NOTIONAL BALANCES AND STRIKE
    RATES                                                            S-132
INDEX OF TERMS                                                       S-134

S-4

## SUMMARY INFORMATION

*The following summary highlights selected information from this prospectus supplement. It does not contain all of the information that you need to consider in making your investment decision. To understand the terms of the offered certificates, read carefully this entire prospectus supplement and the accompanying prospectus.*

*This summary provides an overview of certain calculations, cash flows and other information to aid your understanding. This summary is qualified by the full description of these calculations, cash flows and other information in this prospectus supplement and the accompanying prospectus.*

## TRANSACTION PARTICIPANTS

On June 26, 2007, which is the closing date, the mortgage loans that support the certificates will be sold by Washington Mutual Bank, the sponsor of the securitization transaction, to WaMu Asset Acceptance Corp., the depositor. On the closing date, the depositor will sell the mortgage loans and related assets to the WaMu Mortgage Pass-Through Certificates Series 2007-OA6 Trust. In exchange for the mortgage loans and related assets, the Trust will issue the certificates pursuant to the order of the depositor.

The mortgage loans will be serviced by Washington Mutual Bank, as servicer. Some servicing activities will be performed by Washington Mutual Mortgage Securities Corp., as administrative agent of the servicer. Some servicing activities will be outsourced to third party vendors.

The trustee of the Trust will be LaSalle Bank National Association, and the Delaware trustee will be Christiana Bank & Trust Company. Washington Mutual Bank fsb will have possession of and will review the mortgage notes, mortgages and other legal documents related to the mortgage loans as custodian for the Trust.

## WHAT YOU OWN

**Your certificates represent interests *only* in the assets of the issuing entity. All payments to you will come only from the amounts received in connection with those assets.**

The Trust owns a pool of mortgage loans and other assets, as described under "The Trust" in this prospectus supplement.

There are no outstanding series or classes of securities that are backed by the assets of the issuing entity or otherwise have claims on the assets of the issuing entity, other than the certificates. The depositor does not expect that any securities representing additional interests in or claims on the assets of the issuing entity will be issued in the future.

### Information About the Mortgage Pool

The mortgage pool consists of 2,435 mortgage loans with an aggregate principal balance as of June 1, 2007 of approximately $1,448,100,398; provided, however, that in the case of 151 mortgage loans that were originated during the period from, and including, June 2, 2007 to, and including, June 11, 2007, all



EXHIBIT "B"

44

39US
M39

3013651298-057

# ADJUSTABLE RATE NOTE
## (12-MTA Index - Payment and Rate Caps)

3013651298

**THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. MY MONTHLY PAYMENT INCREASES WILL HAVE LIMITS WHICH COULD RESULT IN THE PRINCIPAL AMOUNT I MUST REPAY BEING LARGER THAN THE AMOUNT I ORIGINALLY BORROWED, BUT NOT MORE THAN ___115%___ OF THE ORIGINAL AMOUNT (OR $____1,099,687.50__). MY INTEREST RATE CAN NEVER EXCEED THE LIMIT STATED IN THIS NOTE OR ANY RIDER TO THIS NOTE. A BALLOON PAYMENT MAY BE DUE AT MATURITY.**

__MAY 05, 2007__                          __CORONA__                         , __CALIFORNIA__
                                              CITY                                STATE

__1549 HEATHER LANE, RIVERSIDE, CA  92504__
                    PROPERTY ADDRESS

## 1.  BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ ____956,250.00____ plus any amounts added in accordance with Section 4 (G) below, (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is __WASHINGTON MUTUAL BANK, FA__ I will make all payments under this Note in form of cash, check or money order. I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder".

## 2.  INTEREST

Interest will be charged on unpaid Principal until the full amount has been paid. Up until the first day of the calendar month that immediately precedes the first payment due date set forth in Section 3 of this Note, I will pay interest at a yearly rate of __7.926 %__. Thereafter until the first Change Date (as defined in Section 4 of this Note) I will pay interest at a yearly rate of __1.775 %__. The interest rate required by this Section 2 and Section 4 of this Note is the Rate I will pay both before and after any default described in Section 7(B) of this Note.

## 3.  PAYMENTS

(A) Time and Place of Payments

I will pay Principal and interest by making payments every month. In this Note, "payments" refer to Principal and interest payments only, although other charges such as taxes, insurance and/or late charges may also be payable with the monthly payment.

I will make my monthly payments on __1ST__ day of each month beginning on __JULY, 2007__, I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied to interest before Principal. If, on __JUNE 01, 2037__, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date".

I will make my monthly payments at __P.O. BOX 78148 PHOENIX, AZ 85062-8148__ _____, or at a different place if required by the Note Holder.

(B) Amount of My Initial Monthly Payments

Each of my monthly payments until the first Payment Change Date will be in the amount of U.S. $__3,427.87__, unless adjusted at an earlier time under Section 4(H) of this Note.

45

30 1365 1298

**(C) Payment Changes**
My monthly payment will be recomputed, according to Sections 4(E)(F)(G)(H) and (I) of this Note, to reflect changes in the Principal balance and interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

4.   **INTEREST RATE AND MONTHLY PAYMENT CHANGES**
**(A) Change Dates**
The interest rate I will pay may further change on the ___1ST___ day of ___JULY , 2007_____ , and on that day every month thereafter. Each such day is called a "Change Date".

**(B) The Index**
On each Change Date, my interest rate will be based on an Index. The "Index" is the Twelve-Month Average, determined as set forth below, of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (H.15)" (the "Monthly Yields"). The Twelve-Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12.

The most recent Index figure available as of 15 days before each interest rate Change Date is called the "Current Index". If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**
Before each Change Date, the Note Holder will calculate my new interest rate by adding ___TWO AND 90 / 100_____ percentage points ___2 . 900___ % ("Margin") to the Current Index. The Note Holder will then round the result of this addition to the nearest one-thousandth of one percentage point (0.001%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date. In the event a new Index is selected, pursuant to paragraph 4(B), a new Margin will be determined. The new Margin will be the difference between the average of the old Index for the most recent three year period which ends on the last date the Index was available plus the Margin on the last date the old Index was available and the average of the new Index for the most recent three year period which ends on that date (or if not available for such three year period, for such time as it is available). This difference will be rounded to the next higher 1/8 of 1%.

**(D) Interest Rate Limit**
My interest rate will never be greater than ___TEN AND 45 / 100_____ percentage points ___10 . 450___ % ("Cap"), except that following any sale or transfer of the property which secures repayment of this Note after the first interest rate Change Date, the maximum interest rate will be the higher of the Cap or 5 percentage points greater than the interest rate in effect at the time of such sale or transfer.

**(E) Payment Change Dates**
Effective every year commencing ___JULY 01 , 2008_____ , and on the same date each twelfth month thereafter ("Payment Change Date"), the Note Holder will determine the amount of the monthly payment that would be sufficient to repay the projected principal balance I am expected to owe as of the Payment Change Date in full on the Maturity Date at the interest rate in effect 45 days prior to the Payment Change Date in substantially equal payments. The result of this calculation is the new amount of my monthly payment, subject to Section 4(F) below, and I will make payments in the new amount until the next Payment Change Date unless my payments are changed earlier under Section 4(H) of this Note.

**(F) Monthly Payment Limitations**
Unless Section 4(H) and 4(I) below apply, the amount of my new monthly payment, beginning with a Payment Change Date, will be limited to 7 1/2% more or less than the amount I have been paying. This payment cap applies only to the principal payment and does not apply to any escrow payments Lender may require under the Security Instrument.

32859 (11-01)                          Page 2 of 6                          LNT60USB (VERSION 1.0)

46

3013651298

**(G) Changes in My Unpaid Principal Due to Negative Amortization or Accelerated Amortization**

Since my payment amount changes less frequently than the interest rate and since the monthly payment is subject to the payment limitations described in Section 4(F), my monthly payment could be less or greater than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid Principal I owe at the monthly payment date in full on the maturity date in substantially equal payments. For each month that the monthly payment is less than the interest portion, the Note Holder will subtract the monthly payment from the amount of the interest portion and will ad the difference to my unpaid Principal, and interest will accrue on the amount of this difference at the current interest rate. For each month that the monthly payment is greater than the interest portion, the Note Holder will apply the excess towards a principal reduction of the Note.

**(H) Limit on My Unpaid Principal; Increased Monthly Payment**

My unpaid principal can never exceed a maximum amount equal to ___115%___ of the principal amount original borrowed. In the event my unpaid Principal would otherwise exceed that ___115%___ limitation, I will begin paying a new monthly payment until the next Payment Change Date notwithstanding the 7 1/2% annual payment increase limitation. The new monthly payment will be an amount which would be sufficient to repay my then unpaid Principal in full on the maturity date at my interest rate in effect the month prior to the payment due date in substantially equal payments.

**(I) Required Full Monthly Payment**

On the ___FIFTH___ anniversary of the due date of the first monthly payment, and on that same day every ___FIFTH___ year thereafter, the monthly payment will be adjusted without regard to the payment cap limitation in Section 4(F).

**(J) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**(K) Failure to Make Adjustments**

If for any reason Note Holder fails to make an adjustment to the interest rate or payment amount as described in this Note, regardless of any notice requirement, I agree that Note Holder may, upon discovery of such failure, then make the adjustment as if they had been made on time. I also agree not to hold Note Holder responsible for any damages to me which may result from Note Holder's failure to make the adjustment and to let the Note Holder, at its option, apply any excess monies which I may have paid to partial Prepayment of unpaid Principal.

**5.  BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment". When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full prepayment or partial prepayments without paying any prepayment charge. The Note Holder will apply all of my prepayments to reduce the amount of principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the principal amount of the Note. If I make a partial prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. My partial prepayment may have the effect of reducing the amount of my monthly payments, but only after the first Payment Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.



39U2

3013651298

## 6. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then; (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

Miscellaneous Fees: I understand that the Note Holder will also charge a return item charge in the event a payment that I make in connection with repayment of this loan is not honored by the financial institution on which it is drawn. The current fee is $ 15.00 . Lender reserves the right to change the fee from time to time without notice except as may be required by law.

## 7. BORROWER'S FAILURE TO PAY AS REQUIRED

(A) Late Charges for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of FIFTEEN calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 5.000 % of my overdue payment of Principal and interest. I will pay this late charge promptly but only once of each late payment.

(B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

(C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 10 days after the date on which the notice is delivered or mailed to me (or, if the Federal National Mortgage Association or the Federal Home Loan Mortgage Corporation buys all or part of Lender's rights under the Security Instrument, in which case the notice will specify a date, not less than 30 days from the date the notice is given the Borrower).

(D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

(E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note, whether or not a lawsuit is brought, to the extent not prohibited by Applicable Law. Those expenses include, for example, reasonable attorneys' fees.

## 8. GIVING OF NOTICES

Unless Applicable Law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 9. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety, or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety, or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.



48

3013651298

## 10. WAIVERS

I and any other person who has obligations under this Note waive the rights of presentment and notice of dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 11. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

Transfer of the Property or a Beneficial Interest in Borrower.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) the request to assume is made after one year following recordation of the Deed of Trust, (b) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (c) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument or other obligations related to the Note or other loan document is acceptable to Lender, (d) Assuming party executes Assumption Agreement acceptable to Lender at its sole choice and discretion, which Agreement may include an increase to Cap as set forth below and (e) payment of Assumption Fee if requested by Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption and Lender may increase the maximum rate limit to the higher of the Cap or 5 percentage points greater than the interest rate in effect at the time of the transfer. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender has entered into a written Assumption Agreement with transferee and formally releases Borrower.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

## 12. MISCELLANEOUS PROVISIONS

In the event the Note Holder at any time discovers that this Note or the Security Instrument or any other document related to this loan, called collectively the "Loan Documents," contains an error which was caused by a clerical or ministerial mistake, calculation error, computer error, printing error or similar error (collectively "Errors"), I agree, upon notice from the Note Holder, to reexecute any Loan Documents that are necessary to correct any such Errors and I also agree that I will not hold the Note Holder responsible for any damage to me which may result from any such Errors.

If any of the Loan Documents are lost, stolen, mutilated or destroyed and the Note Holder delivers to me an indemnification in my favor, signed by the Note Holder, then I will sign and deliver to the Note Holder a Loan Document identical in form and content which will have the effect of the original for all purposes.

49

3013651298

WITNESS THE HAND (S) AND SEAL (S) OF THE UNDERSIGNED.

RICHARD WAYNE HILL

Pay to the order of

Without Recourse
Washington Mutual Bank, FA

Cynthia A. Riley, Vice President

32859 (11-01)                    Page 6 of 6                    LNT60USF (VERSION 1.0)

50

EXHIBIT "C"

51

39US
M39



PNOTE

3013651298-057

## ADJUSTABLE RATE NOTE
### (12-MTA Index - Payment and Rate Caps)

3013651298

THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. MY MONTHLY PAYMENT INCREASES WILL HAVE LIMITS WHICH COULD RESULT IN THE PRINCIPAL AMOUNT I MUST REPAY BEING LARGER THAN THE AMOUNT I ORIGINALLY BORROWED, BUT NOT MORE THAN ___115%___ OF THE ORIGINAL AMOUNT (OR $___1,099,687.50___). MY INTEREST RATE CAN NEVER EXCEED THE LIMIT STATED IN THIS NOTE OR ANY RIDER TO THIS NOTE. A BALLOON PAYMENT MAY BE DUE AT MATURITY.

___MAY 05, 2007___      ___CORONA___,   ___CALIFORNIA___
                              CITY              STATE

___1549 HEATHER LANE, RIVERSIDE, CA 92504___
                    PROPERTY ADDRESS

## 1. BORROWER'S PROMISE TO PAY
In return for a loan that I have received, I promise to pay U.S. $ ___956,250.00___ plus any amounts added in accordance with Section 4 (G) below, (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is ___WASHINGTON MUTUAL BANK, FA___. I will make all payments under this Note in form of cash, check or money order. I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder".

## 2. INTEREST
Interest will be charged on unpaid Principal until the full amount has been paid. Up until the first day of the calendar month that immediately precedes the first payment due date set forth in Section 3 of this Note, I will pay interest at a yearly rate of ___7.926 %___. Thereafter until the first Change Date (as defined in Section 4 of this Note) I will pay interest at a yearly rate of ___1.775 %___. The interest rate required by this Section 2 and Section 4 of this Note is the Rate I will pay both before and after any default described in Section 7(B) of this Note.

## 3. PAYMENTS
### (A) Time and Place of Payments
I will pay Principal and interest by making payments every month. In this Note, "payments" refer to Principal and interest payments only, although other charges such as taxes, insurance and/or late charges may also be payable with the monthly payment.

I will make my monthly payments on ___1ST___ day of each month beginning on ___JULY, 2007___. I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied to interest before Principal. If, on ___JUNE 01, 2037___, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date".

I will make my monthly payments at ___P.O. BOX 78148 PHOENIX, AZ 85062-8148___ , or at a different place if required by the Note Holder.

### (B) Amount of My Initial Monthly Payments
Each of my monthly payments until the first Payment Change Date will be in the amount of U.S. $ ___3,427.87___, unless adjusted at an earlier time under Section 4(H) of this Note.

32859 (11-01)                    Page 1 of 6                    LNT80USA (VERSION 1.0)

52

301365 1298

**(C) Payment Changes**

My monthly payment will be recomputed, according to Sections 4(E)(F)(G)(H) and (I) of this Note, to reflect changes in the Principal balance and interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

**4.   INTEREST RATE AND MONTHLY PAYMENT CHANGES**

**(A) Change Dates**

The   interest   rate   I   will   pay   may   further   change   on   the   ___1ST___   day   of ___JULY, 2007_____, and on that day every month thereafter. Each such day is called a "Change Date".

**(B) The Index**

On each Change Date, my interest rate will be based on an Index. The "Index" is the Twelve-Month Average, determined as set forth below, of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (H.15)" (the "Monthly Yields"). The Twelve-Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12.

The most recent Index figure available as of 15 days before each interest rate Change Date is called the "Current Index". If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding ___TWO AND 90/100_____ percentage   points __2.900__% ("Margin") to the Current Index. The Note Holder will then round the result of this addition to the nearest one-thousandth of one percentage point (0.001%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date. In the event a new Index is selected, pursuant to paragraph 4(B), a new Margin will be determined. The new Margin will be the difference between the average of the old Index for the most recent three year period which ends on the last date the Index was available plus the Margin on the last date the old Index was available and the average of the new Index for the most recent three year period which ends on that date (or if not available for such three year period, for such time as it is available). This difference will be rounded to the next higher 1/8 of 1%.

**(D) Interest Rate Limit**

My interest rate will never be greater than ___TEN AND 45/100___ percentage points __10.450__% ("Cap"), except that following any sale or transfer of the property which secures repayment of this Note after the first interest rate Change Date, the maximum interest rate will be the higher of the Cap or 5 percentage points greater than the interest rate in effect at the time of such sale or transfer.

**(E) Payment Change Dates**

Effective every year commencing ___JULY 01, 2008_____, and on the same date each twelfth month thereafter ("Payment Change Date"), the Note Holder will determine the amount of the monthly payment that would be sufficient to repay the projected principal balance I am expected to owe as of the Payment Change Date in full on the Maturity Date at the interest rate in effect 45 days prior to the Payment Change Date in substantially equal payments. The result of this calculation is the new amount of my monthly payment, subject to Section 4(F) below, and I will make payments in the new amount until the next Payment Change Date unless my payments are changed earlier under Section 4(H) of this Note.

**(F) Monthly Payment Limitations**

Unless Section 4(H) and 4(I) below apply, the amount of my new monthly payment, beginning with a Payment Change Date, will be limited to 7 1/2% more or less than the amount I have been paying. This payment cap applies only to the principal payment and does not apply to any escrow payments Lender may require under the Security Instrument.

32859 (11-01)                                  Page 2 of 6                                  LNT60USB (VERSION 1.0)

3013661298

**(G) Changes in My Unpaid Principal Due to Negative Amortization or Accelerated Amortization**

Since my payment amount changes less frequently than the interest rate and since the monthly payment is subject to the payment limitations described in Section 4(F), my monthly payment could be less or greater than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid Principal I owe at the monthly payment date in full on the maturity date in substantially equal payments. For each month that the monthly payment is less than the interest portion, the Note Holder will subtract the monthly payment from the amount of the interest portion, and will add the difference to my unpaid Principal, and interest will accrue on the amount of this difference at the current interest rate. For each month that the monthly payment is greater than the interest portion, the Note Holder will apply the excess towards a principal reduction of the Note.

**(H) Limit on My Unpaid Principal; Increased Monthly Payment**

My unpaid principal can never exceed a maximum amount equal to ___115%___ of the principal amount original borrowed. In the event my unpaid Principal would otherwise exceed that ___115%___ limitation, I will begin paying a new monthly payment until the next Payment Change Date notwithstanding the 7 1/2% annual payment increase limitation. The new monthly payment will be an amount which would be sufficient to repay my then unpaid Principal in full on the maturity date at my interest rate in effect the month prior to the payment due date in substantially equal payments.

**(I) Required Full Monthly Payment**

On the ___FIFTH___ anniversary of the due date of the first monthly payment, and on that same day every ___FIFTH___ year thereafter, the monthly payment will be adjusted without regard to the payment cap limitation in Section 4(F).

**(J) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**(K) Failure to Make Adjustments**

If for any reason Note Holder fails to make an adjustment to the interest rate or payment amount as described in this Note, regardless of any notice requirement, I agree that Note Holder may, upon discovery of such failure, then make the adjustment as if they had been made on time. I also agree not to hold Note Holder responsible for any damages to me which may result from Note Holder's failure to make the adjustment and to let the Note Holder, at its option, apply any excess monies which I may have paid to partial Prepayment of unpaid Principal.

**5.  BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment". When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full prepayment or partial prepayments without paying any prepayment charge. The Note Holder will apply all of my prepayments to reduce the amount of principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the principal amount of the Note. If I make a partial prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. My partial prepayment may have the effect of reducing the amount of my monthly payments, but only after the first Payment Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

32659 (11-01)                         Page 3 of 6                         LNT60USC (VERSION 1.0)

54

39U2

3013651298

## 6. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then; (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**Miscellaneous Fees:** I understand that the Note Holder will also charge a return item charge in the event a payment that I make in connection with repayment of this loan is not honored by the financial institution on which it is drawn. The current fee is $  15.00  . Lender reserves the right to change the fee from time to time without notice except as may be required by law.

## 7. BORROWER'S FAILURE TO PAY AS REQUIRED

### (A) Late Charges for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of  FIFTEEN  calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be   5.000  % of my overdue payment of Principal and interest. I will pay this late charge promptly but only once of each late payment.

### (B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

### (C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 10 days after the date on which the notice is delivered or mailed to me (or, if the Federal National Mortgage Association or the Federal Home Loan Mortgage Corporation buys all or part of Lender's rights under the Security Instrument, in which case the notice will specify a date, not less than 30 days from the date the notice is given the Borrower).

### (D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

### (E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note, whether or not a lawsuit is brought, to the extent not prohibited by Applicable Law. Those expenses include, for example, reasonable attorneys' fees.

## 8. GIVING OF NOTICES

Unless Applicable Law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 9. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety, or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety, or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

32859 (11-01)                    Page 4 of 6                    LNT60USD (VERSION 1.0)

55

3013651298

## 10. WAIVERS

I and any other person who has obligations under this Note waive the rights of presentment and notice of dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 11. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.**

If all or any part of the Property or any Interest in the Property is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) the request to assume is made after one year following recordation of the Deed of Trust, (b) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (c) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument or other obligations related to the Note or other loan document is acceptable to Lender, (d) Assuming party executes Assumption Agreement acceptable to Lender at its sole choice and discretion, which Agreement may include an increase to Cap as set forth below and (e) payment of Assumption Fee if requested by Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption and Lender may increase the maximum rate limit to the higher of the Cap or 5 percentage points greater than the interest rate in effect at the time of the transfer. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender has entered into a written Assumption Agreement with transferee and formally releases Borrower.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

## 12. MISCELLANEOUS PROVISIONS

In the event the Note Holder at any time discovers that this Note or the Security Instrument or any other document related to this loan, called collectively the "Loan Documents," contains an error which was caused by a clerical or ministerial mistake, calculation error, computer error, printing error or similar error (collectively "Errors"), I agree, upon notice from the Note Holder, to reexecute any Loan Documents that are necessary to correct any such Errors and I also agree that I will not hold the Note Holder responsible for any damage to me which may result from any such Errors.

If any of the Loan Documents are lost, stolen, mutilated or destroyed and the Note Holder delivers to me an indemnification in my favor, signed by the Note Holder, then I will sign and deliver to the Note Holder a Loan Document identical in form and content which will have the effect of the original for all purposes.

*56*

3013651298

WITNESS THE HAND (S) AND SEAL (S) OF THE UNDERSIGNED.

RICHARD WAYNE HILL

57

# EXHIBIT "D"

58

# AFFIDAVIT

THE STATE OF CALIFORNIA

COUNTY OF RIVERSIDE

BEFORE ME, the undersigned authority, personally appeared RICHARD HILL who, being by me duly sworn, deposed as follows:

"My name is Richard Hill, I am over 21 years of age, of sound mind, with personal knowledge of the following facts, and fully competent to testify. I further attest that the assertions contained in the accompanying statement are true and correct."

On May 18, 2017 I received a purported true and correct copy of the ADJUSTABLE RATE NOTE dated May 05, 2007 that I signed at closing in the City of Corona California with Washington Mutual Bank, FA, from Select Portfolio Servicing Inc. This copy of the note while it did look like the ADJUSTABLE RATE NOTE that I signed at closing it did not have the initials of the party sitting across from me at the time of closing, on the document who initialed the documents after I signed them. (See Exhibit "A" attached within)

This copy of the Note also had a stamping on the bottom of page 6 of the Note with the words "Pay to the order of" however No payee was named, and this stamping was signed by Cynthia A. Riley.

On December 20, 2017 I received another purported true and correct copy of the ADJUSTABLE RATE NOTE dated May 05, 2007 that I signed in the city of Corona California with Washington Mutual Bank, FA, from Select Portfolio Servicing however this copy did have the initials on the bottom of every page of the document, however what was missing was the stamping that was on the other copy of the Note that I have received from Select Portfolio Servicing Inc., on May 18, 2017. At the time of closing on May 05, 2017 in the city of Corona California, when I was signing the documents I remember the party that was sitting across from

1

59

me was initialing all the documents that I was signing, and, on this copy, there were initials but no stamping that was signed by Cynthia A. Riley. (See Exhibit "B" within)

The above statements are affirmed by me under penalty of perjury under the laws of the State of California to be true and correct to the best of my knowledge and belief, are based on my own personal knowledge, and I am competent to make these statements.

FURTHER THE AFFIANT SAYETH NAUGHT

By

Richard Wayne Hill

STATE OF CALIFORNIA      )
                         ) ss
COUNTY OF RIVERSIDE   )

Subscribed and sworn before me, _____, Notary Public, on this ___ day of May 2018 by _____, who proved to me on the basis of satisfactory evidence to be the person who appeared before me. WITNESS my hand and official seal.

Notary Public

My commission expires: _____

State of CALIFORNIA                          SEAL:
County of RIVERSIDE

2

60

# JURAT

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached and not the truthfulness, accuracy, or validity of that document.

State of California

County of _Riverside_

Subscribed and sworn to (or affirmed) before me on this _12th_ day of _May_

20_18_ by _Richard Wayne Hill_

proved to me on the basis of satisfactory evidence to be the person(s) who appeared before me

Signature _____ (Seal)

## OPTIONAL INFORMATION

### INSTRUCTIONS

*The wording of all Jurats completed in California after January 1, 2015 must be in the form set forth within the Jurat itself. There are no exceptions. If a Jurat to be completed does not follow this form, the notary must correct the verbiage by using a jurat stamp containing the correct wording or attaching a separate jurat form such as this one with does contain the proper wording. In addition, the notary must require an oath or affirmation from the document signer regarding the truthfulness of the contents of the document. The document must be signed AFTER the oath or affirmation. If the document was previously signed, it must be re-signed in front of the notary public during the jurat process.*

DESCRIPTION OF THE ATTACHED DOCUMENT

_Affidavit_

(Title or description of attached document)

_____
(Title or description of attached document continued)

Number of Pages _____ Document Date _____

_____
(Additional information)

* State and county information must be the state and county where the document signer(s) personally appeared before the notary public.

* Date of notarization must be the date the signer(s) personally appeared which must also be the same date the jurat process is completed.

* Print the name(s) of the document signer(s) who personally appear at the time of notarization.

* Signature of the notary public must match the signature on file with the office of the county clerk.

* The notary seal impression must be clear and photographically reproducible. Impression must not cover text or lines. If seal impression smudges, re-seal if a sufficient area permits, otherwise complete a different jurat form.

  ❖ Additional information is not required but could help to ensure this jurat is not misused or attached to a different document.

  ❖ Indicate title or type of attached document, number of pages and date.

* Securely attach this document to the signed document with a staple.

_61_

# EXHIBIT "A"

39US
M39

3013651298~057

# ADJUSTABLE RATE NOTE
## (12-MTA Index - Payment and Rate Caps)

3013651298

**THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. MY MONTHLY PAYMENT INCREASES WILL HAVE LIMITS WHICH COULD RESULT IN THE PRINCIPAL AMOUNT I MUST REPAY BEING LARGER THAN THE AMOUNT I ORIGINALLY BORROWED, BUT NOT MORE THAN ___115%___ OF THE ORIGINAL AMOUNT (OR $_____1,099,687.50_). MY INTEREST RATE CAN NEVER EXCEED THE LIMIT STATED IN THIS NOTE OR ANY RIDER TO THIS NOTE. A BALLOON PAYMENT MAY BE DUE AT MATURITY.**

___MAY 05, 2007_____     ____CORONA_____, ___CALIFORNIA____
                                        CITY                          STATE

__1549 HEATHER LANE, RIVERSIDE, CA 92504_____
                          PROPERTY ADDRESS

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $_____956,250.00_____ plus any amounts added in accordance with Section 4 (G) below, (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is ___WASHINGTON MUTUAL BANK, FA_____. I will make all payments under this Note in form of cash, check or money order. I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder".

## 2. INTEREST

Interest will be charged on unpaid Principal until the full amount has been paid. Up until the first day of the calendar month that immediately precedes the first payment due date set forth in Section 3 of this Note, I will pay interest at a yearly rate of ___7.926__%. Thereafter until the first Change Date (as defined in Section 4 of this Note) I will pay interest at a yearly rate of ___1.775___%. The interest rate required by this Section 2 and Section 4 of this Note is the Rate I will pay both before and after any default described in Section 7(B) of this Note.

## 3. PAYMENTS

**(A) Time and Place of Payments**

I will pay Principal and interest by making payments every month. In this Note, "payments" refer to Principal and interest payments only, although other charges such as taxes, insurance and/or late charges may also be payable with the monthly payment.

I will make my monthly payments on ___1ST___ day of each month beginning on ___JULY, 2007_____. I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied to interest before Principal. If, on ___JUNE 01, 2037_____, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date".

I will make my monthly payments at ___P.O. BOX 78148 PHOENIX, AZ 85062-8148_____, or at a different place if required by the Note Holder.

**(B) Amount of My Initial Monthly Payments**

Each of my monthly payments until the first Payment Change Date will be in the amount of U.S. $___3,427.87___, unless adjusted at an earlier time under Section 4(H) of this Note.

32859 (11-01)                     Page 1 of 6                     LNT60USA (VERSION 1.0)

63

3013851298

**(C) Payment Changes**

My monthly payment will be recomputed, according to Sections 4(E)(F)(G)(H) and (I) of this Note, to reflect changes in the Principal balance and interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

4. **INTEREST RATE AND MONTHLY PAYMENT CHANGES**

**(A) Change Dates**

The interest rate I will pay may further change on the __1ST__ day of __JULY, 2007__ , and on that day every month thereafter. Each such day is called a "Change Date".

**(B) The Index**

On each Change Date, my interest rate will be based on an Index. The "Index" is the Twelve-Month Average, determined as set forth below, of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (H.15)" (the "Monthly Yields"). The Twelve-Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12.

The most recent Index figure available as of 15 days before each interest rate Change Date is called the "Current Index". If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding __TWO AND 90/100__ percentage points __2.900__ % ("Margin") to the Current Index. The Note Holder will then round the result of this addition to the nearest one-thousandth of one percentage point (0.001%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date. In the event a new Index is selected, pursuant to paragraph 4(B), a new Margin will be determined. The new Margin will be the difference between the average of the old Index for the most recent three year period which ends on the last date the Index was available plus the Margin on the last date the old Index was available and the average of the new Index for the most recent three year period which ends on that date (or if not available for such three year period, for such time as it is available). This difference will be rounded to the next higher 1/8 of 1%.

**(D) Interest Rate Limit**

My interest rate will never be greater than __TEN AND 45/100__ percentage points __10.450__ % ("Cap"), except that following any sale or transfer of the property which secures repayment of this Note after the first interest rate Change Date, the maximum interest rate will be the higher of the Cap or 5 percentage points greater than the interest rate in effect at the time of such sale or transfer.

**(E) Payment Change Dates**

Effective every year commencing __JULY 01, 2008__ , and on the same date each twelfth month thereafter ("Payment Change Date"), the Note Holder will determine the amount of the monthly payment that would be sufficient to repay the projected principal balance I am expected to owe as of the Payment Change Date in full on the Maturity Date at the interest rate in effect 45 days prior to the Payment Change Date in substantially equal payments. The result of this calculation is the new amount of my monthly payment, subject to Section 4(F) below, and I will make payments in the new amount until the next Payment Change Date unless my payments are changed earlier under Section 4(H) of this Note.

**(F) Monthly Payment Limitations**

Unless Section 4(H) and 4(I) below apply, the amount of my new monthly payment, beginning with a Payment Change Date, will be limited to 7 1/2% more or less than the amount I have been paying. This payment cap applies only to the principal payment and does not apply to any escrow payments Lender may require under the Security Instrument.

32859 (11-01)                         Page 2 of 6                         LNT60USB (VERSION 1.0)

64

3013651298

**(G) Changes in My Unpaid Principal Due to Negative Amortization or Accelerated Amortization**

Since my payment amount changes less frequently than the interest rate and since the monthly payment is subject to the payment limitations described in Section 4(F), my monthly payment could be less or greater than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid Principal I owe at the monthly payment date in full on the maturity date in substantially equal payments. For each month that the monthly payment is less than the interest portion, the Note Holder will subtract the monthly payment from the amount of the interest portion and will add the difference to my unpaid Principal, and interest will accrue on the amount of this difference at the current interest rate. For each month that the monthly payment is greater than the interest portion, the Note Holder will apply the excess towards a principal reduction of the Note.

**(H) Limit on My Unpaid Principal; Increased Monthly Payment**

My unpaid principal can never exceed a maximum amount equal to __115%__ of the principal amount original borrowed. In the event my unpaid Principal would otherwise exceed that __115%__ limitation, I will begin paying a new monthly payment until the next Payment Change Date notwithstanding the 7 1/2% annual payment increase limitation. The new monthly payment will be an amount which would be sufficient to repay my then unpaid Principal in full on the maturity date at my interest rate in effect the month prior to the payment due date in substantially equal payments.

**(I) Required Full Monthly Payment**

On the __FIFTH__ anniversary of the due date of the first monthly payment, and on that same day every __FIFTH__ year thereafter, the monthly payment will be adjusted without regard to the payment cap limitation in Section 4(F).

**(J) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**(K) Failure to Make Adjustments**

If for any reason Note Holder fails to make an adjustment to the interest rate or payment amount as described in this Note, regardless of any notice requirement, I agree that Note Holder may, upon discovery of such failure, then make the adjustment as if they had been made on time. I also agree not to hold Note Holder responsible for any damages to me which may result from Note Holder's failure to make the adjustment and to let the Note Holder, at its option, apply any excess monies which I may have paid to prepayment of unpaid Principal.

**5.   BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment". When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full prepayment or partial prepayments without paying any prepayment charge. The Note Holder will apply all of my prepayments to reduce the amount of principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the principal amount of the Note. If I make a partial prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. My partial prepayment may have the effect of reducing the amount of my monthly payments, but only after the first Payment Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

65

39U2

301365 1298

## 6.  LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then; (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

Miscellaneous Fees: I understand that the Note Holder will also charge a return item charge in the event a payment that I make in connection with repayment of this loan is not honored by the financial institution on which it is drawn. The current fee is $__15.00__. Lender reserves the right to change the fee from time to time without notice except as may be required by law.

## 7.  BORROWER'S FAILURE TO PAY AS REQUIRED

(A) Late Charges for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of __FIFTEEN__ calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be __5.000__% of my overdue payment of Principal and interest. I will pay this late charge promptly but only once of each late payment.

(B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

(C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 10 days after the date on which the notice is delivered or mailed to me (or, if the Federal National Mortgage Association or the Federal Home Loan Mortgage Corporation buys all or part of Lender's rights under the Security Instrument, in which case the notice will specify a date, not less than 30 days from the date the notice is given the Borrower).

(D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

(E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note, whether or not a lawsuit is brought, to the extent not prohibited by Applicable Law. Those expenses include, for example, reasonable attorneys' fees.

## 8.  GIVING OF NOTICES

Unless Applicable Law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 9.  OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety, or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety, or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

32859 (11-01)                    Page 4 of 6                    LNT60USD (VERSION 1.0)

3013651298

## 10. WAIVERS

I and any other person who has obligations under this Note waive the rights of presentment and notice of dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 11. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

Transfer of the Property or a Beneficial Interest in Borrower.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) the request to assume is made after one year following recordation of the Deed of Trust, (b) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (c) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument or other obligations related to the Note or other loan document is acceptable to Lender, (d) Assuming party executes Assumption Agreement acceptable to Lender at its sole choice and discretion, which Agreement may include an increase to Cap as set forth below and (e) payment of Assumption Fee if requested by Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption and Lender may increase the maximum rate limit to the higher of the Cap or 5 percentage points greater than the interest rate in effect at the time of the transfer. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender has entered into a written Assumption Agreement with transferee and formally releases Borrower.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

## 12. MISCELLANEOUS PROVISIONS

In the event the Note Holder at any time discovers that this Note or the Security Instrument or any other document related to this loan, called collectively the "Loan Documents," contains an error which was caused by a clerical or ministerial mistake, calculation error, computer error, printing error or similar error (collectively "Errors"), I agree, upon notice from the Note Holder, to reexecute any Loan Documents that are necessary to correct any such Errors and I also agree that I will not hold the Note Holder responsible for any damage to me which may result from any such Errors.

If any of the Loan Documents are lost, stolen, mutilated or destroyed and the Note Holder delivers to me an indemnification in my favor, signed by the Note Holder, then I will sign and deliver to the Note Holder a Loan Document identical in form and content which will have the effect of the original for all purposes.

32859 (11-01)                    Page 5 of 6                    LNT60USE (VERSION 1.0)

*67*

3013651298

WITNESS THE HAND (S) AND SEAL (S) OF THE UNDERSIGNED.

_____
RICHARD WAYNE HILL

Pay to the order of

Without Recourse
Washington Mutual Bank, FA

_____
Cynthia A. Riley, Vice President

32859 (11-01)                    Page 6 of 6                    LNT60USF (VERSION 1.0)

*68*

EXHIBIT "B"

39US
M39

3013651298-057



PNOTE

**ADJUSTABLE RATE NOTE**
**(12-MTA Index - Payment and Rate Caps)**

3013651298

THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. MY MONTHLY PAYMENT INCREASES WILL HAVE LIMITS WHICH COULD RESULT IN THE PRINCIPAL AMOUNT I MUST REPAY BEING LARGER THAN THE AMOUNT I ORIGINALLY BORROWED, BUT NOT MORE THAN ___115%___ OF THE ORIGINAL AMOUNT (OR $____1,099,687.50___). MY INTEREST RATE CAN NEVER EXCEED THE LIMIT STATED IN THIS NOTE OR ANY RIDER TO THIS NOTE. A BALLOON PAYMENT MAY BE DUE AT MATURITY.

___MAY 05, 2007___          ___CORONA___          , ___CALIFORNIA___
                               CITY                    STATE

___1549 HEATHER LANE, RIVERSIDE, CA 92504___
                      PROPERTY ADDRESS

**1. BORROWER'S PROMISE TO PAY**

In return for a loan that I have received, I promise to pay U.S. $ ___956,250.00___ plus any amounts added in accordance with Section 4 (G) below, (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is ___WASHINGTON MUTUAL BANK, FA___. I will make all payments under this Note in form of cash, check or money order. I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder".

**2. INTEREST**

Interest will be charged on unpaid Principal until the full amount has been paid. Up until the first day of the calendar month that immediately precedes the first payment due date set forth in Section 3 of this Note, I will pay interest at a yearly rate of ___7.926__%. Thereafter until the first Change Date (as defined in Section 4 of this Note) I will pay interest at a yearly rate of ___1.775___%. The interest rate required by this Section 2 and Section 4 of this Note is the Rate I will pay both before and after any default described in Section 7(B) of this Note.

**3. PAYMENTS**

**(A) Time and Place of Payments**

I will pay Principal and interest by making payments every month. In this Note, "payments" refer to Principal and interest payments only, although other charges such as taxes, insurance and/or late charges may also be payable with the monthly payment.

I will make my monthly payments on ___1ST___ day of each month beginning on ___JULY, 2007___. I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied to interest before Principal. If, on ___JUNE 01, 2037___, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date".

I will make my monthly payments at ___P.O. BOX 78148 PHOENIX, AZ 85062-8148___ _____, or at a different place if required by the Note Holder.

**(B) Amount of My Initial Monthly Payments**

Each of my monthly payments until the first Payment Change Date will be in the amount of U.S. $___3,427.87___, unless adjusted at an earlier time under Section 4(H) of this Note.

32859 (11-01)                    Page 1 of 6                    LNT60USA (VERSION 1.0)

70

**(C) Payment Changes**

My monthly payment will be recomputed, according to Sections 4(E)(F)(G)(H) and (I) of this Note, to reflect changes in the Principal balance and interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

**4.    INTEREST RATE AND MONTHLY PAYMENT CHANGES**

**(A) Change Dates**

The interest rate I will pay may further change on the ___1ST___ day of ___JULY, 2007___, and on that day every month thereafter. Each such day is called a "Change Date".

**(B) The Index**

On each Change Date, my interest rate will be based on an Index. The "Index" is the Twelve-Month Average, determined as set forth below, of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (H.15)" (the "Monthly Yields"). The Twelve-Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12.

The most recent Index figure available as of 15 days before each interest rate Change Date is called the "Current Index". If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding ___TWO AND 90/100___ percentage points ___2.900___ % ("Margin") to the Current Index. The Note Holder will then round the result of this addition to the nearest one-thousandth of one percentage point (0.001%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date. In the event a new Index is selected, pursuant to paragraph 4(B), a new Margin will be determined. The new Margin will be the difference between the average of the old Index for the most recent three year period which ends on the last date the Index was available plus the Margin on the last date the old Index was available and the average of the new Index for the most recent three year period which ends on that date (or if not available for such three year period, for such time as it is available). This difference will be rounded to the next higher 1/8 of 1%.

**(D) Interest Rate Limit**

My interest rate will never be greater than ___TEN AND 45/100___ percentage points ___10.450___ % ("Cap"), except that following any sale or transfer of the property which secures repayment of this Note after the first interest rate Change Date, the maximum interest rate will be the higher of the Cap or 5 percentage points greater than the interest rate in effect at the time of such sale or transfer.

**(E) Payment Change Dates**

Effective every year commencing ___JULY 01, 2008___, and on the same date each twelfth month thereafter ("Payment Change Date"), the Note Holder will determine the amount of the monthly payment that would be sufficient to repay the projected principal balance I am expected to owe as of the Payment Change Date in full on the Maturity Date at the interest rate in effect 45 days prior to the Payment Change Date in substantially equal payments. The result of this calculation is the new amount of my monthly payment, subject to Section 4(F) below, and I will make payments in the new amount until the next Payment Change Date unless my payments are changed earlier under Section 4(H) of this Note.

**(F) Monthly Payment Limitations**

Unless Section 4(H) and 4(I) below apply, the amount of my new monthly payment, beginning with a Payment Change Date, will be limited to 7 1/2% more or less than the amount I have been paying. This payment cap applies only to the principal payment and does not apply to any escrow payments Lender may require under the Security Instrument.

32859 (11-01)                                  Page 2 of 6                                  LNT60USB (VERSION 1.0)

*71*

3013851298

**(G) Changes in My Unpaid Principal Due to Negative Amortization or Accelerated Amortization**

Since my payment amount changes less frequently than the interest rate and since the monthly payment is subject to the payment limitations described in Section 4(F), my monthly payment could be less or greater than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid Principal I owe at the monthly payment date in full on the maturity date in substantially equal payments. For each month that the monthly payment is less than the interest portion, the Note Holder will subtract the monthly payment from the amount of the interest portion and will ad the difference to my unpaid Principal, and interest will accrue on the amount of this difference at the current interest rate. For each month that the monthly payment is greater than the interest portion, the Note Holder will apply the excess towards a principal reduction of the Note.

**(H) Limit on My Unpaid Principal; Increased Monthly Payment**

My unpaid principal can never exceed a maximum amount equal to ___115%___ of the principal amount original borrowed. In the event my unpaid Principal would otherwise exceed that ___115%___ limitation, I will begin paying a new monthly payment until the next Payment Change Date notwithstanding the 7 1/2% annual payment increase limitation. The new monthly payment will be an amount which would be sufficient to repay my then unpaid Principal in full on the maturity date at my interest rate in effect the month prior to the payment due date in substantially equal payments.

**(I) Required Full Monthly Payment**

On the ___FIFTH___ anniversary of the due date of the first monthly payment, and on that same day every ___FIFTH___ year thereafter, the monthly payment will be adjusted without regard to the payment cap limitation in Section 4(F).

**(J) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**(K) Failure to Make Adjustments**

If for any reason Note Holder fails to make an adjustment to the interest rate or payment amount as described in this Note, regardless of any notice requirement, I agree that Note Holder may, upon discovery of such failure, then make the adjustment as if they had been made on time. I also agree not to hold Note Holder responsible for any damages to me which may result from Note Holder's failure to make the adjustment and to let the Note Holder, at its option, apply any excess monies which I may have paid to actual Prepayment of unpaid Principal.

**5. BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment". When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full prepayment or partial prepayments without paying any prepayment charge. The Note Holder will apply all of my prepayments to reduce the amount of principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the principal amount of the Note. If I make a partial prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. My partial prepayment may have the effect of reducing the amount of my monthly payments, but only after the first Payment Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

72

39U2

30 1365 1298

### 6. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**Miscellaneous Fees:** I understand that the Note Holder will also charge a return item charge in the event a payment that I make in connection with repayment of this loan is not honored by the financial institution on which it is drawn. The current fee is $ _15 00_ . Lender reserves the right to change the fee from time to time without notice except as may be required by law.

### 7. BORROWER'S FAILURE TO PAY AS REQUIRED

**(A) Late Charges for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of _FIFTEEN_ calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be _5 000_ % of my overdue payment of Principal and interest. I will pay this late charge promptly but only once of each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 10 days after the date on which the notice is delivered or mailed to me (or, if the Federal National Mortgage Association or the Federal Home Loan Mortgage Corporation buys all or part of Lender's rights under the Security Instrument, in which case the notice will specify a date, not less than 30 days from the date the notice is given the Borrower).

**(D) No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note, whether or not a lawsuit is brought, to the extent not prohibited by Applicable Law. Those expenses include, for example, reasonable attorneys' fees.

### 8. GIVING OF NOTICES

Unless Applicable Law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

### 9. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety, or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety, or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

32859 (11-01)                    Page 4 of 6                    LNT60USD (VERSION 1.0)

73

3013651298

## 10. WAIVERS

I and any other person who has obligations under this Note waive the rights of presentment and notice of dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 11. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.**

If all or any part of the Property or any interest in the Property is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) the request to assume is made after one year following recordation of the Deed of Trust, (b) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (c) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument or other obligations related to the Note or other loan document is acceptable to Lender, (d) Assuming party executes Assumption Agreement acceptable to Lender at its sole choice and discretion, which Agreement may include an increase to Cap as set forth below and (e) payment of Assumption Fee if requested by Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption and Lender may increase the maximum rate limit to the higher of the Cap or 5 percentage points greater than the interest rate in effect at the time of the transfer. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender has entered into a written Assumption Agreement with transferee and formally releases Borrower.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

## 12. MISCELLANEOUS PROVISIONS

In the event the Note Holder at any time discovers that this Note or the Security Instrument or any other document related to this loan, called collectively the "Loan Documents," contains an error which was caused by a clerical or ministerial mistake, calculation error, computer error, printing error or similar error (collectively "Errors"), I agree, upon notice from the Note Holder, to reexecute any Loan Documents that are necessary to correct any such Errors and I also agree that I will not hold the Note Holder responsible for any damage to me which may result from any such Errors.

If any of the Loan Documents are lost, stolen, mutilated or destroyed and the Note Holder delivers to me an indemnification in my favor, signed by the Note Holder, then I will sign and deliver to the Note Holder a Loan Document identical in form and content which will have the effect of the original for all purposes.

32859 (11-01)                      Page 5 of 6                      LNT60USE (VERSION 1.0)

74

3013651298

WITNESS THE HAND (S) AND SEAL (S) OF THE UNDERSIGNED.

RICHARD WAYNE HILL

75

EXHIBIT "E"

76

RECORDING REQUESTED BY
FIRST AMERICAN TITLE

3013651298

Recording Requested By:
WASHINGTON MUTUAL BANK   FA

Return To:
WASHINGTON MUTUAL BANK   FA
2210 ENTERPRISE DR
FLORENCE, SC 29501
DOC OPS M/S FSCE 440

DOC # 2007-0326394
05/16/2007 08:00A Fee:72.00
Page 1 of 22
Recorded in Official Records
County of Riverside
Larry W. Ward
Assessor, County Clerk & Recorder



ORIGINAL DEED

Prepared By:
FRANCES DIAZ

3284942          (Space Abov'

| S | R | U | PAGE | SIZE | DA | MISC | LONG | RFD | COPY |
|---|---|---|------|------|----|------|------|-----|------|
|   |   |   | 22   |      |    |      |      |     |      |
| M | A | L | 485  | 426  | PCOR | NCOR | SMF | NCHG | EXAM |
|   |   |   |      |      |    |      |      |     | 002  |

ZCA1
M39

# DEED OF TRUST

3013651298-057

DC159   78   T 002

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A) "Security Instrument"** means this document, which is dated MAY 05, 2007
together with all Riders to this document.
**(B) "Borrower"** is RICHARD WAYNE HILL A MARRIED MAN AS HIS SOLE AND
SEPARATE PROPERTY

Borrower's address is 1549 HEATHER LANE, RIVERSIDE, CA 92504
. Borrower is the trustor under this Security Instrument.

**(C) "Lender"** is WASHINGTON MUTUAL BANK, FA

Lender is a FEDERAL SAVINGS BANK
organized and existing under the laws of THE UNITED STATES OF AMERICA

CALIFORNIA – Single Family – Fannie Mae/Freddie Mac UNIFORM INSTRUMENT     Form 3005 1/01

–6(CA) (0207)
Page 1 of 15          Initials
VMP MORTGAGE FORMS – (800)521-7291

77

Lender's address is 2273 N. GREEN VALLEY PARKWAY, SUITE 14, HENDERSON, NV 89014

Lender is the beneficiary under this Security Instrument.

(D) "Trustee" is CALIFORNIA RECONVEYANCE COMPANY, A CALIFORNIA CORP

(E) "Note" means the promissory note signed by Borrower and dated MAY 05, 2007
The Note states that Borrower owes Lender NINE HUNDRED FIFTY SIX THOUSAND TWO HUNDRED FIFTY AND 00/100                                                         Dollars
(U.S. $    956,250.00    ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than JUNE 01, 2037
(F) "Property" means the property that is described below under the heading "Transfer of Rights in the Property."
(G) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.
(H) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower (check box as applicable):

| [X] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
|---|---|---|
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [ ] Other(s) [specify] |
| [ ] 1-4 Family Rider | [ ] Biweekly Payment Rider | |

(I) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.
(J) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.
(K) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.
(L) "Escrow Items" means those items that are described in Section 3.
(M) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.
(N) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.
(O) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.
(P) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and

Initials: _____

@D -6(CA) (0207)                    Page 2 of 15                    Form 3005 1/01

*78*

restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(Q)** "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the COUNTY                     of RIVERSIDE                     :
      [Type of Recording Jurisdiction]          [Name of Recording Jurisdiction]
        THE LEGAL DESCRIPTION IS ATTACHED HERETO AS A SEPARATE EXHIBIT
        AND IS MADE A PART HEREOF.

Parcel ID Number: 245-040-018                     which currently has the address of
1549 HEATHER LANE                                                          [Street]
RIVERSIDE                               [City], California 92504  [Zip Code]
("Property Address"):

        TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

        BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

        THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

        UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

        1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges. Borrower shall pay when due the principal of, and interest on, the debt evidenced by the

Initials: _____

-6(CA) (0207)                     Page 3 of 15                     Form 3005 1/01

*79*

Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the

Initials: _RWH_



80

term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. Charges; Liens. Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Initials: _RHA_

-6(CA) (0207)          Page 5 of 15          Form 3005 1/01

*81*

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. **Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance.

Initials: 

-6(CA) (0207)                    Page 6 of 15                    Form 3005 1/01

*82*

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. Occupancy. Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. Preservation, Maintenance and Protection of the Property; Inspections. Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

Initials: _____

-6(CA) (0207)                 Page 7 of 15                 Form 3005 1/01

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Initials: _RWA_

-6(CA) (0207)                    Page 8 of 15                    Form 3005 1/01

_84_

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or



‑6(CA) (0207)                     Page 9 of 15                     Form 3005 1/01

Initials:

85

loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. Borrower Not Released; Forbearance By Lender Not a Waiver. Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

13. Joint and Several Liability; Co-signers; Successors and Assigns Bound. Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

14. Loan Charges. Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to

Initials: _RWA_

-6(CA) (0207)                           Page 10 of 15                           Form 3005 1/01

*86*

make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

15. **Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

16. **Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

17. **Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

18. **Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

19. **Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred

Initials: _RtH_

-6(CA) (0207)  Page 11 of 15  Form 3005 1/01

_87_

in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20. Sale of Note; Change of Loan Servicer; Notice of Grievance. The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. Hazardous Substances. As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual

Initials: _____

-6(CA) (0207)                    Page 12 of 15                    Form 3005 1/01

*88*

knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

23. Reconveyance. Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

24. Substitute Trustee. Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee.

Initials: RWA

-6(CA) (0207)                         Page 13 of 15                         Form 3005 1/01

89

State of California
County of RIVERSIDE

On May 10, 2007                    } ss.
                                    before me, Jeri J. Spargur, Notary Public
                                                        personally appeared
RICHARD WAYNE HILL

personally known to me (or proved to me on the basis of satisfactory evidence) to be the
person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that
he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their
signature(s) on the instrument the person(s) or the entity upon behalf of which the person(s)
acted, executed the instrument.
WITNESS my hand and official seal.

                                    Jeri J. Spargur                    (Seal)

JERI J. SPARGUR
COMM. # 1672695
NOTARY PUBLIC•CALIFORNIA
RIVERSIDE COUNTY
My Commission Expires
June 5, 2010

VMP -6(CA) (0207)          Page 15 of 15        Initials: RWH        Form 3005 1/01

90

ZCA2

Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

**25. Statement of Obligation Fee.** Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____        _____ (Seal)
                                                                      -Borrower

RICHARD WAYNE HILL

_____        _____ (Seal)
                                                                      -Borrower

_____ (Seal)        _____ (Seal)
                  -Borrower                                           -Borrower

_____ (Seal)        _____ (Seal)
                  -Borrower                                           -Borrower

_____ (Seal)        _____ (Seal)
                  -Borrower                                           -Borrower

-6(CA) (0207)                Page 14 of 15                Form 3005 1/01

91

EXHIBIT "F"

92

RECORDING REQUESTED BY
CALIFORNIA RECONVEYANCE COMPANY

AND WHEN RECORDED MAIL TO
CALIFORNIA RECONVEYANCE COMPANY
9200 Oakdale Avenue
Mail Stop: CA2-4379
Chatsworth, CA 91311

DOC # 2010-0503463
10/21/2010 08:00A Fee:21.00
Page 1 of 2
Recorded in Official Records
County of Riverside
Larry W. Ward
Assessor, County Clerk & Recorder



| S | R | U | PAGE | SIZE | DA | MISC | LONG | RFD | COPY |
|---|---|---|------|------|-----|------|------|-----|------|
| ( | | | 2 | | / | | | | |
| M | A | L | 465 | 426 | PCOR | NCOR | SMF | NCHG | EXAM |
| | | | | | | T: | | CTY | UNI | 065 |

Trustee Sale No. 445535CA    Loan No. 3013651298    Title Order No. 616827

**IMPORTANT NOTICE**

NOTE: After having been recorded, this Assignment should be kept with the
Note and the Deed of Trust hereby assigned

## ASSIGNMENT OF DEED OF TRUST

FOR VALUE RECEIVED, the undersigned hereby grants, assigns and transfers to Bank of America, National Association successor by merger to LaSalle Bank NA as trustee for WaMu Mortgage Pass-Through Certificates Series 2007-OA6 Trust all beneficial interest under that certain Deed of Trust dated 05-05-2007, executed by RICHARD W HILL A MARRIED MAN AS HIS SOLE AND SEPARATE PROPERTY, as Trustor; to CALIFORNIA RECONVEYANCE COMPANY as Trustee; and Recorded 05-16-2007, Book , Page , Instrument 2007-0326394 of official records in the Office of the County Recorder of RIVERSIDE COUNTY, California. **APN:** 245-040-018-0 **Situs:** 1549 HEATHER LANE, , RIVERSIDE, CA 92504

TOGETHER with the note or notes therein described and secured thereby, the money due and to become due thereon, with interest, and all rights accrued or to accrue under said Deed of Trust including the right to have reconveyed, in whole or in part, the real property described therein.

DATE:  October 20, 2010

JPMorgan Chase Bank, National Association, successor in interest to WASHINGTON MUTUAL BANK, FA

_____
Colleen Irby, Officer

FA_MERGE.DOC

1

*93*

Trustee Sale No. 445535CA Loan No. 3013651298 Title Order No. 616827

STATE OF CALIFORNIA
COUNTY OF LOS ANGELES

On October 20, 2010 before me, JESSICA ERIN SNEDDEN , "Notary Public", personally appeared Colleen Irby, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____ (Seal)

JESSICA ERIN SNEDDEN
COMM. # 1858851
NOTARY PUBLIC-CALIFORNIA
LOS ANGELES COUNTY
My Comm. Exp. July 24, 2013

Jessica Erin Snedden
1858851
Los Angeles County
July 24, 2013

FA_MERGE.DOC

2

94

95

EXHIBIT "G"

WaMuClosingBook.txt

Division of Resolutions and Receiverships

Washington Mutual Bank

Closing Book

Institution Number: 10015
Institution Location: Henderson, NV

Date of Closing: September 25, 2008

Confidential Information Confidential Information

Transaction Recap
Washington Mutual Bank
Henderson, NV

In all the transactions offered by the FDIC, the Whole Bank Purchase and Assumption Agreement
will be tailored to the winning bid. In all transactions, all assets are purchased by the acquirer and
the preferred stock is excluded from the transaction. The legal documents will be the governing
documents for this transaction.

The FDIC is offering five alternative transaction structures:

1. All liabilities are assumed except the preferred stock.
2. All liabilities are assumed, except the preferred stock and the subordinated debt.
3. All liabilities are assumed except the preferred stock, the subordinated debt and the senior
debt.
4. All deposits and secured liabilities are assumed by the acquirer.
5. All insured deposits and secured liabilities are assumed.
The bid for alternatives 1, 2, or 3 must be at least the FDIC's administrative costs of the closing
equal to $_____. (amount to be provided).

Assets Purchased: The Assuming Bank will purchase all assets whether or not on the
books of the Bank, except for those that are specifically excluded under Article III of the
Whole Bank agreement. In general, all assets are acquired at book value with the
exception of securities which are purchased at fair market value.

Leased Premises: The Assuming Bank has a 90 day option to cause the Receiver to assign
to the Assuming Bank any or all leased Bank Premises which have been continuously
occupied by the Assuming Bank from the closing date to the date assignment is
elected.

Furniture, Fixtures and Equipment: The Assuming Bank shall purchase all FF&E located on
premises purchased, leased or subleased.

Notice to Vacate Leased Premises: If the Assuming Bank elects not to accept an assignment

Page 1

97

WaMuClosingBook.txt

of the lease or sublease any leased Bank Premises, the Assuming Bank must provide notice
specifying the date of occupancy termination, which will be no more than 90 days after date
of notice.

10.Excluded Assets: Assets listed in Section 3.5 of the Purchase and Assumption Agreement
are specifically excluded, but not limited to:

Washington Mutual Bank
Henderson, NV
Transaction Recap

(1) Any financial institution bonds, banker's blanket bonds, or public liability, fire, or
extended coverage insurance policy or any other insurance policy of the Failed Bank, or
premium refund, unearned premium derived from cancellation, or any proceeds
payable with respect to any of the foregoing;
(2) Any interest, right, action, claim, or judgment against (i) any officer, director, employee,
accountant, attorney, or any other Person employed or retained by the Failed Bank or

any Subsidiary of the Failed Bank on or prior to Bank Closing arising out of any act or
omission of such Person in such capacity, (ii) any underwriter of financial institution
bonds, banker's blanket bonds or any other insurance policy of the Failed Bank, (iii) any
shareholder or holding company of the Failed Bank, or (iv) any other Person whose
action or inaction may be related to any loss (exclusive of any loss resulting from such
Person's failure to pay on a Loan made by the Failed Bank) incurred by the Failed
Bank; provided, that for the purposes hereof, the acts, omissions or other events giving
rise to any such claim shall have occurred on or before Bank Closing, regardless of
when any such claim is discovered and regardless of whether any such claim is made
with respect to a financial institution bond, banker's blanket bond, or any other
insurance policy of the Failed Bank in force as of Bank Closing;
(3) Any criminal/restitution orders issued in favor of the Failed Bank;
11. Deposits: Assumed deposits will include accrued, but unpaid interest and other liabilities as
appropriate under the provisions of the Purchase and Assumption Agreement.
12. Employee Benefit Plans: all employee benefit plans transfer to the acquirer.
13. Litigation: The Receiver will retain all non-asset related defensive litigation and the
Assuming Bank will keep all offensive litigation.
14. Contracts: The Assuming Bank will be given a 120-day option to identify and notify the
Receiver of the contracts to be repudiated.
Confidential Information


PURCHASE AND ASSUMPTION AGREEMENT

BANK

WHOLE

Page 2

WaMuClosingBook.txt

AMONG
FEDERAL DEPOSIT INSURACE CORPORATION,

RECEIVER OF WASHINGTON MUTUAL BANK,

HENDERSON, NEVADA

FEDERAL DEPOSIT INSURANCE CORPORATION

and

JPMORGAN CHASE BANK, NATIONAL ASSOCIATION

OF
SEPTEMBER 25, 2008

DATED AS

.
ARTICLE I

ARTICLE II

2.1

2.2

2.3

2.4

2.5

ARTICLE III

3.1

3.2

3.3

3.4

3.5

3.6

IV

ARTICLE

4.1

4.2

4.3

99

WaMuClosingBook.txt

4.4

4.5

4.6

4.7

4.8

4.9

4.10

4.11

4.12

4.13

TABLE OF CONTENTS

DEFINITIONS
.................................................................................
........2

ASSUMPTION OF
LIABILITIES....................................................8

Liabilities Assumed by Assuming Bank
.............................................8
Interest on Deposit Liabilities
..................................................8
Unclaimed Deposits
.................................................................
.8
Omitted
.................................................................
....................9
Borrower Claims
.................................................................
......9

PURCHASE OF ASSETS
.................................................................9

Assets Purchased by Assuming Ban
.............................................9
Asset Purchase Price
.................................................................
9

Maner of Conveyance; Limited Warranty;
Nonrecourse; Etc.

100

WaMuClosingBook.txt

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ..10

Puts of Assets to the
Receiver. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1 0


Assets Not Purchased by Assuming Ban . . . . . . . . . . . . . . . . . . . . . . . . . . .
. . . . . . . ..11
Assets Essential to Receiver . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
. . . . . . . . . . . . . . . . ..11


ASSUMPTION OF CERTAIN DUTIES AND OBLIGATIONS........13


Continuation of Baning Business. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
. . . . . . . . . . . . . . . ..13
Agreement with Respect to Credit Card Business
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ..13
Agreement with Respect to Safe Deposit Business
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ..13


Agreement with Respect to Safekeeping Business. . . . . . . . . . . . . . . . . . . . . . . . . . .
..13


Agreement with Respect to Trust Business
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ..13
Agreement with Respect to Ban Premises
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ..14
Agreement with Respect to Leased Data

Processing Equipment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
. . . . . . . . . . . . . . . . . . . . . . ..16


Agreement with Respect to Certain
Existing Agreements. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
. . . . . . . . . . . . . . . ..16
Informational Tax Reporting
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ..17


Insurance. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
. . . . . . . . . . . . . . . . . . . . . . ..1 7


Offce Space for Receiver and Corporation
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ..17
Omitted
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
. . . . . . . . . . . . . . . . ..18
Omitted
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
. . . . . . . . . . . . . . . . ..18

11
Washington Mutual BankExecution Copy Henderson, Nevada

*101*

WakeClosingBook.txt

Whole Bank P&A

ARTICLE V

5.1

5.2

5.3

ARTICLE VI

6.1

6.2

6.3

6.4

ARTICLE VII

ARTICLE VIII

IX

ARTICLE

9.1

9.2

9.3

9.4

9.5

9.6

9.7

X

ARTICLE

XI

ARTICLE

XII

ARTICLE

12.1

12.2

102

WaMuClosingBook.txt

12.3

12.4

12.5

12.6

12.7

12.8

Execution Copy
Whole Bank P&A

DUTIES WITH RESPECT TO DEPOSITORS
OF THE FAILED
BANK....................................................................................18

Payment of Checks, Drafts and Orders
................................................................18
Certain Agreements Related to Deposits
................................................................18
Notice to Depositors
................................................................................18

RECORDS
................................................................................
..............19

Transfer of
Records...............................................................................
.......19
Delivery of Assigned Records ... ........ ...................... .......
.................... ..... ..20
Records
.............................................................................20

Preservation of

Access to Records; Copies.............. ...... ....................................
....................20

BID; INITIAL PAYMENT
................................................................................20

PROFORMA
................................................................................
........20

Page 7

*103*

WamuClosingBook.txt

CONTINUING COOPERATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

General
Matters. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
. . . . . . . . . . . . 21
Additional Title
Documents. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
Claims and Suits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
. . . . . . . . . . . . . . . . . . . . . . . . . 21

Deposits
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Payment of

Withheld Payments
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
22
Proceedings with Respect to Certain Assets
and Liabilities. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
. . . . . . . . . . . . . . . . . 22
Information . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

CONDITION PRECEDENT
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

REPRESENTATIONS AND WARTIES OF THE

ASSUMING BANK
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

INDEMNIFICATION
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Indemnitees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
Conditions Precedent to
Indemnification. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
No Additional
Waranty. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
28
Indemnification of Corporation and Receiver. . . . . . . . . . . . . . . . . . . . . . . .
. . . . . . . . . . 29
Obligations Supplemental
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
Criminal Claims. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
. . . . . . . . . . . . . . . . . . . . . . . 29

Indemnification of

104

WaMuClosingBook.txt

the Corporation...................................................29

Limited Guaranty of

Subrogation
...............................................................................
............30

ii

Washington Mutual Bank
Henderson, Nevada

ARTICLE XIII

13.1

13.2

13.3

13.4

13.5

13.6

13.7

13.8

13.9

13.10

13.11

13.12

13.13

SCHEDULES

2.1

3.2

3.5

EXHIBIT

3.2(c)

MISCELLANEOUS

/105

WaMuClosingBook.txt

....................................................................... .. 30

Entire Agreement
...........................................................................
...30
Headings...................................................................
........................ .30

Counterpars.......................................................... ..
............................................ .30

Governing Law
...........................................................................
......30
Successors
..............30
Modification; Assignent....................................... ... ...
.............................. .31
Notice
...........................................................................
................... ..31

Maner of Payment.........................................................
...............................381

Costs, Fees and Expenses..............................................32
Waiver.....................................................................
...............................32
Severability...............................................................
...... .............. ........... ..32
Term of Agreement
...........................................................................
32
Survival of Covenants, Etc.
..................................................................32

Certain Liabilities Not
Assumed................................................................34
Purchase Price of Assets or Assets
.............................................................35
Certain Assets Not
Purchased.......... .............................................37

Certain Qualified Financial Contracts .....................38Valuation
of

iv
Execution Copy Washington Mutual Bank
Whole Bank P&A Henderson, Nevada



WaMuClosingBook.txt

PURCHASE AND ASSUMPTION AGREEMENT

BANK

WHOLE

THIS AGREEMENT, made and entered into as of the 25th day of September, 2008, by
and among the FEDERAL DEPOSIT INSURANCE CORPORATION, RECEIVER of
WASHINGTON MUTUAL BANK, HENDERSON, NEVADA (the "Receiver"),

the laws of

JPMORGAN CHASE BANK, NATIONAL ASSOCIATION, organized under

business in Seattle, Washington
(the "Assuming Ban"), and the FEDERAL DEPOSIT INSURANCE CORPORATION,

the United States of America, and having its principal place of

the United States of America and having its principal offce in

organized under the laws of

Washington, D.C., acting in its corporate capacity (the "Corporation").

WITNESSETH:

WHEREAS, on Ben Closing, the Charering Authority closed Washington Mutual

Ban (the "Failed Ban") pursuant to applicable law and the Corporation was appointed
Receiver

thereof; and

WHEREAS, the Assuming Ban desires to purchase substantially all of the assets and

the Failed Ban on the terms and
conditions set forth in this Agreement; and

assume all deposit and substantially all other liabilities of

provide

WHEREAS, pursuant to 12 U.S.C. Section 1823(c)(2)(A), the Corporation may

assistance to the Assuming Ban to facilitate the transactions contemplated by this
Agreement,
which assistance may include indemnification pursuant to Aricle XII; and

WHEREAS, the Board of Directors ofthe Corporation (the "Board") has determined to

Page 11

*107*

WaMuClosingBook.txt

provide assistance to the Assuming Ban on the terms and subject to the conditions set forth in
this Agreement; and

WHEREAS, the Board has determined pursuant to 12 U.S.C. Section 1823(c)(4)(A) that

the Corporation to provide insurance
coverage for the insured deposits in the Failed Ban and is the least costly to the deposit
insurance fund of all possible methods for meeting such obligation.

such assistance is necessar to meet the obligation of

the mutual promises herein set forth and other

NOW THEREFORE, in consideration of

valuable consideration, the paries hereto agree as follows:

.
ARTICLE I

DEFINITIONS

Capitalized terms used in this Agreement shall have the meanings set forth in this Aricle
I, or elsewhere in this Agreement. As used herein, words imparing the singular include the plural
and vice versa.

"Accounting Records" means the general ledger and subsidiary ledgers and supporting schedules which support the general ledger balances.

the Failed Ban acquired

"Acquired Subsidiaries" means Subsidiares of

pursuant to Section 3 .1.

"Adversely Classifed" means, with respect to any Loan or security, a Loan or security which has been designated in the most recent report of examination as "Substandard,"
"Doubtful" or "Loss" by the Failed Ban's appropriate Federal or State Charering Authority or
regulator.

" Affiliate" of any Person means any director, officer, or employee of that Person and any other Person (i) who is directly or indirectly controlling, or controlled by, or under direct
or indirect common control with, such Person, or (ii) who is an affiliate of such Person as the

the Ban Holding Company Act of 1956, as amended,

Page 12



WaMuClosingBook.txt
term "affiliate" is defined in Section 2 of

12 U.S.C. Section 1841.

"Agreement" means this Purchase and Assumption Agreement by and among the
Assuming Ban, the Corporation and the Receiver, as amended or otherwise modified
from time

to time.

the Failed Ban purchased pursuant to Section 3.1.
this

"Assets" means all assets of

Assets owned by Subsidiares of the Failed Ban are not "Assets" within the meaning of


definition.

"Assumed Deposits" means Deposits.

the Failed Ban on the date on

"Bank Closing" means the close of business of

which the Charering Authority closed such institution.

"Bank Premises" means the baning houses, drive-in baning facilities, and

teller facilities (staffed or automated) together with appurtenant parking, storage
and service

facilities and structures connecting remote facilities to baning houses, and land on
which the

foregoing are located, that are owned or leased by the Failed Ban and that are
occupied by the

Ban Closing.

Failed Ban as of

"Bid Amount" has the meaning provided in Article VII.

2

Execution Copy Washington Mutual Bank
Henderson, Nevada

Whole Bank P&A

                    Page 13


*109*

WaMuClosingBook.txt
"Book Value" means, with respect to any Asset and any Liability Assumed, thethe
Failed Bank  The Book Value of

dollar amount thereof stated on the Accounting Records of

Bank Closing after adjustments made by the Assuming Bank

any item shall be determined as of

for normal operational and timing differences in accounts, suspense items, unposted debits and
credits, and other similar adjustments or corrections and for setoffs, whether voluntary or
involuntary. The Book Value of a Subsidiary of the Failed Bank acquired by the Assuming Bank
shall be determined from the investment in subsidiar and related accounts on the "ban only"

(unconsolidated) balance sheet of the Failed Ban based on the equity method of accounting.
Without limiting the generality of the foregoing, (i) the Book Value of a Liability Assumed shall

Ban Closing, and (ii) the Book Value of a

include all accrued and unpaid interest thereon as of

Loan shall reflect adjustments for eared interest, or unearned interest (as it relates to the "rule of
78s" or add-on-interest loans, as applicable), if any, as of Bank Closing, adjustments for the

portion of earned or uneared loan-related credit life and/or disability insurance premiums, if
Ban Closing, and adjustments for Failed Ban

any, attributable to the Failed Bank as of

any, in each case as determined for financial reporting purposes. The Book Value of an Asset shall not include any adjustment for loan premiums, discounts or any related deferred

Advances, if

the Failed Ban.

income or fees, or general or specific reserves on the Accounting Records of

"Business Day" means a day other than a Saturday, Sunday, Federal legal holiday the State where the Failed Ban is located, or a day on which

or legal holiday under the laws of

Page 14

*110*

WaMuClosingBook.txt

the principal office of the Corporation is closed.

"Chartering Authority" means (i) with respect to a national ban, the Office of

the Currency, (ii) with respect to a Federal savings association or savings .

the Comptroller of

Thrft Supervision, (iii) with respect to a ban or savings institution charered

ban, the Offce of

a State, the agency of such State charged with primar responsibility for regulating and/or

closing bans or savings institutions, as the case may be, (iv) the Corporation in accordance withappointment, or (v) the appropriate Federal

by

12 U.S.C. Section 1821(c), with regard to self

baning agency in accordance with 12 US.c. 1821(c)(9).

"Commitment" means the unfunded portion of a line of credit or other commitment reflected on the books and records of the Failed Ban to make an extension of credit

(or additional advances with respect to a Loan) that was legally binding on the Failed Ban as of

Ban Closing, other than extensions of credit pursuant to the credit card business and overdraft

protection plans of the Failed Ban, if any.

"Credit Documents" mean the agreements, instruments, certificates or other documents at any time evidencing or otherwise relating to, governing or executed in connection with or as security for, a Loan, including without limitation notes, bonds, loan agreements, letter of credit applications, lease financing contracts, baner's acceptances, drafts, interest protection agreements, currency exchange agreements, repurchase agreements, reverse repurchase agreements, guarantees, deeds of trust, mortgages, assignents, security agreements, pledges, subordination or priority agreements, lien priority agreements, undertakings, security instruments, certificates, documents, legal opinions, paricipation agreements and intercreditor agreements, and all amendments, modifications, renewals, extensions, rearrangements, and

the foregoing.

Page 15

WaMuClosingBook.txt

substitutions with respect to any of

3

Washington Mutual BankExecution Copy Henderson, Nevada

Whole Bank P&A

"Credit File" means all Credit Documents and all other credit, collateral, or

the Assuming Ban, or any of its

insurance documents in the possession or custody of

Subsidiaries or Affliates, relating to an Asset or a Loan included in a Put Notice, or copies of
any thereof.

"Data Processing Lease" means any lease or licensing agreement, binding on the

which is data processing equipment or computer
hardware or software used in connection with data processing activities. A lease or licensing
agreement for computer software used in connection with data processing activities shallwhether such lease or licensing agreement also

Failed Ban as of Bank Closing, the subject of

constitute a Data Processing Lease regardless of

covers data processing equipment.

"Deposit" means a deposit as defined in 12 U.S.C. Section 1813(1), including
without limitation, outstanding cashier's checks and other offcial checks and all uncollected

the Failed

items included in the depositors' balances and credited on the books and records of

those deposit

Ban; provided, that the term "Deposit" shall not include all or any portion of

the Receiver or the Corporation, (i) may be required to

balances which, in the discretion of

satisfy it for any liquidated or contingent liability of any depositor arsing from an unauthorized
or unlawful transaction, or (ii) may be needed to provide payment of any liability

Page 16

112

WaMuClosingBook.txt

of any
depositor to the Failed Ban or the Receiver, including the liability of any
depositor as a director

the liability is or can be determined as

or officer of the Failed Ban, whether or not the amount of

Ban Closing.

of

"Failed Bank Advances" means the total sums paid by the Failed Ban to (i)
protect its lien position, (ii) pay ad valorem taxes and hazard insurance, and (iii)
pay credit life

insurance, accident and health insurance, and vendor's single interest insurance.

"Fixtures" means those leasehold improvements, additions, alterations and
Ban Premises and which were acquired, added, built,

installations constituting all or a par of

the holder of legal title

installed or purchased at the expense of
the Failed Ban, regardless of

Ban Closing.

thereto as of

"Furniture and Equipment" means the furniture and equipment (other than

leased data processing equipment, including hardware and softare), leased or owned
by the

Ban Closing, including without

the Failed Ban as of

Failed Ban and reflected on the books of

limitation automated teller machines, carating, furniture, offne machinery
(including personal
computers), shelving, office supplies, telephone, surveillance and security systems,
and arork.

Section 12.1(b),

"Indemnitees" means, except as provided in paragraph (11) of

Page 17

*113*

WaMuClosingBook.txt

the Assuming Ban other than any

(i) the Assuming Ban, (ii) the Subsidiares and Affiliates of the

Subsidiares or Affliates of the Failed Ban that are or become Subsidiares or Affliates of

the Assuming Ban and

Assuming Ban, and (iii) the directors, offcers, employees and agents of

its Subsidiares and Affliates who are not also present or former directors, offcers, employees or
agents of the Failed Ban or of any Subsidiar or Affliate of the Failed Bank.

4

Washington Mutual Bank

Execution Copy

Henderson, Nevada

Whole Bank P&A

"Initial Payment" means the payment made pursuant to Aricle VII, the amount
the Bid Amount is positive, the Bid Amount plus the Required

of which shall be either (i) if

the Bid Amount is negative, the Required Payment minus the Bid Amount. The

Payment or (ii) if

the Initial Payment

Initial Payment shall be payable by the Corporation to the Assuming Ban if

is a negative amount. The Initial Payment shall be payable by the Assuming Ban to the

the Initial Payment is positive.

Corporation if

indebtedness legally owed by an Obligor

"Legal Balance" means the amount of

Page 18

WaMuClosingBook.txt

with respect to a Loan, including principal and accrued and unpaid interest, late fees, attorneys'
fees and expenses, taxes, insurance premiums, and similar charges, if any.

"Liabilities Assumed" has the meaning provided in Section 2...

"Lien" means any mortgage, lien, pledge, charge, assignment for security purposes, security interest, or encumbrance of any kind with respect to an Asset, including any
conditional sale agreement or capital lease or other title retention agreement relating to such
Asset.

the following owed to or held by the Failed Ban as of

"Loans" means all of

Ban Closing:

the Accounting

(i) loans (including loans which have been charged off
the Failed Ban in whole or in par prior to Ban Closing), paricipation agreements,

Records of

interests in paricipations, overdrafts of customers (including but not limited to overdrafts made

pursuant to an overdraft protection plan or similar extensions of credit in connection with a
deposit account), revolving commercial lines of credit, home equity lines of credit, Commitments, United States and/or State-guaranteed student loans, and lease financing
contracts;

(ii) all Liens, rights (including rights of set-off), remedies, powers, privileges, demands, claims, priorities, equities and benefits owned or held by, or accruing or to accrue to or

the obligations or instruments referred to in clause (i) above,

for the benefit of, the holder of

including but not limited to those arsing under or based upon Credit Documents, casualty
insurance policies and binders, standby letters of credit, mortgage title insurance policies and
binders, payment bonds and performance bonds at any time and from time to time existing with

the obligations or instruments referred to in clause (i) above; and

respect to any of

Page 19

115

WaMuClosingBook.txt

(iii) all amendments, modifications, renewals, extensions, refinancings, and refundings of or for any of the foregoing;

provided, that there shall be excluded from the definition of "Loans" amounts owing under

Qualified Financial Contracts.

"Obligor" means each Person liable for the full or partial payment or performance of any Loan, whether such Person is obligated directly, indirectly, primarily, secondarily, jointly, or severally.

5
Washington Mutual Bank
Execution Copy Henderson, Nevada
Whole Bank P&A

"Other Real Estate" means all interests in real estate (other than Ban Premises and Fixtures), including but not limited to mineral rights, leasehold rights, condominium and cooperative interests, air rights and development rights that are owned by the Failed Ban.

"Payment Date" means the first Business Day after Ban Closing.

"Person" means any individual, corporation, partnership, joint venture, association, joint-stock company, trust, unincorporated organization, or government or any

agency or political subdivision thereof, excluding the Corporation.

"Primary Indemnitor" means any Person (other than the Assuming Ban or any

its Affiliates) who is obligated to indemnify or insure, or otherwise make payments (including payments on account of claims made against) to or on behalf of any Person in connection with the claims covered under Article XII, including without limitation any insurer issuing any directors and officers liability policy or any Person issuing a financial institution bond or baner's

of

blanet bond.

"Proforma" means producing a balance sheet that reflects a reasonably accurate

the Failed Ban through the date of closing. The Proforma financial

financial statement of

Page 20

WaMuClosingBook.txt

both the Assuming Ban and the Receiver.

statements serve as a basis for the opening entries of

"Put Date" has the meaning provided in Section 3.4.

"Put Notice" has the meaning provided in Section 3.4.

"Qualified Financial Contract" means a qualified financial contract as defined

in 12 U.S.C. Section 1821(e)(8)(D).

"Record" means any document, microfiche, microfim and computer records
(including but not limited to magnetic tape, disc storage, card forms and printed
copy) of the
Failed Ban generated or maintained by the Failed Ban that is owned by or in the
possession of
the Receiver at Ban Closing.

"Related Liabilty" with respect to any Asset means any liability existing and

Ban Closing for (i) indebtedness

the Failed Ban as of

reflected on the Accounting Records of

secured by mortgages, deeds of trust, chattel mortgages, security interests or other
liens on or
affecting such Asset, (ii) ad valorem taxes applicable to such Asset, and (iii) any
other obligation
determined by the Receiver to be directly related to such Asset.

"Related Liabilty Amount" with respect to any Related Liability on the books

of the Assuming Ban, means the amount of such Related Liability as stated on the
Accounting

the Assuming Ban (as maintained in accordance with generally accepted accounting

Records of

which the Related Liability Amount is being determined. With
respect to a liability that relates to more than one asset, the amount of such
Related Liability shall
be allocated among such assets for the purpose of determining the Related Liability
Amount with

principles) as of the date as of

6

*117*

MemoClosingBook.txt

Washington Mutual Bank

Execution Copy

Henderson, Nevada

Whole Bank P&A

respect to anyone of such assets. Such allocation shall be made by specific allocation, where
determinable, and otherwise shall be pro rata based upon the dollar amount of such assets stated

the entity that owns such asset.

on the Accounting Records of

"Required Payment" means $50,000,000.00

"Repurchase Price" means with respect to any Asset or asset, which shall be determined by the Receiver, the lesser of (a) or (b):

(a) (i) in the event of a negative Bid Amount, the amount paid by the Assuming Bank, discounted by a percentage equal to the quotient produced by dividing the

the Failed
Ban;

Assuming Ban's Bid Amount by the aggregate Book Value of the Risk Assets of

(ii) in the event of a negative Bid Amount, the amount resulting from
(a)(i), above, or in the event of a positive Bid Amount, the amount paid by the Assuming Ban,

(x) for a Loan, shall be decreased by any portion of the Loan classified "loss" and by one-half of
any portion of the Loan classified "doubtful" as of the date of Ban Closing, and (y) for any

Asset or asset, including a Loan, decreased by the amount of any money received with respect

thereto since Ban Closing and, if the Asset is a Loan or other interest bearng or earing asset,

the resulting amount shall then be increased or decreased, as the case may be, by interest or
discount (whichever is applicable) accrued from and after Ban Closing at the lower of: (i) the
contract rate with respect to such Asset, or (ii) the Settlement Interest Rate; net proceeds received
by or due to the Assuming Ban from the sale of collateral, any forgiveness of debt, or otherwise
shall be deemed money received by the Assuming Ban; or

Page 22

*118*

WaMuClosingBook.txt
(b) the dollar amount thereof stated on the Accounting Records of the
Assuming Ban as of the date as of which the Repurchase Price is being determined, as

maintained in accordance with generally accepted accounting principles, and, if the
asset is a

and adjusted in the same maner as the Book
Value ofa Failed Ban Loan would be adjusted hereunder.

Loan, regardless of the Legal Balance thereof                    .

Provided, however, (b), above, shall not be applicable and the Bid Amount shall be
considered to
have been positive for Loans repurchased pursuant to Section 3.4(a).

"Risk Assets" means (i) all Loans purchased hereunder, excluding (a) New Loans
and (b) Loans to the extent secured by Assumed Deposits (and not included in
(i)(a)), plus (ii) the
Accrued Interest Receivable, Prepaid Expense, and Other Assets.

"Safe Deposit Boxes" means the safe deposit boxes of the Failed Ban, if any,

including the removable safe deposit boxes and safe deposit stacks in the Failed
Ban's vault(s),

all rights and benefits (other than fees collected prior to Ban Closing) under
rental agreements
with respect to such safe deposit boxes, and all keys and combinations thereto.

"Settlement Date" means the first Business Day immediately prior to the day
which is one hundred eighty (180) days after Ban Closing, or such other date prior
thereto as

7

Execution Copy Washington Mutual Bank
Whole Bank P&A Henderson, Nevada

.
may be agreed upon by the Receiver and the Assuming Bank. The Receiver, in its
discretion,

may extend the Settlement Date.

"Settlement Interest Rate" means, for the first calendar quarter or portion

thereof during which interest accrues, the rate determined by the Receiver to be
equal to the
equivalent coupon issue yield on twenty-six (26)-week United States Treasury Bills
in effect as

Ban Closing as published in The Wall Street Journal; provided, that ifro such
equivalentof

Ban Closing, the equivalent coupon issue yield for such

Page 73

*119*

WamuClosingBook.txt
coupon issue yield is available as of

Treasury Bills most recently published in The Wall Street Journal prior to Ban
Closing shall be
used. Thereafter, the rate shall be adjusted to the rate determined by the Receiver
to be equal to

the first day of each

the equivalent coupon issue yield on such Treasury Bills in effect as of

succeeding calendar quarter during which interest accrues as published in The Wall
Street

Journal.

"Subsidiary" has the meaning set forth in Section 3(w)(4) ofthe Federal Deposit
Insurance Act, 12 US.C. Section 1813(w)(4), as amended.

II
ASSUMPTION OF LIABILITIES

ARTICLE

2.1 Liabilities Assumed by Assuming Bank. Subject to Sections 2.5 and 4.8, the
Assuming Ban expressly assumes at Book Value (subject to adjustment pursuant to
Aricle
the Failed Ban which are

the liabilities of

VII) and agrees to pay, perform, and discharge, all of

Ban Closing, including the

the Failed Ban as of

reflected on the Books and Records of

Assumed Deposits and all liabilities associated with any and all employee benefit
plans, except
as listed on the attached Schedule 2.1, and as otherwise provided in this Agreement
(such
liabilities referred to as "Liabilities Assumed"). Notwithstanding Section 4.8, the
Assuming
the Failed Ban.
Ban specifically assumes all mortgage servicing rights and obligations of

Page 24

*120*

WaMuClosingBook.txt

2.2 Interest on Deposit Liabilities. The Assuming Ban agrees that it will assume all Ban Closing, and it wil accrue and pay interest on Deposit Liabilities assumed pursuant to Section 2.1 at the same rate(s) and on the same terms as agreed to by the

deposit contracts as of

Failed Ban as existed as of Ban Closing. If such Deposit has been pledged to secure an

obligation of the depositor or other pary, any withdrawal thereof shall be subject to the terms of
the agreement governing such pledge.

2.3 Unclaimed Deposits. If, within eighteen (18) months after Ban Closing, any the Failed Ban does not claim or arange to continue such depositor's Deposit

depositor of

assumed pursuant to Section 2.1 at the Assuming Ban, the Assuming Ban shall, within fifteen

(15) Business Days after the end of such eighteen (18)-month period, (i) refud to the
Corporation the full amount of each such Deposit (without reduction for service charges), (ii)

provide to the Corporation an electronic schedule of all such refunded Deposits in such form as

may be prescribed by the Corporation, and (iii) assign, transfer, convey and deliver to the

the Assuming Ban in and to Records previously
transferred to the Assuming Ban and other records generated or maintained by the Assuming

Receiver all right, title and interest of

the

Ban pertaining to such Deposits. During such eighteen (18)-month period, at the request of

8

Execution Copy Washington Mutual Bank
Henderson, Nevada

Whole Bank P&A

Corporation, the Assuming Bank promptly shall provide to the Corporation schedules
Page 25

*/2/*

WaMuClosingBook.txt

of
unclaimed deposits in such form as may be prescribed by the Corporation.

2.4 Omitted.
2.5 Borrower Claims. Notwithstanding anything to the contrar in this Agreement,
any liability associated with borrower claims for payment of or liability to any
borrower for
to any borrower, whether or not such

relief

monetar relief, or that provide for any other form of

liability is reduced to judgment, liquidated or unliquidated, fixed or contingent,
matured or
unmatured, disputed or undisputed, legal or equitable, judicial or extra-judicial,
secured or
unsecured, whether asserted affrmatively or defensively, related in any way to any
loan or
commitment to lend made by the Failed Ban prior to failure, or to any loan made by a
third

pary in connection with a loan which is or was held by the Failed Ban, or otherwise
arsing in

connection with the Failed Ban's lending or loan purchase activities are
specifically not
assumed by the Assuming Ban.

ARTICLE III
PURCHASE OF ASSETS

3.1 Assets Purchased by Assuming Bank. Subject to Sections 3.5, 3.6 and 4.8, the
Assuming Ban hereby purchases from the Receiver, and the Receiver hereby sells,
assigns,
the Receiver

transfers, conveys, and delivers to the Assuming Ban, all right, title, and interest
of

the assets (real, personal and mixed, wherever located and however acquired)
including all subsidiares, joint ventures, parnerships, and any and all other
business

in and to all of

the Failed

combinations or arangements, whether active, inactive, dissolved or terminated, of

Ban Closing. Assets are

the Failed Ban as of

Page 26

*/22*

WamuClosingBook.txt

Man whether or not reflected on the books of

purchased hereunder by the Assuming Ban subject to all liabilities for indebtedness

collateralized by Liens affecting such Assets to the extent provided in Section 2.1.
The

subsidiares, joint ventures, parnerships, and any and all other business
combinations or
arangements, whether active, inactive, dissolved or terminated being purchased by
the Assuming
Ban includes, but is not limited to, the entities listed on Schedule 3 1a.
Notwithstanding

Section 4.8, the Assuming Ban specifically purchases all mortgage servicing rights
and

the Failed Ban.

obligations of

3.2 Asset Purchase Price.
the Failed Ban subject to an option to purchase by the Assuming

(a) All Assets and assets of
Ban shall be purchased for the amount, or the amount resulting from the method
specified for

determining the amount, as specified on Schedule 3.2, except as otherwise may be
provided

the Failed Ban subject to an option to purchase or other asset
purchased for which no purchase price is specified on Schedule 3.2 or otherwise
herein shall be
purchased at its Book Value. Loans or other assets charged off the Accounting
Records of the

zero.

herein. Any Asset, asset of

Failed Ban prior to the date of Ban Closing shall be purchased at a price of

9

Execution Copy Washington Mutual Bank
Whole Bank P&A Henderon, Nevada

(b) The purchase price for securities (other than the capital stock of any Acquired
Subsidiary) purchased under Section 3.1 by the Assuming Ban shall be the market
value thereof
Bank Closing, which market value shall be (i) the "Mid/Last", or "Trade" (as

Page 27

*123*

WaMuClosingBook.txt

applicable), as of

the trading day effective on Bank

market price for each such security quoted at the close of

Closing as published electronically by Bloomberg, L.P.; (ii) provided, that if such market price is
not available for any such security, the Assuming Bank will submit a bid for each such security
within three days ofnotification/id request by the Receiver (unless a different time period is

agreed to by the Assuming Ban and the Receiver) and the Receiver, in its sole discretion will

accept or reject each such bid; and (iii) further provided in the absence of an acceptable bid from
the Assuming Ban, each such security shall not pass to the Assuming Ban and shall be deemed
to be an excluded asset hereunder.

(c) Qualified Financial Contracts shall be purchased at market value determined in
Exhibit 3.2(c). Any costs associated with such valuation shall be
shared equally by the Receiver and the Assuming Ban.

accordance with the terms of

3.3 Manner of Conveyance; Limited Warranty; Nonrecourse; Etc. THE
CONVEYANCE OF ALL ASSETS, INCLUDING REAL AN PERSONAL PROPERTY
INTERESTS, PURCHASED BY THE ASSUMING BAN UNER THIS AGREEMENT
SHALL BE MADE, AS NECESSARY, BY RECENER'S DEED OR RECENER'S BILL OF
SALE, "AS IS", "WHERE IS", WITHOUT RECOURSE AND, EXCEPT AS OTHERWISE
SPECIFICALLY PROVIDED IN THIS AGREEMENT, WITHOUT ANY WARTIES
WHATSOEVER WITH RESPECT TO SUCH ASSETS, EXPRESS OR IMPLIED, WITH
RESPECT TO TITLE, ENFORCEABILITY, COLLECTFFILITY, DOCUMENTATION OR
FREEDOM FROM LIINS OR ENCUMBRACES (IN WHOLE OR IN PART), OR ANY
OTHER MATTERS.

3.4 Puts of Assets to the Receiver.
(a) Omitted.
(b) Puts Prior to the Settlement Date. During the period from Ban Closing to and
including the Business Day immediately preceding the Settlement Date, the Assuming
Ban shall
be entitled to require the Receiver to purchase any Asset which the Assuming Ban can
establish

Ban Closing. The Assuming Ban shall

is evidenced by forged or stolen instruments as of

transfer all such Assets to the Receiver without recourse, and shall indemnify the Receiver
against any and all claims of any Person claiming by, through or under the Assuming Ban with
respect to any such Asset, as provided in Section 12.4.

Page 28

WaMuClosingBook.txt

(c) Notices to the Receiver. In the event that the Assuming Ban elects to require the
Receiver to purchase one or more Assets, the Assuming Ban shall deliver to the Receiver a
notice (a "Put Notice") which shall include:

(i) a list of all Assets that the Assuming Bank requires the Receiver to purchase;

10

Execution Copy Washington Mutual Bank
Whole Bank P&A Henderson, Nevada


(ii) a list of all Related Liabilities with respect to the Assets identified
pursuant to (i) above; and

the estimated Repurchase Price of each Asset identified

(iii) a statement of
the applicable Put Date.

pursuant to (i) above as of

Such notice shall be in the form prescribed by the Receiver or such other form to which the
Receiver shall consent. As provided in Section 9.6, the Assuming Bank shall deliver to the
Receiver such documents, Credit Files and such additional information relating to the subject

the Put Notice as the Receiver may request and shall provide to the Receiver full access
to all other relevant books and records.

matter of


(d) Purchase by Receiver. The Receiver shall purchase Loans that are specified in
the Put Notice and shall assume Related Liabilities with respect to such Loans, and the transfer of
such Loans and Related Liabilities shall be effective as of a date determined by the Receiver

the Credit Files

which date shall not be later than thirty (30) days after receipt by the Receiver of


with respect to such Loans (the "Put Date").

( e) Purchase Price and Payment Date. Each Loan purchased by the Receiver
pursuant to this Section 3.4 shall be purchased at a price equal to the Repurchase Price of such

Page 29

*125*

WaMuClosingBook.txt

Loan less the Related Liability Amount applicable to such Loan, in each case determined as of
the applicable Put Date. If the difference between such Repurchase Price and such Related

Liability Amount is positive, then the Receiver shall pay to the Assuming Ban the amount of

such difference; if the difference between such amounts is negative, then the Assuming Ban

shall pay to the Receiver the amount of such difference. The Assuming Ban or the Receiver, as

the case may be, shall pay the purchase price determined pursuant to this Section 3.4( e) not later

than the twentieth (20th) Business Day following the applicable Put Date, together with interest

on such amount at the Settlement Interest Rate for the period from and including such Put Date

to and including the day preceding the date upon which payment is made.

(f) Servicing. The Assuming Ban shall administer and manage any Asset subject to purchase by the Receiver in accordance with usual and prudent baning standards and business
practices until such time as such Asset is purchased by the Receiver.

(g) Reversals. In the event that the Receiver purchases an Asset (and assumes the Related Liability) that it is not required to purchase pursuant to this Section 3.4, the Assuming

Ban shall repurchase such Asset (and assume such Related Liability) from the Receiver at a

price computed so as to achieve the same economic result as would apply if the Receiver had

never purchased such Asset pursuant to this Section 3.4.

3.5 Assets Not Purchased by Assuming Bank. The Assuming Ban does not purchase, acquire or assume, or (except as otherwise expressly provided in this Agreement)

obtain an option to purchase, acquire or assume under this Agreement the assets or Assets listed

on the attached Schedule 3.5.

3.6 Assets Essential to Receiver.
11

Washington Mutual Bank

Execution Copy

Page 30

*126*

WaMuClosingBook.txt

Henderson, Nevada

Whole Bank P&A

(a) The Receiver may refuse to sell to the Assuming Ban, or the Assuming Bank
the Receiver set forth in a written notice to the Assuming Bank, to

agrees, at the request of

the Assuming Ban's right, title and
interest in and to, any Asset or asset essential to the Receiver as determined by
the Receiver in its
discretion (together with all Credit Documents evidencing or pertaining thereto),
which may
include any Asset or asset that the Receiver determines to be:

assign, transfer, convey, and deliver to the Receiver all of

the

(i) made to an officer, director, or other Person engaging in the affairs of
Failed Ban, its Subsidiaries or Affliates or any related entities of any of

the foregoing;

(ii) the subject of any investigation relating to any claim with respect to any
item described in Section 3.5(a) or (b), or the subject of, or potentially the
subject of, any legal proceedings;

(iii) made to a Person who is an Obligor on a loan owned by the Receiver or
the Corporation in its corporate capacity or its capacity as receiver of any
institution;

(iv) secured by collateral which also secures any asset owned by the Receiver;
or

the Failed Ban not purchased by the Assuming

(v) related to any asset of
the Failed Ban not assumed

by the Assuming Ban under Aricle II.

Ban under this Aricle II or any liability of

(b) Each such Asset or asset purchased by the Receiver shall be purchased at a price
equal to the Repurchase Price thereof less the Related Liability Amount with respect
to any
Related Liabilities related to such Asset or asset, in each case determined as of
the date ofthe
notice provided by the Receiver pursuant to Section 3.6(a). The Receiver shall pay
the Assuming

Ban not later than the twentieth (20th) Business Day following receipt of related
Credit

Page 31

*127*

WaMuClosingBook.txt

Documents and Credit Files together with interest on such amount at the Settlement
Interest Rate
for the period from and including the date of receipt of such documents to and
including the day

preceding the day on which payment is made. The Assuming Ban agrees to administer
and

manage each such Asset or asset in accordance with usual and prudent baning
standards and
business practices until each such Asset or asset is purchased by the Receiver. All
transfers with
respect to Asset or assets under this Section 3.6 shall be made as provided in
Section 9.6. The
Assuming Ban shall transfer all such Asset or assets and Related Liabilities to the
Receiver
without recourse, and shall indemnify the Receiver against any and all claims of any
Person
claiming by, through or under the Assuming Ban with respect to any such Asset or
asset, as
provided in Section 12.4.

IV

ARTICLE

12

Execution Copy Washington Mutual Bank
Whole Bank P&A Henderson, Nevada


ASSUMPTION OF CERTAIN DUTIES AND OBLIGATIONS

The Assuming Bank agrees with the Receiver and the Corporation as follows:

4.1 Continuation of Banking Business. The Assuming Bank agrees to provide full
the Failed Ban commencing on the first baning business
the Assuming Bank, such

service banking in the trade area of

day (including a Saturday) after Ban Closing. At the option of

the Ban Premises, or at other premises within

banking services may be provided at any or all of

such trade area.

4.2 Agreement with Respect to Debit and Credit Card Business. The Assuming
Ban agrees to honor and perform, from and after Ban Closing, all duties and
obligations with
respect to the Failed Ban's debit and credit card business, and/or processing

Page 32

WaMuClosingBook.txt

related to debit and
credit cards, if any, and assumes all outstanding extensions of credit with respect thereto.

4.3 Agreement with Respect to Safe Deposit Business. The Assuming Ban
assumes and agrees to discharge, from and after Ban Closing, in the usual course of conducting
the Failed Ban with respect to all Safe Deposit

a baning business, the duties and obligations of

Boxes, if any, of the Failed Ban and to maintain all of the necessar facilities for the use of such
boxes by the renters thereof during the period for which such boxes have been rented and the rent
the rental agreements between the

therefor paid to the Failed Ban, subject to the provisions of

Failed Ban and the respective renters of such boxes; provided, that the Assuming Ban may

the Assuming Ban located

relocate the Safe Deposit Boxes of the Failed Ban to any office of

the Failed Ban. Fees related to the safe deposit business collected prior to

in the trade area of

the Receiver and fees collected after Ban Closing shall

Ban Closing shall be for the benefit of

the Assuming Ban.

be for the benefit of

4.4 Agreement with Respect to Safekeeping Business. The Receiver transfers,
conveys and delivers to the Assuming Ban and the Assuming Ban accepts all securities andBan Closing.

other items, if any, held by the Failed Ban in safekeeping for its customers as of

The Assuming Bank assumes and agrees to honor and discharge, from and after Ban Closing,
the Failed Ban with respect to such securities and items held in safekeeping. The Assuming Ban shall be entitled to all rights and benefits heretofore accrued or
hereafter accruing with respect thereto; provided, that, fees related to the safe keeping business

Page 33

*129*

WaMuClosingBook.txt

the Receiver and fees collected after

the duties and obligations of

collected prior to Ban Closing shall be for the benefit of

Ban Closing shall be for the benefit of the Assuming Ban. The Assuming Ban shall provide

to the Receiver written verification of all assets held by the Failed Ban for safekeeping within
sixty (60) days after Ban Closing.

4.5 Agreement with Respect to Trust Business.
(a) The Assuming Ban shall, without further transfer, substitution, act or deed, to the
full extent permitted by law, succeed to the rights, obligations, properties, assets, investments,

the Failed Ban under trusts, executorships, administrations,
guardianships, and agencies, and other fiduciar or representative capacities, all to the same
extent as though the Assuming Ban had assumed the same from the Failed Ban prior to Ban

deposits, agreements, and trusts of


13

Execution Copy Washington Mutual Bank
Whole Bank P&A Henderson, Nevada


Closing; provided, that any liability based on the misfeasance, malfeasance or nonfeasance of the
Failed Bank, its directors, officers, employees or agents with respect to the trust business is not

assumed hereunder.

(b) The Assuming Bank shall, to the full extent permitted by law, succeed to, and be

entitled to take and execute, the appointment to all executorships, trusteeships, guardianships and
other fiduciary or representative capacities to which the Failed Ban is or may be named in wills,
whenever probated, or to which the Failed Bank is or may be named or appointed by any other
instrument.

(c) In the event additional proceedings of any kind are necessar to accomplish the
transfer of such trust business, the Assuming Ban agrees that, at its own expense, it will take
whatever action is necessar to accomplish such transfer. The Receiver agrees to use
Page 34

130

WaMuClosingBook.txt

reasonable
efforts to assist the Assuming Ban in accomplishing such transfer.

(d) The Assuming Ban shall provide to the Receiver written verification of the assets
held in connection with the Failed Ban's trust business within sixty (60) days after Ban

Closing.

4.6 Agreement with Respect to Bank Premises.
(a) Option to Lease. The Receiver hereby grants to the Assuming Ban an exclusive
option for the period of ninety (90) days commencing the day after Ban Closing to cause the
Receiver to assign to the Assuming Ban any or all leases for leased Ban Premises, if any,

which have been continuously occupied by the Assuming Bank from Ban Closing to the date it
the leases with respect thereto to the extent such leases can be

elects to accept an assigment of

this option with respect to any lease must be as to all

assigned; provided, that the exercise of

premises or other property subject to the lease. If an assigment canot be made of any such

leases, the Receiver may, in its discretion, enter into subleases with the Assuming Ban
containing the same terms and conditions provided under such existing leases for such leased

Ban Premises or other property. The Assuming Ban shall give notice to the Receiver within the
option period of its election to accept or not to accept an assigment of any or all leases (or enter

into subleases or new leases in lieu thereof). The Assuming Ban agrees to assume all leases
assigned (or enter into subleases in lieu thereof) pursuant to this Section 4.6.

(b) Facilitation. The Receiver agrees to facilitate the assumption, assigment or
sublease of leases or the negotiation of new leases by the Assuming Ban; provided, that neither
the Receiver nor the Corporation shall be obligated to engage in litigation, make payments to the
Assuming Ban or to any third pary in connection with facilitating any such assumption,

assigment, sublease or negotiation or commit to any other obligations to third

Page 35

*131*

WaMuClosingBook.txt

paries.

(c) Occupancy. The Assuming Ban shall give the Receiver fifteen (15) days' prior
written notice of its intention to vacate prior to vacating any leased Ban Premises
with respect

to which the Assuming Ban has not exercised the option provided in Section 4.6(a).
Any such
notice shall be deemed to terminate the Assuming Ban's option with respect to such
leased Ban
Premises.

14

Washington Mutual Bank
Execution Copy Henderson, Nevada
Whole Bank P&A

(d) Occupancy Costs.
(i) The Assuming Bank agrees, during the period of any occupancy by it of
the

leased Bank Premises, to pay to the Receiver, or to appropriate third paries at the
direction of

Receiver, all operating costs with respect thereto and to comply with all relevant
terms of

applicable leases entered into by the Failed Bank, including without limitation the
timely

payment of all rent, taxes, fees, charges, utilities, insurance and assessments.

(ii) The Assuming Ban agrees during the period of occupancy by it of leased
Ban Premises to pay to the Receiver rent for the use of all leased Furniture and
Equipment and

all owned or leased Fixtures located on such Bank Premises for the period of such
occupancy.

Rent for such property owned by the Failed Bank shall be the market rental value
thereof, as

determined by the Receiver within sixty (60) days after Ban Closing. Rent for such
leased
property shall be an amount equal to any and all rent and other amounts which the
Receiver
incurs or accrues as an obligation or is obligated to pay for such period of
occupancy pursuant to

the Assuming Ban purchases any owned

all leases and contracts with respect to such property. If

Fixtures in accordance with Section 4.6(f), the amount of any rents paid by the
Assuming Ban

Page 36

*132*

WamuClosingBook.txt

with respect thereto shall be applied as an offset against the purchase price thereof.

the

(e) Certain Requirements as to Furniture, Equipment and Fixtures. If Assuming Ban accepts an assignent of the lease (or enters into a sublease or a new lease in
lieu thereof) for leased Ban Premises, or if the Assuming Ban does not exercise such option
but within twelve (12) months following Ban Closing obtains the right to occupy such premises

(whether by assignent, lease, sublease, purchase or otherwise), other than in accordance with

the leases or

Section 4.6(a), the Assuming Ban shall (i) accept an assignent or a sublease of

negotiate new leases for all Furniture and Equipment and Fixtures leased by the Failed Ban and

located thereon, and (ii) if applicable, accept an assignent or a sublease of any ground lease or
negotiate a new ground lease with respect to any land on which such Ban Premises are located;
provided, that the Receiver shall not have disposed of such Furniture and Equipment and
Fixtures or repudiated the leases specified in clause (i) or (ii).

the Assuming Ban elects not to accept an assignent of

(f) Vacating Premises. If
the lease or sublease any leased Ban Premises, the notice of such election in accordance with
Section 4.6(a) shall specify the date upon which the Assuming Ban's occupancy of such leased
Ban Premises shall terminate, which date shall not be later than the date which is one hundred
eighty (180) days after Ban Closing. Upon vacating such premises, the Assuming Ban shall
relinquish and release to the Receiver such premises and the Fixtures located thereon in the same

condition as at Ban Closing, normal wear and tear excepted. By failing to provide notice of its

intention to vacate such premises prior to the expiration of the option period specified in Section
4.6(a), or by occupying such premises after the one hundred eighty (180)-day period specified

above in this paragraph, the Assuming Ban shall, at the Receiver's option, (x) be deemed to

have assumed all leases, obligations and liabilities with respect to such premises
Page 37

WashClosingBook.txt

(including any

ground lease with respect to the land on which premises are located), and leased furniture and

Equipment and leased Fixtures located thereon in accordance with this Section 4.6 (unless the

15

Execution Copy Washington Mutual Bank
Whole Bank P&A Henderson, Nevada

Receiver previously repudiated any such lease), and (y) be required to purchase all Fixtures

Ban Closing.

owned by the Failed Ban and located on such premises as of

(g) Omitted.
4.7 Agreement with Respect to Leased Data Processing Equipment
(a) The Receiver hereby grants to the Assuming Ban an exclusive option for the ninety (90) days commencing the day after Ban Closing to accept an assignent from

period of

the Receiver of any or all Data Processing Leases to the extent that such Data Processing Leases

can be assigned.

(b) The Assuming Ban shall (i) give written notice to the Receiver within the option period specified in Section 4.7(a) of its intent to accept an assignent or sublease of any or all
Data Processing Leases and promptly accept an assignent or sublease of such Data Processing

Leases, and (ii) give written notice to the appropriate lessor(s) that it has accepted an assignent

or sublease of any such Data Processing Leases.

(c) The Receiver agrees to facilitate the assignent or sublease of Data Processing Leases or the negotiation of new leases or license agreements by the Assuming Ban; provided,
that neither the Receiver nor the Corporation shall be obligated to engage in litigation or make
payments to the Assuming Ban or to any third pary in connection with facilitating any such

assumption, assignent, sublease or negotiation.

Page 38

*134*

WaMuClosingBook.txt

(d) The Assuming Ban agrees, during its period of use of any property subject to a
Data Processing Lease, to pay to the Receiver or to appropriate third paries at the
direction of the
Receiver all operating costs with respect thereto and to comply with all relevant
terms of the
applicable Data Processing Leases entered into by the Failed Ban, including without
limitation
the timely payment of all rent, taxes, fees, charges, utilities, insurance and
assessments.
(e) The Assuming Ban shall, not later than fifty (50) days after giving the notice
provided in Section 4.7(b), (i) relinquish and release to the Receiver all property
subject to the
relevant Data Processing Lease, in the same condition as at Ban Closing, normal wear
and tear
excepted, or (ii) accept an assignent or a sublease thereof or negotiate a new lease
or license
agreement under this Section 4.7.

4.8 Agreement with Respect to Certain Existing Agreements.
With respect to agreements existing as of Ban Closing which provide for the
rendering
of services by or to the Failed Ban, within one hundred twenty (120) days after Ban
Closing,
the Assuming Ban shall give the Receiver written notice specifyng whether it elects
to assume
or not to assume each such agreement. Except as may be otherwise provided in this
Aricle N,
the Assuming Ban agrees to comply with the terms of each such agreement for a period

commencing on the day after Ban Closing and ending on: (i) in the case of an
agreement that

provides for the rendering of services by the Failed Ban, the date which is ninety
(90) days after

Ban Closing, and (ii) in the case of an agreement that provides for the rendering of
services to

16

Washington Mutual Bank
Execution Copy Henderson, Nevada
Whole Bank P&A

the Failed Bank, the date which is thirty (30) days after the Assuming Bank has
given notice to
the Receiver of its election not to assume such agreement; provided, that the
Receiver can
reasonably make such service agreements available to the Assuming Bank. The Assuming
Ban
shall be deemed by the Receiver to have assumed agreements for which no notification
is timely
given. The Receiver agrees to assign, transfer, convey, and deliver to the Assuming
Ban all

the Receiver, ifany, in and to agreements the Assuming Ban assumesright, title and
interest of

*135*

WaMuClosingBook.txt

hereunder. In the event the Assuming Bank elects not to accept an assignment of any lease (or

sublease) or negotiate a new lease for leased Ban Premises under Section 4.6 and does not

this Section 4.8 shall not apply to service
agreements related to such premises. The Assuming Ban agrees, during the period it has the use
or benefit of any such agreement, promptly to pay to the Receiver or to appropriate third paries

otherwise occupy such premises, the provisions of

the Receiver all operating costs with respect thereto and to comply with allat the direction of

relevant terms of such agreement. This paragraph shall not apply with respect to deposit

contracts which are expressly assumed by the Assuming Ban under Section 2.2 of this Agreement.

4.9 Informational Tax Reporting. The Assuming Ban agrees to perform all
the Failed Ban with respect to Federal and State income tax informational
reporting related to (i) the Assets and the Liabilities Assumed, (ii) deposit accounts that were
closed and loans that were paid off or collateral obtained with respect thereto prior to Ban

obligations of

Closing, (iii) miscellaneous payments made to vendors of the Failed Ban, and (iv) any other

asset or liability ofthe Failed Bank, including, without limitation, loans not purchased and
Deposits not assumed by the Assuming Ban, as may be required by the Receiver.

Under a private letter ruling (PLR) issued to the FDIC in Januar of 1988, the Internal Revenue
Service will allow the Assuming Ban to report for the Failed Ban transactions under its own
TIN for the entire year 2008; there is no need to dual-report for different payors in pre- v. post-
closing date periods.

The Assuming Ban agrees to prepare on behalf ofthe Receiver all required Federal and State

compliance and income/franchise tax returns for the Failed Ban and acquired subsidiar entities

Ban Closing. The returns will be provided to the Receiver within the statutorily requiredas of

Page 40

*136*

WaMuClosingBook.txt

filing timeframe.

4.10 Insurance. The Assuming Ban agrees to obtain insurance coverage effective from and after Ban Closing, including public liability, fire and extended coverage insurance
acceptable to the Receiver with respect to leased Ban Premises that it occupies, and all leased
Furniture and Equipment and Fixtures and leased data processing equipment (including hardware
and softare) located thereon, in the event such insurance coverage is not already in force and

Ban Closing. All such insurance
shall, where appropriate (as determined by the Receiver), name the Receiver as an additional
insured.

effect with respect to the Assuming Ban as the insured as of

4.11 Office Space for Receiver and Corporation. For the period commencing on the day following Ban Closing and ending on the one hundred eightieth (180th) day thereafter, the
Assuming Ban agrees to provide to the Receiver and the Corporation, without charge, adequate

17

Execution Copy Washington Mutual Bank
Whole Bank P&A Henderson, Nevada

and suitable offce space (including parking facilities and vault space), furniture, equipment

(including photocopying and telecopying machines) and utilities (including local telephone
service and a dedicated broadband or T -1 internet service) at the Bank Premises occupied by the

their respective functions with respect to the

Assuming Bank for their use in the discharge of

Failed Bank. In the event the Receiver and the Corporation determine that the space provided is
inadequate or unsuitable, the Receiver and the Corporation may relocate to other quarers having
adequate and suitable space and the costs of relocation and any rental and utility costs for the

the period of occupancy by the Receiver and the Corporation shall be borne by the

balance of

Page 41

137

WaMuClosingBook.txt

Assuming Bank.

4.12 Omitted.
4.13 Omitted.
ARTICLE V

DUTIES WITH RESPECT TO DEPOSITORS OF THE FAILED BANK

5.1 Payment of Checks, Drafts and Orders. Subject to Section 9.5, the Assuming
Ban agrees to pay all properly drawn checks, drafts and withdrawal orders of
depositors of the
Failed Ban presented for payment, whether drawn on the check or draft forms provided
by thethe
Failed Ban or by the Assuming Ban, to the extent that the Deposit balances to the
credit of

respective makers or drawers assumed by the Assuming Ban under this Agreement are
suffcient to permit the payment thereof, and in all other respects to discharge, in
the usual course

the Failed Ban with respect to

of conducting a baning business, the duties and obligations of

the Failed Ban assumed by the

the Deposit balances due and owing to the depositors of

Assuming Ban under this Agreement.

5.2 Certain Agreements Related to Deposits. Subject to Section 2.2, the Assuming
Ban agrees to honor the terms and conditions of any wrtten escrow or mortgage
servicing
agreement or other similar agreement relating to a Deposit liability assumed by the
Assuming
Ban pursuant to this Agreement.
5.3 Notice to Depositors.
(a) Within thirty (30) days after Bank Closing, the Assuming Ban shall give (i)
the Failed

its assumption of the Deposit liabilities of

the Failed Ban of

notice to depositors of

Ban, and (ii) any notice required under Section 2.2, by mailing to each such
depositor a notice
with respect to such assumption and by advertising in a newspaper of general
circulation in the

county or counties in which the Failed Ban was located. The Assuming Ban agrees that
it will
                                        Page 42

*138*

WaMuClosingBook.txt

obtain prior approval of all such notices and advertisements from counsel for the Receiver and
that such notices and advertisements shall not be mailed or published until such approval is
received.

the Failed Ban

(b) The Assuming Ban shall give notice by mail to depositors of
concerning the procedures to claim their deposits, which notice shall be provided to the

10

Washington Mutual Bank
Execution Copy Henderson, Nevada
Whole Bank P&A

Assuming Ban by the Receiver or the Corporation. Such notice shall be included with the notice
to depositors to be mailed by the Assuming Bank pursuant to Section 5.3(a).

(c) If the Assuming Ban proposes to charge fees different from those charged by the the

Failed Ban before it establishes new deposit account relationships with the depositors of

Failed Ban, the Assuming Bank shall give notice by mail of such changed fees to such

depositors.

ARTICLE VI

RECORDS

6.1 Transfer of Records.
(a) In accordance with Section 3.1, the Receiver assigns, transfers, conveys and the

delivers to the Assuming Ban the following Records pertaining to the Deposit liabilities of

Failed Ban assumed by the Assuming Ban under this Agreement, except as provided in Section 6.4:

(i) signature cards, orders, contracts between the Failed Ban and its depositors and Records of similar character;

(ii) passbooks of depositors held by the Failed Ban, deposit slips, cancelled checks and withdrawal orders representing charges to accounts of depositors;

and the following Records pertaining to the Assets:

Page 43

*139*

WaMuClosingBook.txt

(iii) records of deposit balances carred with other bans, baners or trust companies;

(iv) loan and collateral records and Credit Files and other documents;

(v) deeds, mortgages, abstracts, surveys, and other instruments or records of title pertaining to real estate or real estate mortgages;

(vi) signature cards, agreements and records pertaining to Safe Deposit Boxes, if

any; and

(vii) records pertaining to the credit card business, trust business or safekeeping business of the Failed Ban, if any.

(b) The Receiver, at its option, may assign and transfer to the Assuming Ban by a other

single blanet assignent or otherwise, as soon as practicable after Ban Closing, any

Records not assigned and transferred to the Assuming Bank as provided in this Agreement,
including but not limited to loan disbursement checks, general ledger tickets, offcial ban

tapes) and paid out loan files.

checks, proof transactions (including proof

19

Execution Copy Washington Mutual Bank
Whole Bank P&A Henderson, Nevada

6.2 Delivery of Assigned Records. The Receiver shall deliver to the Assuming Bank all Records described in (i) Section 6.1 (a) as soon as practicable on or after the date of this

Agreement, and (ii) Section 6.1 (b) as soon as practicable after making any assignent described

therein.

6.3 Preservation of Records. The Assuming Ban agrees that it will preserve and the Receiver, the Corporation and the Assuming Bank, all

maintain for the joint benefit of

which it has custody for such period as either the Receiver or the Corporation in its
discretion may require, until directed otherwise, in writing, by the Receiver or Corporation. The
Assuming Bank shall have the primary responsibility to respond to subpoenas, discovery

Page 44

140

WaMu_ClosingBook.txt

Records of

which it has custody.

requests, and other similar offcial inquiries with respect to the Records of

6.4 Access to Records; Copies. The Assuming Ban agrees to permit the Receiver
and the Corporation access to all Records of which the Assuming Ban has custody, and
to use,
inspect, make extracts from or request copies of any such Records in the maner and
to the
extent requested, and to duplicate, in the discretion of the Receiver or the
Corporation, any

microfilm or microfiche pertaining to Deposit account relationships;
provided, that in the event that the Failed Ban maintained one or more duplicate
copies of such
microfim or microfiche Records, the Assuming Ban hereby assigns, transfers, and
conveys to
the Corporation one such duplicate copy of each such Record without cost to the
Corporation,
and agrees to deliver to the Corporation all Records assigned and transferred to the
Corporation
under this Article VI as soon as practicable on or after the date of this Agreement.
The pary
requesting a copy of any Record shall bear the cost (based on standard accepted
industry charges
to the extent applicable, as determined by the Receiver) for providing such
duplicate Records. A
copy of each Record requested shall be provided as soon as practicable by the pary
having

Record in the form of

custody thereof.

ARTICLE VII
BID; INITIAL PAYMENT

The Assuming Ban has submitted to the Receiver a positive bid of $1 ,888,000,000.00
for the
Assets purchased and Liabilities Assumed hereunder (the "Bid Amount"). On the
Payment Date,
the Assuming Ban wil pay to the Corporation, or the Corporation will pay to the
Assuming

the
Payment Date is not the day following the day of Ban Closing) from and including the
day
following Ban Closing to and including the day preceding the Payment Date at the
Settlement
Interest Rate.

Ban, as the case may be, the Initial Payment, together with interest on such amount
Page 45

*141*

WamuClosingBook.txt
(if

ARTICLE VIII
PROFORMA

20

Execution Copy Washington Mutual Bank
Whole Bank P&A Henderson, Nevada

The Assuming Bank, as soon as practical after Bank Closing, in accordance with the best
information then available, shall provide to the Receiver a Proforma Statement of
Condition

the Failed Bank as shown on the Failed Bank's books and
records as of Ban Closing and reflecting which assets and liabilities are passing to the Assuming
Ban and which assets and liabilities are to be retained by the Receiver. In addition, the
Assuming Bank is to provide to the Receiver, in a standard data request as defined by the
Receiver, an electronic database of all loans, deposits, and subsidiaries and other business
Bank Closing. See Schedule 3.1a.

indicating all assets and liabilities of

combinations owned by the Failed Bank as of

IX
CONTINUING COOPERATION

ARTICLE

9.1 General Matters. The paries hereto agree that they will, in good faith and with
their best efforts, cooperate with each other to carr out the transactions contemplated by this
Agreement and to effect the purposes hereof.

9.2 Additional Title Documents. The Receiver, the Corporation and the Assuming
Ban each agree, at any time, and from time to time, upon the request of any pary hereto, to

execute and deliver such additional instruments and documents of conveyance as shall be

reasonably necessary to vest in the appropriate pary its full legal or equitable title in and to the

property transferred pursuant to this Agreement or to be transferred in accordance herewith. The

Page 46

WaMuClosingBook.txt

Assuming Bank shall prepare such instruments and documents of conveyance (in form and

substance satisfactory to the Receiver) as shall be neccesar to vest title to the Assets in the

Assuming Ban. The Assuming Bank shall be responsible for recording such instruments and

documents of conveyance at its own expense.

9.3 Claims and Suits.
(a) The Receiver shall have the right, in its discretion, to (i) defend or settle any claim
or suit against the Assuming Ban with respect to which the Receiver has indemnified the

Assuming Ban in the same maner and to the same extent as provided in Aricle XII, and (ii)

defend or settle any claim or suit against the Assuming Ban with respect to any Liability

Assumed, which claim or suit may result in a loss to the Receiver arsing out of or related to this

Agreement, or which existed against the Failed Ban on or before Ban Closing. The exercise by

the Receiver of any rights under this Section 9.3(a) shall not release the Assuming Ban with

respect to any of its obligations under this Agreement.

(b) In the event any action at law or in equity shall be instituted by any Person against
the Receiver and the Corporation as codefendants with respect to any asset of the Failed Ban

retained or acquired pursuant to this Agreement by the Receiver, the Receiver agrees, at the

the Corporation, to join with the Corporation in a petition to remove the action to the

United States District Court for the proper district. The Receiver agrees to institute, with or

without joinder of the Corporation as coplaintiff, any action with respect to any such retained or

acquired asset or any matter connected therewith whenever notice requiring such action shall be

given by the Corporation to the Receiver.

request of

Page 47

WamuClosingBook.txt

2:

Washington Mutual Bank

Execution Copy

Henderson, Nevada

Whole Bank P&A

9.4 Payment of Deposits. In the event any depositor does not accept the obligation of
the Failed Bank assumed by the Assuming

the Assuming Bank to pay any Deposit liability of

Ban pursuant to this Agreement and asserts a claim against the Receiver for all or any portion of

any such Deposit liability, the Assuming Bank agrees on demand to provide to the Receiver

the Deposit liability reflected on

funds sufficient to pay such claim in an amount not in excess of

the books of the Assuming Ban at the time such claim is made. Upon payment by the Assuming
Ban to the Receiver of such amount, the Assuming Bank shall be discharged from any further
obligation under this Agreement to pay to any such depositor the amount of such Deposit liability
paid to the Receiver.

9.5 Withheld Payments. At any time, the Receiver or the Corporation may, in its
discretion, determine that all or any portion of any deposit balance assumed by the Assuming
Ban pursuant to this Agreement does not constitute a "Deposit" (or otherwise, in its discretion,

determine that it is the best interest of the Receiver or Corporation to withhold all or any portion

of any deposit), and may direct the Assuming Ban to withhold payment of all or any portion of

any such deposit balance. Upon such direction, the Assuming Ban agrees to hold such deposit

and not to make any payment of such deposit balance to or on behalf of the depositor, or to itself,

transfer, set-off, or otherwise. The Assuming Ban agrees to maintain the "withheld payment" status of any such deposit balance until directed in writing by the Receiver

Page 48

WaMuClosingBook.txt

whether by way of

the Receiver or the Corporation, the

or the Corporation as to its disposition. At the direction of

Assuming Ban shall return all or any portion of such deposit balance to the Receiver or the
Corporation, as appropriate, and thereupon the Assuming Ban shall be discharged from any
further liability to such depositor with respect to such returned deposit balance. If such deposit
balance has been paid to the depositor prior to a demand for return by the Corporation or the
Receiver, and payment of such deposit balance had not been previously withheld pursuant to this
Section, the Assuming Ban shall not be obligated to return such deposit balance to the Receiver
or the Corporation. The Assuming Ban shall be obligated to reimburse the Corporation or the
Receiver, as the case may be, for the amount of any deposit balance or portion thereof paid by the
Assuming Ban in contravention of any previous direction to withhold payment of such deposit

which was withheld pursuant to this

balance or return such deposit balance the payment of

Section.

9.6 Proceedings with Respect to Certain Assets and Liabilties.
(a) In connection with any investigation, proceeding or other matter with respect to the Failed Ban

the Failed Ban retained by the Receiver, or any asset of

any asset or liability of

acquired by the Receiver pursuant to this Agreement, the Assuming Ban shall cooperate to the

extent reasonably required by the Receiver.

(b) In addition to its obligations under Section 6.4, the Assuming Ban shall provide the Receiver access at reasonable times and locations without other limitation

representatives of

the Subsidiares

or qualification to (i) its directors, offcers, employees and agents and those of

Page 49

145

WaMuClosingBook.txt

acquired by the Assuming Ban, and (ii) its books and records, the books and records of such

books, records and Credit Files

Subsidiaries and all Credit Files, and copies thereof. Copies of

22
Washington Mutual Bank
Execution Copy Henderson, Nevada
Whole Bank P&A

shall be provided by the Assuming Bank as requested by the Receiver and the costs of

duplication thereof shall be borne by the Receiver.

(c) Not later than ten (10) days after the Put Notice pursuant to Section 3.4 or the date
transfer of any Loan by the Assuming Bank to the Receiver pursuant to Section
3.6, the Assuming Bank shall deliver to the Receiver such documents with respect to such Loan
as the Receiver may request, including without limitation the following: (i) all related Credit
Documents (other than certificates, notices and other ancillar documents). (ii) a certificate

of the notice of

interest, fees and

the transfer and the amount of
setting forth the principal amount on the date of

other charges then accrued and unpaid thereon, and any restrictions on transfer to which any such
Loan is subject, and (iii) all Credit Files, and all documents, microfiche, microfim and computer
records (including but not limited to magnetic tape, disc storage, card forms and printed copy)

the

the Assuming Ban or any Affiliate of
maintained by, owned by, or in the possession of

Assuming Ban relating to the transferred Loan.

9.7 Information. The Assuming Ban promptly shall provide to the Corporation such
other information, including financial statements and computations, relating to the performance
of the provisions of this Agreement as the Corporation or the Receiver may request from time to
the Failed Ban employed

Page 50

*146*

WaMuClosingBook.txt

the Receiver, make available employees of

time, and, at the request of

the pro forma statement pursuant to

or retained by the Assuming Ban to assist in preparation of  .

Section 8.1.

X
CONDITION PRECEDENT

ARTICLE

the paries to this Agreement are subject to the Receiver and the
Corporation having received at or before Ban Closing evidence reasonably
satisfactory to each
of any necessar approval, waiver, or other action by any governmental authority, the
board of
directors of the Assuming Ban, or other third pary, with respect to this Agreement
and the

The obligations of

the

the Failed Ban and the appointment of
transactions contemplated hereby, the closing of

the Assuming Ban, and any agreements, documents, matters or

Receiver, the charering of

proceedings contemplated hereby or thereby.

XI

ARTICLE

REPRESENTATIONS AND WARTIES OF THE ASSUMING BANK

The Assuming Ban represents and warants to the Corporation and the Receiver as
follows:  .

(a) Corporate Existence and Authority  The Assuming Ban (i) is duly organized,
validly existing and in good standing under the laws of its Charering Authority and
has full
power and authority to own and operate its properties and to conduct its business as
now

Page 51

WaMuClosingBook.txt
conducted by it, and (ii) has full power and authority to execute and deliver this Agreement and

to perform its obligations hereunder. The Assuming Bank has taken all necessary corporate

23
Washington Mutual Bank
Execution Copy Henderson, Nevada
Whole Bank P&A

.
this Agreement and the

action to authorize the execution, delivery and performance of

performance of the transactions contemplated hereby.

(b) Third Party Consents. No governmental authority or other third party consents (including but not limited to approvals, licenses, registrations or declarations) are required in
connection with the execution, delivery or performance by the Assuming Bank of this

Agreement, other than such consents as have been duly obtained and are in full force and effect.

(c) Execution and Enforceability. This Agreement has been duly executed and delivered by the Assuming Ban and when this Agreement has been duly authorized, executed
and delivered by the Corporation and the Receiver, this Agreement will constitute the legal, valid

the Assuming Ban, enforceable in accordance with its terms and binding obligation of

(d) Compliance with Law.
(i) Neither the Assuming Ban nor any of its Subsidiares is in violation of any statute, regulation, order, decision, judgment or decree of, or any restriction imposed by, the
United States of America, any State, municipality or other political subdivision or any agency of
any of the foregoing, or any court or other tribunal having jurisdiction over the Assuming Ban
or any of its Subsidiares or any assets of any such Person, or any foreign governent or agency
thereof having such jurisdiction, with respect to the conduct of the business of the Assuming

the Assuming Ban or
any of its Subsidiares, which, either individually or in the aggregate with all other such
violations, would materially and adversely affect the business, operations or condition (financial

Ban or of any of its Subsidiares, or the ownership of the properties of

the Assuming Bank to perform, satisfy or
Page 52

WaMuClosingBook.txt
observe any obligation or condition under this Agreement,

or otherwise) of the Assuming Ban or the ability of

(ii) Neither the execution and delivery nor the performance by the Assuming
Ban of this Agreement will result in any violation by the Assuming Ban of, or be in
conflict

with, any provision of any applicable law or regulation, or any order, writ or
decree of any court

or governmental authority.

e) Representations Remain True. The Assuming Ban represents and warants
that it has executed and delivered to the Corporation a Purchaser Eligibility
Certification and
Confidentiality Agreement and that all information provided and representations made
by or on
behalf of the Assuming Ban in connection with this Agreement and the transactions
contemplated hereby, including, but not limited to, the Purchaser Eligibility
Certification and
Confidentiality Agreement (which are affrmed and ratified hereby) are and remain
true and
correct in all material respects and do not fail to state any fact required to make
the information
contained therein not misleading.

ARTICLE XII
INDEMNIFICATION

24

Execution Copy Washington Mutual Bank
Whole Bank P&A Henderson, Nevada

12.1 Indemnifcation of Indemnitees. From and after Bank Closing and subject to
the limitations set forth in this Section and Section 12.6 and compliance by the
Indemnitees with
Section 12.2, the Receiver agrees to indemnify and hold harmless the Indemnitees
against any
and all costs, losses, liabilities, expenses (including attorneys' fees) incurred
prior to the
assumption of defense by the Receiver pursuant to paragraph (d) of Section 12.2,
judgments,
fines and amounts paid in settlement actually and reasonably incurred in connection
with claims

the Failed Ban that are not assumed by the

by the

against any Indemnitee (1) based on liabilities of

Assuming Ban pursuant to this Agreement or subsequent to the execution hereof
Page 53

149

WaMuClosingBook.txt

Assuming Bank or any Subsidiar or Affiliate of the Assuming Bank for which indemnification

this Section 12.1 or (2) described in Section 12.1(a) below
subj ect in each case to certain exclusions as provided in (b) of this Section 12.1

is provided hereunder in (a) of

(a)
(1) claims based on the rights of any shareholder or former shareholder as such of the Failed Ban;

(x) the Failed Ban, or (y) any Subsidiar or Affilate of
(2) claims based on the rights of any creditor as such of the Failed Ban, or any creditor as such of any director, offcer, employee or agent of the Failed Ban or any Affiliate of
the Failed Ban or any

the Failed Ban, with respect to any indebtedness or other obligation of

Affilate of the Failed Ban arsing prior to Ban Closing;

(3) claims based on the rights of any present or former director, offcer, employee or agent as such of the Failed Ban or of any Subsidiary or Affilate of the Failed Ban;
the Failed

(4) claims based on any action or inaction prior to Ban Closing of the

Ban, its directors, officers, employees or agents as such, or any Subsidiar or Affiliate of

Failed Ban, or the directors, offcers, employees or agents as such of such Subsidiar or
Atfiliate;

the Failed

(5) claims based on any malfeasance, misfeasance or nonfeasance of the Failed

Ban, its directors, offcers, employees or agents with respect to the trust business of

Ban, if any;

(6) claims based on any failure or alleged failure (not in violation of law) by the Assuming Ban to continue to perform any service or activity previously performed by the Failed

Ban which the Assuming Ban is not required to perform pursuant to this Agreement or which

Page 54

*150*

WaMuClosingBook.txt

arise under any contract to which the Failed Ban was a party which the Assuming Ban elected
not to assume in accordance with this Agreement and which neither the Assuming Ban nor any
Subsidiar or Affiliate of the Assuming Ban has assumed subsequent to the execution hereof;

(7) claims arsing from any action or inaction of any Indemnitee, including for the Failed Ban or of any

purposes of this Section 12.1(a)(7) the former offcers or employees of

Subsidiar or Affliate of the Failed Ban that is taken upon the specific written direction of the

Corporation or the Receiver, other than any action or inaction taken in a maner constituting bad

faith, gross negligence or willful misconduct; and

25

Execution Copy Washington Mutual Bank

Whole Bank P&A Henderson, Nevada

the Failed Bank whose deposit

(8) claims based on the rights of any depositor of
has been accorded "withheld payment" status and/or returned to the Receiver or Corporation in
accordance with Section 9.5 and/or has become an "unclaimed deposit" or has been returned to
the Corporation or the Receiver in accordance with Section 2.3;

(9) claims asserted by, or derivatively by any shareholder on behalf of, the Failed bidding, negotiation, execution and

Ban's parent company based on the process of

the transactions contemplated by this Agreement, provided that (x) the amount

consummation of

the indemnification paid or payable pursuant to this clause (9) shall not exceed $500,000,000,
and (y) the indemnification provided by this clause (9) shall cover only those claims specifically

of

the transactions contemplated by this Agreement.

enumerated in the FDIC's approval of

Page 55

*151*

WaMuClosingBook.txt

(b), provided, that, with respect to this Agreement, except for paragraphs (7), (8) and
(9) of Section 12.1 (a), no indemnification will be provided under this Agreement for any:
(1) judgment or fine against, or any amount paid in settlement (without the written the Receiver) by, any Indemnitee in connection with any action that seeks damages against any Indemnitee (a "counterclaim") arsing with respect to any Asset and based on any
action or inaction of either the Failed Ban, its directors, offcers, employees or agents as such
prior to Ban Closing, unless any such judgment, fine or amount paid in settlement exceeds the
greater of (i) the Repurchase Price of such Asset, or (ii) the monetar recovery sought on such

Asset by the Assuming Bank in the cause of action from which the counterclaim arses; and in

such event the Receiver will provide indemnification only in the amount of such excess; and no

indemnification will be provided for any costs or expenses other than any costs or expenses

(including attorneys' fees) which, in the determination of the Receiver, have been actually and
reasonably incurred by such Indemnitee in connection with the defense of any such counterclaim;
and it is expressly agreed that the Receiver reserves the right to intervene, in its discretion, on its
behalf and/or on behalf of the Receiver, in the defense of any such counterclaim;

approval of

the Failed Ban that is

(2) claims with respect to any liability or obligation of
expressly assumed by the Assuming Ban pursuant to this Agreement or subsequent to the

the Assuming Ban;

execution hereof by the Assuming Ban or any Subsidiar or Affiliate of

the Failed Ban to any present or former

(3) claims with respect to any liability of
the Failed Ban, which

employee as such of the Failed Ban or of any Subsidiar or Affiliate of

liability is expressly assumed by the Assuming Ban pursuant to this Agreement or subsequent to

the Assuming Ban;

Page 56

*152*

WaMuClosingBook.txt

the execution hereof by the Assuming Ban or any Subsidiar or Affiliate of

(4) claims based on the failure of any Indemnitee to seek recovery of damages the Failed Ban, its

from the Receiver for any claims based upon any action or inaction of

directors, offcers, employees or agents as fiduciar, agent or custodian prior to Ban Closing;

the

(5) claims based on any violation or alleged violation by any Indemnitee of the United States of

antitrust, branching, baning or ban holding company or securities laws of

America or any State thereof;

26

Washington Mutual Bank

Execution Copy Henderson, Nevada
Whole Bank P&A

(6) claims based on the rights of any present or former creditor, customer, or the Assuming Ban;

supplier as such of the Assuming Ban or any Subsidiary or Affliate of

(7) claims based on the rights of any present or former shareholder as such of the whether any

Assuming Ban or any Subsidiar or Affliate of the Assuming Bank regardless of

the Failed Bank;

such present or former shareholder is also a present or former shareholder of

providing such

the Receiver determines that the effect of

(8) claims, if indemnification would be to (i) expand or alter the provisions of any waranty or disclaimer

this Agreement, or (ii) create any

Page 57

*153*

WaMuClosingBook.txt
warranty not expressly provided under this Agreement;

thereof provided in Section 3.3 or any other provision of

(9) claims which could have been enforced against any Indemnitee had the Assuming Bank not entered into this Agreement;
(10) claims based on any liability for taxes or fees assessed with respect to the consummation of the transactions contemplated by this Agreement, including without limitation
any subsequent transfer of any Assets or Liabilities Assumed to any Subsidiar or Affiliate of the

Assuming Ban;

(11) except as expressly provided in this Aricle XII, claims based on any action or inaction of any Indemnitee, and nothing in this Agreement shall be construed to provide
the Failed Ban, or (iii)

indemnification for (i) the Failed Ban, (ii) any Subsidiar or Affliate of

any present or former director, offcer, employee or agent of the Failed Ban or its Subsidiares

or Affliates; provided, that the Receiver, in its discretion, may provide indemnification

the Failed Ban or its

hereunder for any present or former director, offcer, employee or agent of

Subsidiares or Affliates who is also or becomes a director, offcer, employee or agent of the

Assuming Ban or its Subsidiares or Affliates;

(12) claims or actions which constitute a breach by the Assuming Bank of the representations and waranties contained in Aricle XI;
(13) claims arsing out of or relating to the condition of or generated by an Asset arsing from or relating to the presence, storage or release of any hazardous or toxic substance, or
any pollutant or contaminant, or condition of such Asset which violate any applicable Federal,
State or local law or regulation concerning environmental protection;

(14) claims based on, related to or arsing from any asset, including a loan, acquired or liability assumed by the Assuming Ban, other than pursuant to this Agreement; and
(15) claims based on, related to or arsing from any liability specifically not assumed by the Assuming Ban pursuant to Section 2.5 of this Agreement.
12.2 Conditions Precedent to Indemnification. It shall be a condition precedent to the obligation of the Receiver to indemnify any Person pursuant to this Aricle XII that such
27

Page 58

*154*

WaMuClosingBook.txt
Execution Copy Washington Mutual Bank
Whole Bank P&A Henderson, Nevada

.
Person shall, with respect to any claim made or threatened against such Person for which such
Person is or may be entitled to indemnification hereunder:

the

(a) give written notice to the Regional Counsel (Litigation Branch) of Corporation in the manner and at the address provided in Section 13.7 of such claim as soon as
practicable after such claim is made or threatened; provided, that notice must be given on or
this Agreement;

before the date which is six (6) years from the date of

(b) provide to the Receiver such information and cooperation with respect to such claim as the Receiver may reasonably require;

(c) cooperate and take all steps, as the Receiver may reasonably require, to preserve
and protect any defense to such claim;

(d) in the event suit is brought with respect to such claim, upon reasonable prior notice, afford to the Receiver the right, which the Receiver may exercise in its sole discretion, to
conduct the investigation, control the defense and effect settlement of such claim, including
without limitation the right to designate counsel and to control all negotiations, litigation,
arbitration, settlements, compromises and appeals of any such claim, all of which shall be at the

the Receiver; provided, that the Receiver shall have notified the Person claiming indemnification in writing that such claim is a claim with respect to which the Person claiming
indemnification is entitled to indemnification under this Aricle XII;

expense of

(e) not incur any costs or expenses in connection with any response or suit with respect to such claim, unless such costs or expenses were incurred upon the written direction of
the Receiver; provided, that the Receiver shall not be obligated to reimburse the amount of any
such costs or expenses unless such costs or expenses were incurred upon the written direction of

the Receiver;

(f) not release or settle such claim or make any payment or admission with respect thereto, unless the Receiver consents in writing thereto, which consent shall not be unreasonably

Page 59



WaMuClosingBook.txt

withheld; provided, that the Receiver shall not be obligated to reimburse the amount of any such
settlement or payment unless such settlement or payment was effected upon the written direction
of the Receiver; and

(g) take reasonable action as the Receiver may request in writing as necessar to
preserve, protect or enforce the rights of the indemnified Person against any
Primary Indemnitor.

12.3 No Additional Warranty. Nothing in this Aricle XII shall be construed or provided under
deemed to (i) expand or otherwise alter any waranty or disclaimer thereof

this Agreement with respect to, among other matters, the

title, value, collectibility, genuineness, enforceability or condition of any (x)
Asset, or (y) asset of this Agreement

Section 3.3 or any other provision of

the Failed Ban purchased by the Assuming Ban subsequent to the execution of

the Assuming Ban, or (ii) create any

by the Assuming Bank or any Subsidiar or Affliate of

waranty not expressly provided under this Agreement with respect thereto.

28

Execution Copy Washington Mutual Bank
Whole Bank P&A Henderson, Nevada

12.4 Indemnifcation of Receiver and Corporation. From and after Ban Closing,
the Assuming Bank agrees to indemnify and hold harmless the Corporation and the Receiver and
their respective directors, officers, employees and agents from and against any and all costs,
losses, liabilities, expenses (including attorneys' fees), judgments, fines and amounts paid in
the following:

settlement actually and reasonably incurred in connection with any of

the Failed Bank assumed

(a) claims based on any and all liabilities or obligations of
by the

by the Assuming Bank pursuant to this Agreement or subsequent to the execution hereof

Page 60

WaMuClosingBook.txt

the Assuming Ban, whether or not any such

Assuming Ban or any Subsidiary or Affiliate of

liabilities subsequently are sold and/or transferred, other than any claim based upon any action or
inaction of any Indemnitee as provided in paragraph (7) or (8) of Section 12.1(a); and

(b) claims based on any act or omission of any Indemnitee (including but not limited to claims of any Person claiming any right or title by or through the Assuming Ban with respect

to Assets transferred to the Receiver pursuant to Section 3.4 or 3.6), other than any action or
inaction of any Indemnitee as provided in paragraph (7) or (8) of Section 12.1 (a).

the Receiver, and the Corporation

12.5 Obligations Supplemental. The obligations of
as guarantor in accordance with Section 12.7, to provide indemnification under this Article XII
are to supplement any amount payable by any Primar Indemnitor to the Person indemnified
under this Article XII. Consistent with that intent, the Receiver agrees only to make payments

the

pursuant to such indemnification to the extent not payable by a Primar Indemnitor. If

aggregate amount of payments by the Receiver, or the Corporation as guarantor in accordanceindemnification under

with Section 12.7, and all Primar Indemnitors with respect to any item of

this Article XII exceeds the amount payable with respect to such item, such Person being
indemnified shall notify the Receiver thereof and, upon the request of the Receiver, shall
promptly pay to the Receiver, or the Corporation as appropriate, the amount of the Receiver's (or
Corporation's) payments to the extent of such excess.

this Article XII to the

12.6 Criminal Claims. Notwithstanding any provision of
contrar, in the event that any Person being indemnified under this Article XII shall become

involved in any criminal action, suit or proceeding, whether judicial, administrative or

Page 61

*157*

WaMuClosingBook.txt

investigative, the Receiver shall have no obligation hereunder to indemnify such Person for

liability with respect to any criminal act or to the extent any costs or expenses are attributable to

the defense against the allegation of any criminal act, unless (i) the Person is successful on the

merits or otherwise in the defense against any such action, suit or proceeding, or (ii) such action,

suit or proceeding is terminated without the imposition of liability on such Person.

12.7 Limited Guaranty of the Corporation. The Corporation hereby guarantees performance of the Receiver's obligation to indemnify the Assuming Ban as set forth in this

Aricle XII. It is a condition to the Corporation's obligation hereunder that the Assuming Ban shall comply in all respects with the applicable provisions of this Aricle XII. The Corporation shall be liable hereunder only for such amounts, if any, as the Receiver is obligated to pay under the terms of this Aricle XII but shall fail to pay. Except as otherwise provided above in this Section 12.7, nothing in this Aricle XII is intended or shall be construed to create any liability or

the Corporation, the United States of America or any deparment or

obligation on the par of

29

Execution Copy Washington Mutual Bank
Henderson, Nevada

Whole Bank P&A

under or with respect to this Aricle XII, or any provision hereof, it being the

agency thereof

the parics hereto that the obligations undertaken by the Receiver under this Aricle

intention of

the Receiver and no other Person or entity.

XII are the sole and exclusive responsibility of

12.8 Subrogation. Upon payment by the Receiver, or the Corporation as guarantor in
Page 62

*158*

MemoClosingBook.txt

accordance with Section 12.7, to any Indemnitee for any claims indemnified by the Receiver
under this Aricle XII, the Receiver, or the Corporation as appropriate, shall become surrogated
to all rights of the Indemnitee against any other Person to the extent of such payment.

ARTICLE XIII
MISCELLANEOUS


the paries

13.1 Entire Agreement. This Agreement embodies the entire agreement of
hereto in relation to the subject matter herein and supersedes all prior understandings or
agreements, oral or written, between the paries.


Contents, Aricles and

the Table of


13.2 Headings. The headings and subheadings of
Sections contained in this Agreement, except the terms identified for definition in Aricle I and
elsewhere in this Agreement, are inserted for convenience only and shall not affect the meaning
or interpretation of this Agreement or any provision hereof.

13.3 Counterparts. This Agreement may be executed in any number of counterpars
and by the duly authorized representative of a different party hereto on separate counterpars,

which when taken

each of which when so executed shall be deemed to be an original and all of


together shall constitute one and the same Agreement.

13.4 GOVERNING LAW. THIS AGREEMENT AND THE RIGHTS AN
OBLIGATIONS HEREUNER SHALL BE GOVERNED BY AN CONSTRUED IN
ACCORDANCE WITH THE FEDERA LAW OF THE UNTED STATFS OF AMERICA,
AN IN THE ABSENCE OF CONTROLLING FEDERAL LAW, IN ACCORDANCE WITH

THE LAWS OF THE STATE IN WHICH THE MAIN OFFICE OF THE FAIFD BAN IS


LOCATED.

this Agreement shall be binding on the

13.5 Successors. All terms and conditions of
successors and assigns of the Receiver, the Corporation and the Assuming Ban. Except as
otherwise specifically provided in this Agreement, nothing expressed or referred to in this

Page 63

*159*

WaMuClosingBook.txt
Agreement is intended or shall be construed to give any Person other than the Receiver, the

Corporation and the Assuming Ban any legal or equitable right, remedy or claim under or with

respect to this Agreement or any provisions contained herein, it being the intention of the paries

responsibilities hereunder, and all

hereto that this Agreement, the obligations and statements of

other conditions and provisions hereof are for the sole and exclusive benefit of the Receiver, the
Corporation and the Assuming Ban and for the benefit of no other Person.

30
Washington Mutual Bank
Execution Copy Henderson, Nevada
Whole Bank P&A

13.6 Modification; Assignment. No amendment or other modification, rescission, release, or assignment of any par of this Agreement shall be effective except pursuant to a
the parties hereto.

written agreement subscribed by the duly authorized representatives of

13.7 Notice. Any notice, request, demand, consent, approval or other communication to any party hereto shall be effective when received and shall be given in writing, and delivered
in person against receipt therefore, or sent by certified mail, postage prepaid, courier service,
telex or facsimile transmission to such party (with copies as indicated below) at its address set
forth below or at such other address as it shall hereafter furnish in writing to the other paries. All
such notices and other communications shall be deemed given on the date received by the
addressee.

Assuming Bank

JPMorgan Chase Ban, National Association

270 Park Avenue

New York, New York 10017

Attention: Brian A. Bessey

with a copy to: Stephen M. Cutler

Receiver and Corporation

Page 64

*160*

WaMuClosingBook.txt

Federal Deposit Insurance Corporation,

Washington Mutual Ban, Henderson, Nevada
1601 Bryan St., Suite 1700
Dallas, Texas 75201

Receiver of

Attention: Deputy Director (DRR-Field Operations Branch)

with copy to: Regional Counsel (Litigation Branch)

and with respect to notice under Article XII:

Federal Deposit Insurance Corporation

Washington Mutual Ban, Henderson, Nevada
1601 Bryan St., Suite 1700
Dallas, Texas 75201
Attention: Regional Counsel (Litigation Branch)

Receiver of

13.8 Manner of Payment. All payments due under this Agreement shall be in lawful
the United States of America in immediately available funds as each pary hereto may
specify to the other parties; provided, that in the event the Receiver or the
Corporation is
obligated to make any payment hereunder in the amount of $25,000.00 or less, such
payment

money of

may be made by check.

31
Washington Mutual Bank

Execution Copy Henderson, Nevada
Whole Bank P&A

13.9 Costs, Fees and Expenses. Except as otherwise specifically provided herein,
each
party hereto agrees to pay all costs, fees and expenses which it has incurred in
connection with or
incidental to the matters contained in this Agreement, including without limitation
any fees and
disbursements to its accountants and counsel; provided, that the Assuming Bank shall
pay all
fees, costs and expenses (other than attorneys' fees incurred by the Receiver)
incurred in
connection with the transfer to it of any Assets or Liabilities Assumed hereunder or
in

Page 65

*161*

WaMuClosingBook.txt

accordance herewith.

the Receiver, the Corporation and the Assuming Bank may
waive its respective rights, powers or privileges under this Agreement; provided,
that such

13.10 Waiver. Each of
the

waiver shall be in writing; and further provided, that no failure or delay on the
par of

Receiver, the Corporation or the Assuming Ban to exercise any right, power or
privilege under

this Agreement shall operate as a waiver thereof, nor will any single or parial
exercise of any

right, power or privilege under this Agreement preclude any other or further
exercise thereof or

the exercise of any other right, power or privilege by the Receiver, the
Corporation, or the

Assuming Ban under this Agreement, nor will any such waiver operate or be construed
as a

future waiver of such right, power or privilege under this Agreement.

13.11 Severabilty. If any provision of this Agreement is declared invalid or
this Agreement

the remaining provisions of

unenforceable, then, to the extent possible, all of

shall remain in full force and effect and shall be binding upon the paries hereto.

13.12 Term of Agreement. This Agreement shall continue in full force and effect
until
the sixth (6th) anniversar of Ban Closing; provided, that the provisions of Section
6.3 and 6.4

this Agreement. Provided, however, the receivership of

the term of

shall survive the expiration of

this Agreement; in such

the term of

Page 66

*162*

WaMuClosingBook.txt

the Failed Ban may be terminated prior to the expiration of

event, the guaranty of the Corporation, as provided in and in accordance with the provisions of

this

the term. Expiration of the term of
Section 12.7 shall be in effect for the remainder of

Agreement shall not affect any claim or liability of any pary with respect to any
(i) amount

when such amount becomes payable,

which is owing at the time of such expiration, regardless of

when such

and (ii) breach of this Agreement occurring prior to such expiration, regardless of

breach is discovered.

13.13 Survival of Covenants, Etc. The covenants, representations, and waranties in this Agreement shall survive the execution of this Agreement and the consummation of the
transactions contemplated hereunder.
(Signature Page Follows)


32


Washington Mutual Bank

Execution Copy Henderson, Nevada
Whole Bank P&A


IN WITNESS WHEREOF, the paries hereto have caused this Agreement to be executed by their duly authorized representatives as of the date first above written.

FEDERAL DEPOSIT INSURANCE CORPORATION,
RECEIVER OF WASHINGTON MUTUAL BANK,

HENDERSON, NEVADA

BY: /Mitchell L. Glassman

NAME: Mitchell L. Glassman
TITLE: Director

Page 67


*163*

WaMuClosingBook.txt

Attest:

/David M. Gearn

FEDERAL DEPOSIT INSURANCE CORPORATION

BY: /Mitchell L. Glassman

NAME: Mitchell L. Glassman
TITLE: Director

Attest:

/David M. Gearn

JPMORGAN CHASE BANK, NATIONAL
ASSOCIATION

BY: /Brian A. Bessey

NAME: Brian A. Bessey
TITLE: Senior Vice President

Attest:

/Michael Lipsitz

33

Execution Copy Washington Mutual Bank
Whole Bank P&A Henderson, Nevada

SCHEDULE 2.1 - Certain Liabilities Not Assumed

1. Preferred stock and litigation pending against the Failed Ban related to liabilities
retained by the receiver.

2. Subordinated debt.
3. Senior debt.
the Failed Ban except
the tax-qualified pension and 401(k) plans and employee medical plan.

4. All employee benefit plans sponsored by the holding company of
5. All management, employment, change-in-control, severance, unfunded deferred
compensation and individual consulting agreements or plans (i) between the Failed Ban
and its employees or (ii) maintained by the Failed Ban on behalf of its employees.
34

Execution Copy Washington Mutual Bank
Whole Bank P&A Henderson, Nevada

Page 68

*164*

WaMuClosingBook.txt

SCHEDULE 3.2 – Purchase Price of Assets

(a) cash and receivables from depository Book Value institutions, including cash items in the process of collection, plus interest thereon:

(b) the capital stock of Market Valuesecurities (exclusive of Acquired Subsidiares), plus interest thereon:

(c) federal funds sold and repurchase Book Value agreements, if any, including interest thereon:

(d) Loans: Book Value

(e) Other Real Estate: Book Value

(f) credit card business, if any, including all Book Value outstanding extensions of credit:

(g) Safe Deposit Boxes and related business, safekeeping business and trust business, if Book Value any:

(h) Records and other documents: Book Value

(i) capital stock of any Acquired Subsidiares: Book Value

(j) amounts owed to the Failed Ban by any Book Value Acquired Subsidiar:

(k) assets securing Deposits of public money, Book Value to the extent not otherwise purchased hereunder:

(1) Overdrafts of customers: Book Value

35

Execution Copy Washington Mutual Bank
Whole Bank P&A Henderson, Nevada

(m) rights, if any, with respect to Qualified Market Value Financial Contracts.

(n) the Failed Bank to provide Book Value rights of mortgage servicing for others and to have mortgage servicing provided to the Failed Ban by others and related contracts.

(C) Ban Premises: Book Value

(p) Furniture and Equipment: Book Value

(q) Fixtures: Book Value

36

Washington Mutual Bank
Execution Copy Henderson, Nevada
Whole Bank P&A

SCHEDULE 3.5 – Certain Assets Not Purchased

Page 69

165

WaMuClosingBook.txt

(1) Any Financial Institution Bonds, Baner's Blanket Bonds, surety bonds (except Court

bonds required for retained litigation risk), Directors and Officers insurance, Professional

Liability insurance, or related premium refund, uneared premium derived from cancellation, or

the foregoing. This shall exclude Commercial

any proceeds payable with respect to any of

General Liability, International Liability, Commercial Automobile, Worker's Compensation,
Employer's Liability, Umbrella and Excess Liability, Property, Mortgage Impairment and
Mortgage Errors & Omissions, Lender-placed coverage, Private Mortgage Insurance, Boiler &
Machinery, Terrorism, Mail, Storage Tan Liability, Marne Liability, Vessel Hull and Vessel
Pollution (if marne assets are acquired), Aircraft Liability (if aircraft assets are acquired)

insurance policies, proceeds and collateral related to, held or issued with respect to or in

connection with any Asset (including Ban staff) acquired by the Assuming Ban under this

Agreement, which such policies, proceeds and collateral are acquired Assets.

(2) any interest, right, action, claim, or judgment against (i) any officer, director, employee,
accountant, attorney, or any other Person employed or retained by the Failed Ban or any

Subsidiar of the Failed Ban on or prior to Ban Closing arsing out of any act or omission of
such Person in such capacity, (ii) any underwriter of financial institution bonds, baner's blanet

the Failed Ban, (iii) any shareholder or holding company

bonds or any other insurance policy of

the Failed Ban, or (iv) any other Person whose action or inaction may be related to any loss
(exclusive of any loss resulting from such Person's failure to pay on a Loan made by the Failed
Ban) incurred by the Failed Bank; provided, that for the purposes hereof, the acts, omissions or
other events giving rise to any such claim shall have occurred on or before Ban Closing,
regardless of when any such claim is discovered and regardless of whether any such claim is

Page 70

*166*

WaMuClosingBook.txt

of

made with respect to a financial institution bond, banar's blanket bond, or any other insurance
Ban Closing;

policy of the Failed Ban in force as of

(3) leased Ban Premises and leased Furniture and Equipment and Fixtures and data
processing equipment (including hardware and softare) located on leased or owned Ban

Premises, if any; provided, that the Assuming Ban does obtain an option under
Section 4.6,

Section 4.7 or Section 4.8, as the case may be, with respect thereto; and

the Failed Ban;

(4) any criminaVrestitution orders issued in favor of
37

Washington Mutual Bank

Execution Copy Henderson, Nevada
Whole Bank P&A

EXHIBIT 3.2(c) -- VALUATION OF CERTAIN
QUALIFIED FINANCIAL CONTRACTS

A. Scope
Interest Rate Contracts -- All interest rate swaps, forward rate agreements, interest rate
futures, caps, collars and floors, whether purchased or written.

Option Contracts - All put and call option contracts, whether purchased or written, on
marketable securities, financial futures, foreign currencies, foreign exchange or foreign

exchange futures contracts.

Foreign Exchange Contracts - All contracts for future purchase or sale of foreign
currencies, foreign currency or cross currency swap contracts, or foreign exchange futures
contracts.

B. Exclusions
All financial contracts used to hedge assets and liabilities that are acquired by the

Assuming Ban but are not subject to adjustment from Book Value.

C. Adjustment

Page 71

*167*

WaMuClosingBook.txt
The difference between the Book Value and market value as of Ban Closing.

D. Methodology
1. The price at which the Assuming Ban sells or disposes of Qualified Financial
Contracts will be deemed to be the fair market value of such contracts, if such sale

or disposition occurs at prevailing market rates within a predefined timetable as

agreed upon by the Assuming Ban and the Receiver.

2. In valuing all other Qualified Financial Contracts, the following principles will
apply:

(i) All known cash flows under swaps or forward exchange contracts shall be
present valued to the swap zero coupon interest rate curve.

(ii) All valuations shall employ prices and interest rates based on the actual
frequency of rate reset or payment.

(iii) Each tranche of amortizing contracts shall be separately valued. The total
its

the values of

value of such amortizing contract shall be the sum of

component tranches.

38

Washington Mutual Bank

Execution Copy Henderson, Nevada
Whole Bank P&A

.
the

(iv) For regularly traded contracts, valuations shall be at the midpoint of
bid and ask prices quoted by customary sources (e.g., The Wall Street

Journal, Telerate, Reuters or other similar source) or regularly traded
exchanges.

(v) For all other Qualified Financial Contracts where published market quotes
the bid and ask

are unavailable, the adjusted price shall be the average of

price quotes from three (3) securities dealers acceptable to the Receiver
and Assuming Ban as of Bank Closing. If quotes from securities dealers

canot be obtained, an appraiser acceptable to the Receiver and the

Assuming Ban will perform a valuation based on modeling, correlation
Page 72

*168*

WaMuClosingBook.txt
analysis, interpolation or other techniques, as appropriate.

39

Execution Copy Washington Mutual Bank
Whole Bank P&A Henderson, Nevada



Page 73

*169*

WaMuClosingBook.txt



170

WaMuClosingBook.txt

0.00

Federal Deposit Insurance Corporation

1601 Bryan Street, Dallas TX 75201 Dallas Regional Office

MEMORANDUM TO: Robert Schoppe
Receiver-in-Charge
FROM: Martha Duncan
Administrative Assistant
DATE: September 26, 2008
SUBJECT: #10015 - Washington Mutual Bank
Henderson, Nevada - In Receivership
Asset Category: Bank Premises

On September 25, 2008, Washington Mutual Bank, Henderson, Nevada (the "Institution") was
closed by the Office of Thrift Supervision and the Federal Deposit Insurance Corporation was
appointed as receiver of the Institution (the "Receiver"). Under the laws of the United States, the
Receiver is charged with the duty of winding up the affairs of the former Institution.

Under the terms of the Whole Bank Purchase and Assumption Agreement, the Assuming Institution, JPMorgan Chase, purchased all of the assets of the failed bank. As a result of the
foregoing, many of the items typically gathered, copied and reconciled at other closings were not
gathered by personnel at this particular closing. Since FDIC did not retain any assets, no
inventory of same was created and none is included herein.

Federal Deposit Insurance Corporation

1601 Bryan Street, Dallas TX 75201 Dallas Regional Office

MEMORANDUM TO: Robert Schoppe
Receiver-in-Charge
FROM: Martha Duncan
Administrative Assistant
DATE: September 26, 2008
SUBJECT: #10015 - Washington Mutual Bank
Henderson, Nevada - In Receivership
Asset Category: Fed Funds Sold

On September 25, 2008, Washington Mutual Bank, Henderson, Nevada (the "Institution") was
closed by the Office of Thrift Supervision and the Federal Deposit Insurance Corporation was
appointed as receiver of the Institution (the "Receiver"). Under the laws of the United States, the
Receiver is charged with the duty of winding up the affairs of the former Institution.

Under the terms of the Whole Bank Purchase and Assumption Agreement, the Assuming
Page 75

171

WaMuClosingBook.txt

institution, JPMorgan Chase, purchased all of the assets of the failed bank. As a result of the
foregoing, many of the items typically gathered, copied and reconciled at other closings were not
gathered by personnel at this particular closing. Since FDIC did not retain any assets, no
inventory of same was created and none is included herein.

Federal Deposit Insurance Corporation

1601 Bryan Street, Dallas TX 75201 Dallas Regional Office

MEMORANDUM TO: Robert Schoppe
Receiver-in-Charge
FROM: Martha Duncan
Administrative Assistant
DATE: September 26, 2008
SUBJECT: #10015 - Washington Mutual Bank
Henderson, Nevada - In Receivership
Asset Category: Loan Trial Balances

On September 25, 2008, Washington Mutual Bank, Henderson, Nevada (the "Institution") was
closed by the Office of Thrift Supervision and the Federal Deposit Insurance Corporation was
appointed as receiver of the Institution (the "Receiver"). Under the laws of the United States, the
Receiver is charged with the duty of winding up the affairs of the former Institution.

Under the terms of the Whole Bank Purchase and Assumption Agreement, the Assuming Institution, JPMorgan Chase, purchased all of the assets of the failed bank. As a result of the
foregoing, many of the items typically gathered, copied and reconciled at other closings were not
gathered by personnel at this particular closing. Since FDIC did not retain any assets, no
inventory of same was created and none is included herein.

Federal Deposit Insurance Corporation

1601 Bryan Street, Dallas TX 75201 Dallas Regional Office

MEMORANDUM TO: Robert Schoppe
Receiver-in-Charge
FROM: Martha Duncan
Administrative Assistant
DATE: September 26, 2008
SUBJECT: #10015 - Washington Mutual Bank
Henderson, Nevada - In Receivership
Asset Category: Loans Sold to Other Institutions

On September 25, 2008, Washington Mutual Bank, Henderson, Nevada (the "Institution") was
closed by the Office of Thrift Supervision and the Federal Deposit Insurance Corporation was
appointed as receiver of the Institution (the "Receiver"). Under the laws of the

Page 76

*172*

WaMuClosingBook.txt

United States, the
Receiver is charged with the duty of winding up the affairs of the former
Institution.

Under the terms of the Whole Bank Purchase and Assumption Agreement, the Assuming
Institution, JPMorgan Chase, purchased all of the assets of the failed bank. As a
result of the
foregoing, many of the items typically gathered, copied and reconciled at other
closings were not
gathered by personnel at this particular closing. Since FDIC did not retain any
assets, no
inventory of same was created and none is included herein.

Federal Deposit Insurance Corporation

1601 Bryan Street, Dallas TX 75201 Dallas Regional Office

MEMORANDUM TO: Robert Schoppe
Receiver-in-Charge
FROM: Martha Duncan
Administrative Assistant
DATE: September 26, 2008
SUBJECT: #10015 - Washington Mutual Bank
Henderson, Nevada - In Receivership
Asset Category: Overdrafts

On September 25, 2008. Washington Mutual Bank, Henderson, Nevada (the "Institution")
was
closed by the Office of Thrift Supervision and the Federal Deposit Insurance
Corporation was
appointed as receiver of the Institution (the "Receiver"). Under the laws of the
United States, the
Receiver is charged with the duty of winding up the affairs of the former
Institution.

Under the terms of the Whole Bank Purchase and Assumption Agreement, the Assuming
Institution, JPMorgan Chase, purchased all of the assets of the failed bank. As a
result of the
foregoing, many of the items typically gathered, copied and reconciled at other
closings were not
gathered by personnel at this particular closing. Since FDIC did not retain any
assets, no
inventory of same was created and none is included herein.

Federal Deposit Insurance Corporation

1601 Bryan Street, Dallas TX 75201 Dallas Regional Office

MEMORANDUM TO: Robert Schoppe
Receiver-in-Charge
FROM: Martha Duncan
Administrative Assistant
DATE: September 26, 2008
SUBJECT: #10015 - Washington Mutual Bank
Henderson, Nevada - In Receivership
Asset Category: Subsidiaries

Page 77

*173*

WaMuClosingBook.txt

On September 25, 2008, Washington Mutual Bank, Henderson, Nevada (the "Institution") was closed by the Office of Thrift Supervision and the Federal Deposit Insurance Corporation was appointed as receiver of the Institution (the "Receiver"). Under the laws of the United States, the Receiver is charged with the duty of winding up the affairs of the former Institution.

Under the terms of the Whole Bank Purchase and Assumption Agreement, the Assuming Institution, JPMorgan Chase, purchased all of the assets of the failed bank. As a result of the foregoing, many of the items typically gathered, copied and reconciled at other closings were not gathered by personnel at this particular closing. Since FDIC did not retain any assets, no inventory of same was created and none is included herein.

Federal Deposit Insurance Corporation

1601 Bryan Street, Dallas TX 75201 Dallas Regional Office

MEMORANDUM TO: Robert Schoppe
Receiver-in-Charge
FROM: Martha Duncan
Administrative Assistant
DATE: September 26, 2008
SUBJECT: #10015 – Washington Mutual Bank
Henderson, Nevada - In Receivership
Asset Category: Loans Assumed by FDIC

On September 25, 2008, Washington Mutual Bank, Henderson, Nevada (the "Institution") was closed by the Office of Thrift Supervision and the Federal Deposit Insurance Corporation was appointed as receiver of the Institution (the "Receiver"). Under the laws of the United States, the Receiver is charged with the duty of winding up the affairs of the former Institution.

Under the terms of the Whole Bank Purchase and Assumption Agreement, the Assuming Institution, JPMorgan Chase, purchased all of the assets of the failed bank. As a result of the foregoing, many of the items typically gathered, copied and reconciled at other closings were not gathered by personnel at this particular closing. Since FDIC did not retain any assets, no inventory of same was created and none is included herein.

Federal Deposit Insurance Corporation

1601 Bryan Street, Dallas TX 75201 Dallas Regional Office

MEMORANDUM TO: Robert Schoppe
Receiver-in-Charge
FROM: Martha Duncan
Administrative Assistant

Page 78

174

WaMuClosingBook.txt

DATE: September 26, 2008
SUBJECT: #10015 - Washington Mutual Bank
Henderson, Nevada - In Receivership
Asset Category: Unfunded commitments retained by the FDIC

On September 25, 2008, Washington Mutual Bank, Henderson, Nevada (the "Institution") was
closed by the Office of Thrift Supervision and the Federal Deposit Insurance Corporation was
appointed as receiver of the Institution (the "Receiver"). Under the laws of the United States, the
Receiver is charged with the duty of winding up the affairs of the former Institution.

Under the terms of the Whole Bank Purchase and Assumption Agreement, the Assuming Institution, JPMorgan Chase, purchased all of the assets of the failed bank. As a result of the foregoing, many of the items typically gathered, copied and reconciled at other closings were not gathered by personnel at this particular closing. Since FDIC did not retain any assets, no inventory of same was created and none is included herein.

Federal Deposit Insurance Corporation

1601 Bryan Street, Dallas TX 75201 Dallas Regional Office

MEMORANDUM TO: Robert Schoppe
Receiver-in-Charge
FROM: Martha Duncan
Administrative Assistant
DATE: September 26, 2008
SUBJECT: #10015 - Washington Mutual Bank
Henderson, Nevada - In Receivership
Asset Category: Charged-off Loans

On September 25, 2008, Washington Mutual Bank, Henderson, Nevada (the "Institution") was
closed by the Office of Thrift Supervision and the Federal Deposit Insurance Corporation was
appointed as receiver of the Institution (the "Receiver"). Under the laws of the United States, the
Receiver is charged with the duty of winding up the affairs of the former Institution.

Under the terms of the Whole Bank Purchase and Assumption Agreement, the Assuming Institution, JPMorgan Chase, purchased all of the assets of the failed bank. As a result of the foregoing, many of the items typically gathered, copied and reconciled at other closings were not gathered by personnel at this particular closing. Since FDIC did not retain any assets, no inventory of same was created and none is included herein.

Federal Deposit Insurance Corporation

1601 Bryan Street, Dallas TX 75201 Dallas Regional Office
Page 79

*175*

WaMoClosingBook.txt

MEMORANDUM TO: Robert Schoppe
Receiver-in-Charge
FROM: Martha Duncan
Administrative Assistant
DATE: September 26, 2008
SUBJECT: #10015 · Washington Mutual Bank
Henderson, Nevada - in Receivership
Asset Category: Owned Real Estate

On September 25, 2008, Washington Mutual Bank, Henderson, Nevada (the "Institution") was
closed by the Office of Thrift Supervision and the Federal Deposit Insurance Corporation was
appointed as receiver of the Institution (the "Receiver"). Under the laws of the United States, the
Receiver is charged with the duty of winding up the affairs of the former Institution.

Under the terms of the Whole Bank Purchase and Assumption Agreement, the Assuming
Institution, JPMorgan Chase, purchased all of the assets of the failed bank. As a result of the
foregoing, many of the items typically gathered, copied and reconciled at other closings were not
gathered by personnel at this particular closing. Since FDIC did not retain any assets, no
inventory of same was created and none is included herein.

Federal Deposit Insurance Corporation

1601 Bryan Street, Dallas TX 75201 Dallas Regional Office ·

MEMORANDUM TO: Robert Schoppe
Receiver-in-Charge
FROM: Martha Duncan
Administrative Assistant
DATE: September 26, 2008
SUBJECT: #10015 – Washington Mutual Bank
Henderson, Nevada - In Receivership
Asset Category: Letters of Credit (LOC)

On September 25, 2008, Washington Mutual Bank, Henderson, Nevada (the "Institution") was
closed by the Office of Thrift Supervision and the Federal Deposit Insurance Corporation was
appointed as receiver of the Institution (the "Receiver"). Under the laws of the United States, the
Receiver is charged with the duty of winding up the affairs of the former Institution.

Under the terms of the Whole Bank Purchase and Assumption Agreement, the Assuming
Institution, JPMorgan Chase, purchased all of the assets of the failed bank. As a result of the
foregoing, many of the items typically gathered, copied and reconciled at other closings were not
gathered by personnel at this particular closing. Since FDIC did not retain any assets, no
inventory of same was created and none is included herein.

Page 80

176

WaMuClosingBook.txt

Federal Deposit Insurance Corporation

1601 Bryan Street, Dallas TX 75201 Dallas Regional Office

MEMORANDUM TO: Robert Schoppe
Receiver-in-Charge
FROM: Martha Duncan
Administrative Assistant
DATE: September 26, 2008
SUBJECT: #10015 - Washington Mutual Bank
Henderson, Nevada - In Receivership
Asset Category: Schedule of Repossessed Collateral

On September 25, 2008, Washington Mutual Bank, Henderson, Nevada (the "Institution")
was
closed by the Office of Thrift Supervision and the Federal Deposit Insurance
Corporation was
appointed as receiver of the Institution (the "Receiver"). Under the laws of the
United States, the
Receiver is charged with the duty of winding up the affairs of the former
Institution.

Under the terms of the Whole Bank Purchase and Assumption Agreement, the Assuming
Institution, JPMorgan Chase, purchased all of the assets of the failed bank. As a
result of the
foregoing, many of the items typically gathered, copied and reconciled at other
closings were not
gathered by personnel at this particular closing. Since FDIC did not retain any
assets, no
inventory of same was created and none is included herein.

Federal Deposit Insurance Corporation

1601 Bryan Street, Dallas TX 75201 Dallas Regional Office

MEMORANDUM TO: Robert Schoppe
Receiver-in-Charge
FROM: Martha Duncan
Administrative Assistant
DATE: September 26, 2008
SUBJECT: #10015 - Washington Mutual Bank
Henderson, Nevada - In Receivership
Asset Category: Other Assets, Bank Owned Vehicles, and Prepaids

On September 25, 2008, Washington Mutual Bank, Henderson, Nevada (the "Institution")
was
closed by the Office of Thrift Supervision and the Federal Deposit Insurance
Corporation was
appointed as receiver of the Institution (the "Receiver"). Under the laws of the
United States, the
Receiver is charged with the duty of winding up the affairs of the former
Institution.

Under the terms of the Whole Bank Purchase and Assumption Agreement, the Assuming
Institution, JPMorgan Chase, purchased all of the assets of the failed bank. As a
result of the

Page 81

*177*

WaMuClosingBook.txt

foregoing, many of the items typically gathered, copied and reconciled at other closings were not
gathered by personnel at this particular closing. Since FDIC did not retain any assets, no
inventory of same was created and none is included herein.

Federal Deposit Insurance Corporation

1601 Bryan Street, Dallas TX 75201 Dallas Regional Office

MEMORANDUM TO: Robert Schoppe
Receiver-in-Charge
FROM: Martha Duncan
Administrative Assistant
DATE: September 26, 2008
SUBJECT: #10015 - Washington Mutual Bank
Henderson, Nevada - In Receivership
Asset Category: Participations Bought and Sold

On September 25, 2008, Washington Mutual Bank, Henderson, Nevada (the "Institution") was
closed by the Office of Thrift Supervision and the Federal Deposit Insurance Corporation was
appointed as receiver of the Institution (the "Receiver"). Under the laws of the United States, the
Receiver is charged with the duty of winding up the affairs of the former Institution.

Under the terms of the Whole Bank Purchase and Assumption Agreement, the Assuming
Institution, JPMorgan Chase, purchased all of the assets of the failed bank. As a result of the
foregoing, many of the items typically gathered, copied and reconciled at other closings were not
gathered by personnel at this particular closing. Since FDIC did not retain any assets, no
inventory of same was created and none is included herein.



Page 82

*178*

WaMuClosingBook.txt



179

WaMuClosingBook.txt



FDIC1

Federal Deposit Insurance Corporation

550 17th Street NW, Washington, D.C. 20429-9990 Division of Resolutions and Receiverships

September 26, 2008

VIA FAX AND E-MAIL

Subject: Washington Mutual Bank
Henderson, NV – In Receivership
Closing Date: September 25, 2008

Page 84

*180*

WaMuClosingBook.txt
Notice of Transfer - Qualified Financial Contracts

Dear Sir or Madam:

The above-captioned institution (the "Institution") was closed on the Closing Date
referenced above and the Federal Deposit Insurance Corporation has been appointed as
receiver

of

the Institution (the "Receiver").

The Receiver is in the process of identifying all parties to "Qualified Financial
Contracts"
to which the Institution was also a party, as that term is defined by 12 U.S.C.
Section
1821(e)(8)(D)(i) ("QFC"). Based on the information available to the Receiver, and in
accordance
with the provisions of 12 U.S.c. Sections 1821(e)(8)-(10), the Receiver has
determined that you
may be a party to one or more QFCs and, assuming that you are such a pary, this
letter is to
advise you that all such QFCs to which you are a party have been transferred to
lPMorgan Chase

transfer is not an admission by

Bank, National Association, Columbus, Ohio. This notification of

transfer is only
given by the Receiver as a precautionary measure pursuant to the above-referenced
statutes.

the Receiver that the subject contract(s) constitutes a QFC. This notification of

Sincerely,

Federal Deposit Insurance Corporation

Washington Mutual Bank

as Receiver of

:J22~

Title: Deputy Director

Resolutions & Receiverships

Division of

Qfc~ Transfer-Letter.doc

Page 85

*181*

WaMuClosingBook.txt



182

WaMuClosingBook.txt



183

WaMuClosingBook.txt



Page 88

184

WaMuClosingBook.txt



FDIC

Page 89

185



WaMuClosingBook.txt

Federal Deposit Insurance Corporation

1601 Bryan Street, Dallas TX 75201 Dallas Regional Office

MEMORANDUM TO: Robert Schoppe
Receiver-in-Charge
FROM: Martha Duncan
Administrative Assistant
DATE: September 26, 2008
SUBJECT: #10015 - Washington Mutual Bank
Henderson, Nevada - In Receivership
Asset Category: Safe Deposit Boxes

On September 25, 2008, Washington Mutual Bank, Henderson, Nevada (the "Institution") was
closed by the Office of Thrift Supervision and the Federal Deposit Insurance Corporation was
appointed as receiver of the Institution (the "Receiver"). Under the laws of the United States, the
Receiver is charged with the duty of winding up the affairs of the former Institution.

Under the terms of the Whole Bank Purchase and Assumption Agreement, the Assuming Institution, JPMorgan Chase, purchased all of the assets of the failed bank. As a result of the foregoing, many of the items typically gathered, copied and reconciled at other closings were not gathered by personnel at this particular closing. Since FDIC did not retain any assets, no inventory of same was created and none is included herein.

Federal Deposit Insurance Corporation

1601 Bryan Street, Dallas TX 75201 Dallas Regional Office

MEMORANDUM TO: Robert Schoppe
Receiver-in-Charge
FROM: Martha Duncan
Administrative Assistant
DATE: September 26, 2008
SUBJECT: #10015 - Washington Mutual Bank
Henderson, Nevada - In Receivership
Asset Category: Possessory Collateral and Safekeeping

On September 25, 2008, Washington Mutual Bank, Henderson, Nevada (the "Institution") was
closed by the Office of Thrift Supervision and the Federal Deposit Insurance

Page 90

186

WamuClosingBook.txt

Corporation was
appointed as receiver of the Institution (the "Receiver"). Under the laws of the
United States, the
Receiver is charged with the duty of winding up the affairs of the former
Institution.

Under the terms of the Whole Bank Purchase and Assumption Agreement, the Assuming
Institution, JPMorgan Chase, purchased all of the assets of the failed bank. As a
result of the
foregoing, many of the items typically gathered, copied and reconciled at other
closings were not
gathered by personnel at this particular closing. Since FDIC did not retain any
assets, no
inventory of same was created and none is included herein.

FDIC



Duncan, Martha C.
From: Fritz, George
Sent: Saturday, October 04, 2008 6:08 PM
To: Glassman, Mitchell; Bieker, Ronald F.; Patelunas, Gail; Ostermiller, William R.;
Rouse, Alan;

Campagna, Frank; Foster, Debra E.; Spaid, Mike; Davis, Belinda; Schoppe, Robert
Cc: Golt, Anthony J.; Mayorga, Luis A.; Greene, Gwendolyn N.; Duncan, Martha C.
Subject: WAMU - Claims Status Report

Attachments: Amended wamu publications(2).doc; Chase_Final_Approved_Notice.pdf;
Amended
NOTICE TO DEPOSITORS OF Washington Mutual Bank.doc;
WaMuStateNotificationFINAL.pdf; DEBT FLOW CHART.xls; List.xls

The following represents the actions taken and current status pertaining to Claims
on the Washington
Mutual Bank receivership.

• As of 09.25.08 a deposit download was received in Washington. At the current time
Page 91

*187*

NaMuClosingBook.txt

this will not
be loaded into RLS due to the overwhelming number of deposit accounts. Additionally, since this
resolution was an all deposit transfer the current plan is to wait until the 18 months to ratify
accounts has passed (March 25, 2010) and then load only the unclaimed deposits returned to the
FDIC from JPMorgan Chase Bank into CAS ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

• A download of outstanding official items has been received. There are 274,743 outstanding items
that total $909,945,346.55. The same procedures for deposits will be applied to these. After the
18 months has passed a new download will be received, reconciled and then escheated according to UDAA requirements.
• The Publication of Notice to Creditors and Depositors of Washington Mutual Bank, Henderson,
NV was placed in the following publications: Wall Street Journal, Las Vegas Review Journal and
the Seattle Times. Publications dates are: 10.01 10.31 and 12.01. With these publications the
Bar Date has been established as December 30, 2008. Attached is a copy of the publication:
Amended wamu
publications(2).d...

• The Notice to Depositors has also been provided to JPMorgan Chase Bank to be inserted with
their letter being mailed to all depositors in compliance with Section 5.3 of the Purchase and
Assumption Agreement. This notice has been reviewed and approved by legal. Attached is a
copy of both the FDIC notice and the JPMorgan Chase Notice:
Chase_Final_Appro Amended NOTICE
ved_Notice.pd... TO DEPOSITORS O..

• Claims had conducted several conference calls and meetings with staff who work in the
"Escheatment" department discussing how to track and monitor the deposits for ratification
purposes. Both parties feel they have a good understanding of the process and its requirements.

Federal Deposit Insurance Corporation

1601 Bryan Street, Dallas TX 75201 Dallas Regional Office

MEMORANDUM TO: Robert Schoppe
Receiver-in-Charge
FROM: Martha Duncan
Administrative Assistant
DATE: September 26, 2008
SUBJECT: #10015 - Washington Mutual Bank
Henderson, Nevada - In Receivership
Stockholder Listing

Page 92

*188*

WaMuClosingBook.txt

On September 25, 2008, Washington Mutual Bank, Henderson, Nevada (the "Institution") was
closed by the Office of Thrift Supervision and the Federal Deposit Insurance Corporation was
appointed as receiver of the Institution (the "Receiver").  Under the laws of the United States, the
Receiver is charged with the duty of winding up the affairs of the former Institution.

At the time of failure, Washington Mutual Inc. (WMI) was the bank's holding company and sole
shareholder. It is publicly traded on the NYSE under the ticker WM. The holding company is
regulated by the OTS as a unitary savings and loan holding company because it acquired two
OTS chartered institutions, Washington Mutual Bank, FA (WMB) and Washington Mutual Bank
FSB (WMBfsb), through supervisory transactions.

.
Washington Mutual Bank
Seattle, WA
FIN: #10015

DIRECTORS AND OFFICERS LISTING

David Bonderman

████████████████████████████████

Stephen I. Chazen

████████████████████████████████████

Stephen E. Frank

███████████████████████

Thomas C. Leppert

████████████████████████████

Charles M. Lillis

██████████████████████████████

Phillip D. Matthews

███████████████████████████████

Margaret Osmer McQuade

Page 93

*189*

WaMuClosingBook.txt



Regina Montoya



Michael K. Murphy

DIRECTORS:



William G. Reed, Jr.



Orin C. Smith



James. H. Stever



Alan Fishman CEO

Page 94

WaMuClosingBook.txt



Page 95

191

WaMuClosingBook.txt



Page 96

192

WaMuClosingBook.txt



193

WaMuClosingBook.txt



Page 98

194

WaMuClosingBook.txt



NOTICE TO DEPOSITORS OF Washington Mutual Bank, Henderson, NV
***Your Institution Has Been Closed***

**YOUR DEPOSITS HAVE BEEN TRANSFERRED
TO ANOTHER INSTITUTION**

On September 25, 2008 (the "Closing Date"), the Office of Thrift Supervision closed
Washington Mutual
Bank, Henderson, NV, 89014 (the "Failed Institution"), and appointed the Federal
Deposit Insurance
Corporation (the "FDIC") as Receiver (the "Receiver"). The FDIC, which insures your
deposits in its
corporate capacity, arranged for the transfer of your deposit(s) ("deposits") at the
Failed Institution to
another insured depository institution, JPMORGAN CHASE BANK NATIONAL ASSOCIATION,
Columbus, OH, 43240 ("the New Institution"). This arrangement should minimize any

Page 99

*195*

WaMuClosingBook.txt

inconvenience the
closing of the Failed Institution may cause you. Although you may leave your
deposit(s) in the New
Institution, you must take some action to claim ownership of your deposit(s).

1. How to Claim Ownership of Your Deposits
Under federal law 12 U.S.C. Section 1822(e) you must claim ownership of your
deposit(s) at the New
Institution within eighteen (18) months from the Closing Date. If you do not claim
your deposit(s) at the
New Institution by March 25, 2010, your deposit(s) will be returned to the FDIC by
the New Institution,
and you may not be able to claim the deposit(s), except as described below in
Section 2.

You may claim your deposit(s) at the New Institution by taking any of the following
actions within 18
months from the Closing Date. If you have more than one deposit account, your action
in claiming your
deposit in one account will automatically claim your deposits in all of your
accounts.

a. Making a deposit to or withdrawal from your account(s). This includes writing a
check
on any account or having an automated direct deposit credited to or an automated
withdrawal debited from any account;
b. Executing a new signature card on your account(s), entering into a new deposit
agreement with the New Institution, changing the ownership on your account(s), or
renegotiating the terms of a certificate of deposit account;
c. Providing the New Institution with a completed change of address form; or
d. Writing to the New Institution and notifying it that you wish to keep your
account(s)
active. Please be sure to include in this notice the name(s) on the account(s), the
account numbers, and the signature of an authorized signer on the account(s), with
name and address.
You should know that bank drafts issued by the Failed Institution, including
officer's checks,
cashier's checks, money orders, dividend checks, interest checks, and expense
checks, are all
considered deposits and must be claimed within 18 months from the Closing Date.

2. Failure to Claim Ownership of Your Deposits within 18 Months
If you do not claim ownership of your deposit(s) at the New Institution within 18
months from the Closing
Date, federal law, 12 U.S.C. Section 1822(e), requires the New Institution to return
the deposit(s) to the
FDIC and the FDIC to deliver the unclaimed deposit(s) as unclaimed property to the
state listed in your
address in the Failed Institution's records. If your address is outside of the
United States, the FDIC is
directed to deliver the unclaimed deposit(s) to the state in which the Failed
Institution had its main office.
If the state accepts custody of your deposit(s), you will have ten years from the
date of delivery to claim
your deposit(s) from the state in accordance with its unclaimed property laws. If
you do not claim your

RLS72113

*196*

WaMuClosingBook.txt

deposit(s) from the state within the ten years. the funds will be returned to the FDIC, and you will be
permanently barred from claiming your deposit(s). If the state declines to accept custody of your
unclaimed deposit(s), you will be able to claim your deposit(s) directly from the FDIC until the receivership
is terminated. However, please note that a receivership may be terminated at any time. Once the
receivership is terminated, you will not be able to claim your deposit(s).

3. Your Deposit Relationship with the New Institution
The New Institution needs your correct address. If the address to which this notice has been addressed
is no longer your current address, contact the New Institution to ensure that it has your correct address.
Similarly, if you have not been receiving account statements, or you have changed your address, you
should contact the New Institution. Remember, supplying a completed change of address form to the
New Institution will serve to claim your deposit(s).

4. Challenging Your Final Insurance Determination
In the event you disagree with the FDIC's determination of your insurance coverage as represented by
the account(s) made available at the New Institution, you may seek a review of the FDIC's determination
in the United States District Court for the federal judicial district where the principal place of business of
the Failed Institution was located. You must file your request for this review no later than 60 days
after the date on which your deposit(s) became available to you at the New Institution. Filing a
request for review will not prevent you from using the funds in your new account.

RLS72113

PUBLICATION
NOTICE TO
CREDITORS AND DEPOSITORS OF
Washington Mutual Bank
Henderson, NV

On September 25, 2008 (the "Closing Date"). the Office of Thrift Supervision closed Washington Mutual
Bank, Henderson, NV, 89014 (the "Failed Institution") and appointed the Federal Deposit Insurance
Corporation as Receiver (the "Receiver") to handle all matters relating to the Failed Institution.

TO THE CREDITORS OF THE FAILED INSTITUTION

All creditors having claims against the Failed Institution must submit their claims in writing, together with
proof of the claims, to the Receiver by December 30, 2008 (the "Bar Date"), at the following address:

Page 101

*197*

WaMuClosingBook.txt

FDIC as Receiver of
Washington Mutual Bank
1601 Bryan Street
Dallas, TX 75201
Attention: George Fritz

Under federal law, with certain limited exceptions, failure to file such claims by
the Bar Date will
result in disallowance by the Receiver, the disallowance will be final, and further
rights or
remedies with regard to the claims will be barred. 12 U.S.C. Section 1821(d)(5)(C),
(d)(6).

TO THE DEPOSITORS OF THE INSTITUTION

The Federal Deposit Insurance Corporation, in its corporate capacity, which insures
your deposits (the
"FDIC"), arranged for the transfer of the deposit(s) at the Failed Institution to
another insured depository
institution, JPMORGAN CHASE BANK NATIONAL ASSOCIATION, Columbus, OH, 43240 ("the New

Institution"). This arrangement should minimize the inconvenience the closing of the
Failed Institution
causes you. You may leave your deposits in the New Institution, but you must take
action to claim
ownership of your deposits.

Federal law 12 U.S.C. Section 1822(e), requires you to claim ownership of ("claim")
your deposits at the
New Institution within eighteen (18) months from the Closing Date. If you do not
claim your deposits at
the New Institution by March 25, 2010, the funds in your account(s) will be
transferred back to the FDIC,
and you will no longer have access to your deposit(s) at the New Institution.
However, as described in
more detail below, you may still be able to obtain these funds from your state
government or the
Receiver.

You may claim your deposits at the New Institution by taking any of the following
actions within 18 months
from the Closing Date. If you have more than one account, your action in claiming
your deposit in one
account will automatically claim your deposit in all of your accounts.

1. Making a deposit to or withdrawal from your account(s). This includes writing a
check on
any account, or having an automated direct deposit credited to or an automated
withdrawal debited from any account;
2. Executing a new signature card on your account(s), enter into a new deposit
agreement
with the New Institution, changing the ownership on your account(s), or
renegotiating the
terms of your certificate of deposit account;
3. Providing the New Institution with a completed change of address form; or
RLS7211

Page 102

*198*

WaMuClosingBook.txt

i Writing to the New Institution and notifying them that you wish to keep your account(s)
active. Please be sure to include the name(s) of the account(s), the account number(s),
and the signature of an authorized signer on the account(s), name and address.
You should know that bank drafts issued by the Failed Institution, including officer's checks,
cashier's checks, money orders, dividend checks, interest checks, and expense checks, are all
considered deposits and must be claimed within 18 months from the Closing Date.

If you do not claim ownership of your deposit(s) at the New Institution within 18 months from the Closing
Date, federal law, 12 U.S.C. Section 1822(e), requires the New Institution to return your deposit(s) to the
FDIC and the FDIC to deliver the unclaimed deposit(s) as unclaimed property to the state listed in your
address on the Failed Institution's records. If your address is outside of the United States, the FDIC is
directed to deliver the unclaimed deposit(s) to the state in which the Failed Institution had its main office.
If the state accepts custody of your deposit(s), you will have ten years from the date of delivery to claim
your deposit(s) from the state in accordance with its unclaimed property laws. If you do not claim your
deposit(s) from the state within the ten years, the funds will be returned to the FDIC, and you will be
permanently barred from claiming your deposit(s). If the state declines to accept custody of your
unclaimed deposit(s), you will be able to claim your deposit(s) directly from the FDIC until the receivership
is terminated. However, please note that a receivership may be terminated at any time. Once the
receivership is terminated, you will not be able to claim your deposit(s).

In the event you disagree with the FDIC's determination of your insurance coverage as represented by
the account(s) made available at the New Institution, you may seek a review of the FDIC's determination
in the United States District Court for the federal judicial district where the principal place of business of
the Failed Institution was located. You must file your request for this review no later than 60 days
after the date on which the FDIC made your deposit(s) available to you at the New Institution.
Filing a request for review will not prevent you from using the funds in your new account.

RLS7211

Duncan, Martha C.

From: Fritz, George
Sent: Thursday, October 02, 2008 10:42 AM
To: Duncan, Martha C.
Subject: Newspaper Publications for the Notices to Creditor/Depositors

Page 103

*199*

WaMuClosingBook.txt

For the Closing Book if you need this.

Thanks,

George

1

.
2

.

COPY FOR WAMU STATEMENT INSERT
WaMu &Chase. Safe &Secure.
WaMu branches became part of JPMorganChase Bank, N.A., on September 25,
2008, ensuring a bright new future for WaMu. JPMorganChase is known for
strength and stability (and nearly a trillion dollars in customer deposits). But
JPMorganChase brings more than money to the party: together we have over
14,000 ATMs and 5,400 branches nationwide, a quarter of a million employees,
and the confidence of bankingwith over 100million other customers.
We know —it's a big, excitingchange. You have questions? We have answers. To
learn more, you can always stop by your localWaMu, call 1-800-788-7000 or
visit wamu.com.
What do Ineedto do?
Justuse your account as you normally would. Regular usewill meet the
requirements to confirm your deposits –it's that easy  If you have an account
which you actively use, you don't need to do anything.
Regular use includesdeposits, withdrawals, writing checks on any account,
or having an automated direct deposit or withdrawal made.
Ifyou have an account you don't regularly use, you would be covered by any of the
following actions:
Make a deposit or withdrawal, write a check, or make an automated direct
deposit or withdrawal;
Sign a new signature card on your account, enter into a new deposit
agreement with us, renegotiate the terms of a certificate of deposit (CD)
account; or
Provide us with a completed change of address form.
Don't worry —we'll contact you over the next few months if there's any action you
need to take.
What happens now
What will happento my account at WaMu? And to my WaMu branch?

.
10/3/08, 7:30 a.m..

It's businessas usual. As of September 25, 2008, JPMorgan Chase Bank, N.A.
assumed all the deposit and loan accounts, and all branches, of Washington Mutual
Bank. You can continue to access your accounts just the way you've accessed them
in the past: use your same branch, same debit, credit and ATM cards, same checks.

I'm a small business owner with WaMu. What will change for my business?

Immediately, no change at all –bank just as you do today. As our systems merge,
we look forward to bringing you innovative services ranging from online invoicing
to convenient ways to help you manage your cash flow. Chase is a national leader
in business banking services, and is the nation's #1 SBA lender.

Ihave a relationship with the WaMu Commercial Group. What will change for
my business?

200

WaMuClosingBook.txt

Immediately, no change at all —work with the Commercial Group just as you do today. As our systems merge, we look forward to bringing you innovative services. Chase is a national leader in commercial lending and cash management solutions.

Where to do business

When can I start using Chase ATMs and branches?

You can soon begin using any WaMu or Chase ATM to get cash or check your

balances with no fee ;watch your upcoming statements for more information. However, please continue to bank at WaMu branches as you do today. Until we combine systems, Chase branches will not be able to offer banking services for WaMu accounts. We'll let you know as soon as you can bank at these branches.

Can I cash WaMu checks at Chase branches, and vice-versa?

While we always want to process your checks and other items as quickly as possible, in most cases, we will treat Chase checks as if they are from a separate

bank for purposes of funds availability and cashing checks until we merge our systems. Until that time, if checks that you write are presented for payment to a Chase branch, the check may be treated as though it was written on another bank.

Making&receiving payments

Do my WaMu direct deposit, automated payments and transfers remain the same?

.
Yes. These services all continue for you without interruption or action on your part.

Where do I send my WaMu credit card and loan payments?

There's no change in how or where you make payments; payment instructions and addresses remain unchanged.

I have a Chase credit card, car loan, and mortgage. Can I make payments at a WaMu branch now?

Not yet! We'll let you know when you can make Chase credit card, car loan, mortgage or other loan payments at WaMu branches, or vice versa.

Insured deposits

I have deposit accounts at both WaMu and Chase. Are both of my accounts insured?

Yes! If you opened a WaMu deposit account before September 26,2008, that account, including any new deposits into that account, will be separately insured by

the FDIC for six months (until March 24,2009), up to the maximum FDIC insurance limits.

Accounts opened on or after September 26,2008, will be combined with all other JPMorgan Chase Bank, N.A. accounts of the same depositor to determine FDIC insurance.

Page 105

WamuClosingBook.txt

Ihave Certificates of Deposit (CDs) at both WaMu and Chase. Are both of
those FDIC-insured?

Yes! WaMu CDs are separately insured from JPMorgan Chase Bank, N.A.
accounts until March 24,2009. And insurance for WaMu CDs existing on
September 25 may be extended: WaMu CDs maturing before March 24,2009
that roll over without any changes ( such as amount, term, or title), and WaMu
CDs maturing after March 24,2009, are separately insured until their first

maturity date after March 24,2009.

WaMu CDs opened on or after September 26,2008, will be combined with all
other JPMorgan Chase Bank, N.A. accounts of the same depositor to determine

FDIC insurance.

10/3/08,7:30 a.m..

Ihave retirement accounts at both WaMu and Chase. Are both of these
accounts insured?

WaMu self-directed Keogh and Individual Retirement deposit accounts (including
retirement CDs) will be separately insured by the FDIC for six months, up to the
maximum FDIC insurance limits, separately from any other retirement accounts
that you may have at JPMorgan Chase Bank, N.A.

Iopened a deposit account with WaMu on or after September 26,2008. I
already have a Chase deposit account. Are they both insured?

Your deposit accounts opened on or after September 26,2008 at a WaMu branch
will not receive the separate FDIC insurance coverage described above. For FDIC
insurance purposes, they will be combined with all other deposits of JPMorgan
Chase Bank, N.A.

You can maximize your FDIC coverage through a combination of joint and
individual accounts. Just visit www.FDIC.gov to find out more.

o 2008 JPMorgan Chase Bank, N.A. Member FDIC, Equal Housing Opportunity
Lender.

NOTICE TO CREDITORS
AND DEPOSITORS OF @ WASHINGTON MUTUAL BANI
HENDERSON, NV

On September 25, 2008 (the 'Closing Date"), the Office of Thrift Supervision closed
Washington
Mutual Bank, Henderson, NV 89014 (the "Failed Institution") and appo-nted the
Federal Depos-t
Insurance Corporation as Receiver (the "Recgiver") to handle all matters relating to
the Failed
Institution.

TO THE CREDITORS OF THE FAILED INSI'ITUTION

I II

Page 106

*202*

WaMoClosingBook.txt
I Al, cred tors having claims against the Failed Institution mJst subm t the'r
claims in wr ling, togetner Iw,lh oroof of the cla,ms. to the Receiver by December
30, 2008 (tne "Bar Oate'f, at tne followina

FDIC as Receiver of Washington Mutual Bank
1601 Bryan Street, Dallas, TX 75201
Attention: George Fritz

Under federal law, with certain limited exceptions, failure to file such claims by
the Bar
Date will result in disallowance by the Receiver, the disallowance will be final,
and further
ri hts or remedies with regard to the claims will be barred. 12 U.S.C. Section
1821(d)(S)(C),

(db.

TO THE DEPOSITORS OF THE INSTITUTION

The Federal Deposit Insurance Corporation, in its corporate capacity, which insures
your deposits
(the "FDIC), arranged for the transfer of the deposit(s) at the Failed Institution
to another insured
deoository institution. JPMORGAN CHASE BANK NATIONAL ASSOCIATION, Columbus. OH,
43i40 ("t6e New Insr~!~rion'). Th's arrangement sno~ld m~nlm;ze the inconvenience
Ire closing of I

on ca~ses VOJ. You mav leave vour de~osits in the New Institution, but you . .
must take action to claim ownership oiyour diposits.'

Federal law 12 U.S.C. Section 1822(e), requires you to claim ownership of ("claim")
your deposits
at the New Institution within eighteen (18) months from the Closing Date. If you do
not claim your
deposits at the New Institution by March 25,2010, the funds in your account(s) will
be transferred
back to the FDIC, and you will no longer have access to your deposit(s) at the New
Institution.
However, as described in more detail below, you may still be able to obtain these
funds from your
state government or the Receiver.

You may clam your deposits at the New Institution by taking any of the following
actions within 18
months from the Closing Date. If you have more than one account, your action in
claiming your
deposit in one account will automatically claim your deposit in all of your
accounts.

1. Making a deposit to or withorawal from yoJr acco~nt(s). Tn~s incl~des wrlt.ng a
check on
anv accoLnt, cr hav na an a~tomated direct oeoosit creoited to or an automatea
w'thdrawal
debited from any accdunt; i
Page 107

203

WaMuClosingBook.txt
2. Executing a new signature card on your account(s), enter into a new deposit
agreement with ;
the New Institution, changing the ownership on your account(s), or renegotiating the
terms j
of your certificate of deposit account;

3. Providing the New Institution with a completed change of address form; or
4. Writing to the New Institution and notifying them that you wish to keep your
account(s)
I active Please be sure to include the name(s) of the account(s), the account
n~.mber(s) and
the signat~re of an almrized signer on the account(s) rame and aodress.

I You should know that bank drafts issued by the Failed Institution, including
officer's checks. I i!
cashier's checks, money orders, dividend checks, interest checks, and expense
checks, are .'

I all considered deposits and must be claimed within 18 months from the Closing
Date.

It you do not claim ownership of our deposit(s) at the New Institution within 18
months from the
Closing Date, federal law, 12 u.J.c. Section 1822(e), requires the New Institution
to return your
deposit@) to the FDIC and the FDIC to deliver the unclaimed deposit(s) as unclaimed
property to
the state listed in your address on the Failed Institution's records. If your
address is outside of
the United States, the FDIC is directed to deliver the unclaimed deposit(s) to the
state in which the
Failed Institution had its main office. If the state accepts custody of your
deposit@), you will have
ten years from the date of delivery to claim your deposit($ from the state in
accordance with its
unclaimed property laws. If you do not claim your deposit(s) from the state within
the ten years,
the funds will be returned to the FDIC, and you will be permanently barred from
claiming your
deposit(s). if the state declines to accept custody of your unclaimed deposit(s),
you will be able to
claim your deposit(s) directly from the FDIC until the receivership is terminated.
However, please
note that a receivership may be terminated at any time. Once the receivership is
terminated, you
will not be able to claim your deposit(s).

In the event you disagree with the FDIC's determination of your insurance coverage
as represented
by the account(s) made available at the New Institution, you may seek a review of
the FDIC's
determination in the United States District Court for the federal judicial district
where the principal
place of business of the Failed Institution was located. You must file your request
for this review
no later than 60 days after the date on which the FDIC made your deposit(s)
available to
you at the New Institution. Filing a request for review will not prevent you from
Page 108

204

WamuClosingBook.txt

using the
funds in your new account.


NOTICE TO CREDITORS @ AND DEPOSITORS OF
WASHINGTON MUTUAL BANK

HENDERSON, NV

-- . --

On September 25, 2008 (the 'Closing Date"), the Office of Thrift Supervision
closed Washington Mutual Bank. Henderson, NV 89014 (the "Failed Institution")
:nd appointed the Federal Deposit Insurance Corporation as Receiver (the

Receive?) to handle all matters relating to the Failed Institution.

TO THE CREDITORS OF THE FAILED INSTITUTION

All creditors having claims against the Failed Institution must submit their claims
in writing, together with proof of the claims, to the Receiver by December 30,
2008 (the "Bar Date"), at the following address:

FDIC as Receiver of Washington Mutual Bank
1601 Bryan Street, Dallas, TX 75201
Attention: George Fritz

Under federal law, with certain limited exceptions, failure to file such claims
bythe Bar DaW will result in disallowance by the Receiver, the disallowance
will be final, and further rights or remedies with regard to the claims will
be barred. 12 U.S.C. Section 1821(d)(S)(C), (d)(6).

TO THE DEPOSITORS OF THE INSTITUTION

The Federal Deposit Insurance Corporation, in its corporate capacity, which
insures your deposits (the "FDIC), arranged for the transfer of the deposit(s)
at the Failed Institution to another insured depository institution. JPMORGAN
CHASE BANK NATIONAL ASSOCIATION, Columbus, OH, 43240 ("the New
Institution"). This arrangement should minimize the inconvenience the closing
of the Failed Institution causes you. You may leave your deposits in the
New Institution, but you must take action to claim ownership of your
deposits.

Federal law 12 U.S.C. Section 1822(e), requires you to claim ownership of
("claim") your deposits at the New Institution within eighteen (18) months from
the Closing Date. If you do not claim your deposits at the New Institution by
March 25, 2010, the funds in your account(s) will be transferred back to the
FDIC, and you will no longer have access to your deposit(s) at the New Institution.
However, as described in more detail below, you may still be able to obtain these
funds from your state government or the Receiver. .

You may claim your deposits at the New Institution by taking any of the following
actions within 18 months from the Closing Date. If you have more than one
account, your action in claiming your deposit in one account will automatically
claim your deposit in all of your accounts.

1. Making a deposit to or withdrawal from your account(s). This includes
writing a check on any account, or having an automated direct deposit

205

WaMuClosingBook.txt
credited to or an automated withdrawal debited from any account.
2. Executing a new signature card on your account(s), enter into a new deposit
agreement with tfie New Institudon, changing the ownership on your
account(s), or renegotiating the terms of your certificate of deposit account;
3. Providing the New Institution with a completed change of address form;
or
4. Writing to the New Institution and notifying them that you wish to keep your
account(s) active. Please be sure to include the name(s) of the account(s),
the account number(s), and the signature of an authorized signer on the
account(s), name and address.
You should know that bank drafts issued by the Failed Institution, including
officer's checks, cashier's checks, money orders, dividend checks, interest
checks, and expense checks, are all considered deposits and must be
claimed withln 18 months from the Closing Date.

If you do not claim ownership of your deposit(s at the New lnstitution within
18 months from the Closing Date, federal law, 12 U)S.C. Section 1822(e), requires
the New lnstitution to return your deposit(s) to the FDlC and he FDlC todeliver
the unclaimed deposit(s) as unclaimed property to the state listed in your address
on the Failed Institution's records. If your address is outside of the United
States.
the FDIC is directed to deliver the unclaimed deposit(s) to the state in wh~ch
the Failed Institution had its main office. If the,state accepts custody of your
deposit@), you will have ten years from the date of delivery to claim your
deposit(s)
from the state in accordance with its unclaimed properly laws. If you do not claim
your deposit(s) from the state within the ten years, the funds will be returned to
the FDIC, and you will be permanently barred from claiming your deposit(s). If
the state declines to accept c~stody of you ~nclaimed depos~t(s),yo^ nillbe
able to claim vour deoostt(s\ dlrecllv from the FDlC unr lthe recel~ershl~

IS
terminated. ~6wever,'please&note that a receivership may be terminated at iny
time. Once the receivership isterminated, you willnotbe able to claim your
deposit(s).

In the event you disagree with the FDIC's determination of your insurance
coverage as represented by the account(s) made available at the New Institution,
you may seek a review of the FDlC's determination in the United States District
Court for the federal judicial district where the principal place of business of
the Failed lnstitution was located. You must file vour reouest for this review

I no later than 60 days afler the date on which th; FDlC made your deposit(s)
available to you at the New Institution. Filing a request for review will
not prevent you from using the funds inyour new account.

NOTICE OF PUBLIC Notice is herebv given thal

HEARING OF THE Council of the Town of Yo!
SHORELINE CITY COUNCbL POlnt Vliii hold 0 public he0
All interested persons ore en. Ot ':OD P.m.on TuesdoY!Och

couraased to attend the public 14' 2Wk at Yarrow ''Int

hearing and provide written 32,'oS~~~n2n$,"~

andlor oral comments.

, ~

Page 110

206

WaMuClosingBook.txt

Dwelling Units per-cos. Address: 4001 NE.41st hw:

When: Monday, October 13 - of the

Yorrow Point. COPT-S

2008 -8:W P m. plication ore available at
where: -~--t ~ center chargei otpartiesi are Hoil. Al

- lerested ~shorelineconference Roan, - the Town invite,
18560 First Avenue NE, attend. Claudia Loulnser,

Shoreline, Woshinston terirn Clerk Treasurer.

Duncan, Martha C.

From: Fritz, George
Sent: Tuesday, October 07, 2008 11:20 AM
To: Duncan, Martha C.
Subject: FW: #10015 WaMu - Approved JPMC Depositor Notice for Publication

Attachments: Chase_Approved_Pub_Notice.pdf

For the Closing Book.
Thanks,
George

From: Fenton, Thaddeus G.
Sent: Tuesday, October 07, 2008 11:16 AM
To: █████████████████████
Cc: Fritz, George; McNaul, Carrie A.
Subject: #10015 WaMu - Approved JPMC Depositor Notice for Publication

Michael,

FDIC Claims Agent In Charge George Fritz has agreed to accept your proposed form of
Notice to Depositors
which JPMC will publish. A copy of that proposed notice is attached, with our
approvals noted thereon.
-Thad

Chase_Approved_P
ub_Notice.pdf ...

1

NOTICE TO DEPOSITORS OF Washington Mutual Bank, Henderson, NV
***Your Institution Has Been Closed***

**YOUR DEPOSITS HAVE BEEN TRANSFERRED TO
JPMorgan Chase Bank, National Association**

JPMorgan Chase Bank, National Association, Columbus, OH, 43240 ("Chase"), assumed
the
                                    Page 111

*207*

WaMuClosingBook.txt

deposits of Washington Mutual Bank, Henderson, NV 89014 ("WaMu") on September 25, 2008.
The Office of Thrift Supervision closed WaMu on September 25, 2008, and the Federal Deposit
Insurance Corporation ("FDIC"), which insures your deposits in its corporate capacity, arranged
for the transfer of your deposits to Chase. This arrangement should minimize any inconvenience
to you and your deposits will continue to be insured by the FDIC to the maximum permitted by
law. To learn more, stop by your local WaMu or visit wamu.com.

Page 112

*208*

# EXHIBIT "H"

209

Page 1

IN THE CIRCUIT COURT OF THE
FIFTH JUDICIAL CIRCUIT, IN AND
FOR LAKE COUNTY, FLORIDA

CASE NO.: 2009 CA 005717

JPMORGAN CHASE BANK, N.A.
as Successor in Interest to
WASHINGTON MUTUAL BANK,

    Plaintiff,

VS

SHERONE D. WAISOME, et al,

    Defendant.

* * * * * * * * * * * * * * * * * * * * * * * * *

DEPOSITION OF:     LAWRENCE NARDI, VOLUME 1 OF 2

DATE TAKEN:      MAY 9, 2012

TIME:         9:03 A.M.

PLACE:        121 SOUTH ORANGE AVENUE
               SUITE 800
               ORLANDO, FLORIDA

REPORTED BY:     CINDY CONNER, CSR, RPR AND
               NOTARY PUBLIC

* * * * * * * * * * * * * * * * * * * * * * * * *

def7843d-1bd4-47cd-9bf2-ab493c04c1f8

210

Lawrence Nardi - 5/9/2012

Page 57

1        A    No.

2        Q    And do you know anything about the loss-share

3    agreement, specifically the calculation of losses and

4    how they are shared with the FDIC?

5        A    No.

6        Q    Okay.  Who in the bank would have that

7    knowledge?

8        A    I don't know of a specific name.  It sounds

9    like the items that you're looking for encompass more

10   than just the mortgage banking portion.  It probably

11   encompasses all of the bank's losses in the loss

12   sharing, so I -- you know, it would likely be someone

13   quite a bit higher up the chain and, you know, probably

14   in a -- in a much larger office than mine.

15       Q    Okay.

16       A    So I don't know any specific names, but it

17   would be someone who's in a control position in the

18   bank, I imagine.

19       Q    Okay.  The -- are you aware of any type of

20   schedule of loans that would have been created to

21   represent the -- either the loans that were asset loans

22   or the loans that were serviced by WAMU?  Are you -- was

23   the -- do you know if there is a schedule or database of

24   loans like that?

25            MS. CREWS:  Object to form.

def7843d-1bd4-47cd-9bf2-ab493c04c1f8

*211*

Lawrence Nardi - 5/9/2012

Page 58

1       A    I know that there was a schedule contemplated

2    in certain documents related to the purchase.  That

3    schedule has never materialized in any form.  We've

4    looked for it in countless other cases.  We've never

5    been able to produce it in any previous cases.  It would

6    certainly be a wonderful thing to have, but it's -- as

7    far as I know, it doesn't exist, although it was -- it

8    was contemplated in the documents.

9       Q    (By Ms. Mack)  Do you -- do you know how

10   the -- well, okay.  If -- for purposes of this question,

11   let's assume that the Waisome loan was an asset of WAMU.

12   Okay?

13      A    Okay.

14      Q    And if it was assumed by JPMorgan Chase

15   because of the purchase and assumption, how would you be

16   able to tell what the book value was at the time --

17           MS. CREWS:  Object to the form.

18      Q    (By Ms. Mack)  -- of the closure of the bank,

19   WAMU?

20      A    For the individual loan level?

21      Q    Yes.

22      A    I -- the answer is I don't know if there was

23   any book level assigned to individual loans.  My

24   understanding of the transaction is it was a whole bank

25   purchase, and there was not individual values assigned

def7843d-1bd4-47cd-9bf2-ab493c04c1f8

2/2

Lawrence Nardi - 5/9/2012

Page 260

1   price for each one of those loans was going to be.  It

2   would be impractical, and it would, clearly, take more

3   than just a few hours or a couple of days, even.

4        Q    (By Ms. Mack)  Okay.  I have a question about

5   3.3, which is on Page 10.

6        A    Sure.

7        Q    If you need a minute to review, just let me

8   know when you're done.

9        A    Okay.

10        Q    Okay.  Where would we find a document with

11   regard to Mr. Waisome's loan that contains the language

12   contained in Section 3.3 of the purchase and assumption

13   agreement?

14        MS. CREWS:  Object to form.

15        A    I'm not aware of any document that would need

16   to contain or does contain that language, so I wouldn't

17   know where to find it either.

18        Q    (By Ms. Mack)  Have you ever in your duties of

19   being a loan analyst -- a loan operations analyst, have

20   you ever seen an FDIC bill of sale or a receiver's deed

21   or an assignment of mortgage or an allonge?

22        MS. CREWS:  Object to form.

23        A    For loans, I'm assuming you're talking about

24   the Fray WAMU loan that was subject to the purchase

25   here.

Electronically signed by Cindy Conner (301-016-457-7653)
Electronically signed by Cindy Conner (301-016-457-7653)

e6eaab86-8de3-4186-b620-7a9b984956f0

213

Lawrence Nardi - 5/9/2012

Page 261

1      Q     (By Ms. Mack)  Right.

2      A     No, there is no assignments of mortgage.

3   There's no allonges.  There's no -- in the thousands of

4   loans that I have come in contact with that were a part

5   of this purchase, I've never once seen an assignment of

6   mortgage.  There is simply not -- they don't exist.  Or

7   allonges or anything transferring ownership from WAMU to

8   Chase, in other words.  Specifically, endorsements and

9   things like that.

10     Q     This would be actually specifically through

11   the FDIC and would contain the language that is in 3.3.

12     A     No.

13           MS. CREWS:  Object to form.

14     A     I haven't seen the document.

15           MS. MACK:  Well, I'm clarifying this and

16        talking about certain documents.

17     Q     (By Ms. Mack)  So you just don't -- you don't

18   think that is something that was performed --

19           MS. CREWS:  Object to form.

20     Q     (By Ms. Mack)  -- as far as transferring the

21   properties in the manner indicated in the purchase and

22   assumption agreement?

23           MS. CREWS:  Object to form.

24     A     Again, I -- I don't know of any requirement or

25   process that was followed regarding the language in this

Electronically signed by Cindy Conner (301-016-457-7653)
Electronically signed by Cindy Conner (301-016-457-7653)          e6eaab86-8de3-4186-b620-7a9b984956f0

214

# EXHIBIT 2

215

# Handwriting Expert, LLC
## *Curt Baggett*

Expert Document Examiner
908 Audelia Road, Suite 200-245
Richardson, Texas 75081
Phone:  972.644.0285
Fax:  972.644.5233
cbhandwriting@gmail.com
*www.ExpertDocumentExaminer.com*

October 27, 2018

### FORENSIC HANDWRITING AND DOCUMENT EXAMINER EXPERT REPORT

Forensic Document Examination
Requested by:

**Richard Wayne Hill**

_____

_____

Regarding
Richard W. Hill

# Curt Baggett's
# Handwriting Expert Report of

# Richard W. Hill

Examination of Opinion For Questioned Signatures
And Basis and Reasons for Expert Opinion

*216*

# TABLE OF CONTENTS

SECTION 1          CURRICULUM VITAE OF CURT BAGGETT

SECTION 2          EXHIBITS (QUESTIONED AND KNOWN SIGNATURES)

SECTION 3          DETAILED REPORTS – BASIS FOR OPINION

SECTION 4          LIST OF DIFFERENCES AND ENLARGED EXHIBITS

SECTION 5          LEGAL DATA
                   United States v. Janet L. Thornton, Case No. 02-M-9150-01
                   To support accuracy of Handwriting Experts at 93.5%

SECTION 6          LIST OF TRIALS AND OTHER TESTIMONIES

SECTION 7          LIST OF PUBLICATIONS

*217*

# SECTION 1

# Curriculum Vitae of Curt Baggett

*2/8*

# CURT BAGGETT

**Expert Document Examiner**

908 Audelia Road, Suite 200-245, Richardson, TX 75081

Phone: 972.644.0285 - Fax: 972.644.5233

cbhandwriting@gmail.com

www.ExpertDocumentExaminer.com

Curt Baggett is a leading handwriting expert in the United States. He is also a skilled authority in document examination and as an expert witness and he has completed over 5,000 cases. Mr. Baggett has examined documents and/or testified in court cases as a handwriting expert in all 50 states, Washington, D.C., the Bahamas, Brazil, Canada, Chile, England, Ireland, Mexico, Pakistan, Puerto Rico, Thailand and New Zealand, Korea, China, Australia and Denmark.

The U.S. Department of Justice, the State of Arizona, State of Arkansas, the State of California, Louisiana Public Defender Board, and the State of Texas have retained him. Mr. Baggett has appeared as a handwriting expert on WOLF-BLITZER-CNN; CHARLES GIBSON-ABC, INSIDE EDITION, CBS Network Radio, CBS, CNBC, CNN, FOX, JUDGE ALEX, TEXAS JUSTICE and GOOD MORNING TEXAS and was a consultant as a forensic document examiner for a number one television show, "CSI: Crime Scene Investigation". Mr. Baggett is the co-author of "The Handwriting Certification Home Study Course" and "How To Spot a Forgery" and has been a guest on various other television and radio programs discussing handwriting and forensic document examination.

Mr. Baggett once held the position as Dean of the School of Forensic Document Examination at Handwriting University. In addition to lecturing and teaching document examination, Mr. Baggett has analyzed handwriting for over 40 years. He has been qualified as an expert witness in Justice of the Peace, Municipal, District, State, U.S. District, and Federal Bankruptcy Courts, Eastern Caribbean Supreme Court, High Court of Tynwald British Isles and the Provincial Courts of Canada.

His education and training in document examination and psychology include: U.S. Army, Military Police Officer's School; B.A. and M.Ed., McNeese State University, Lake Charles, Louisiana; and post-graduate studies at the University of Houston, Houston, Texas.

Curt Baggett's library is extensive and includes literature on questioned document examination, forensic handwriting analysis, behavior profiling, and statement analysis.

Laboratory equipment used for examination consists of a Stereo Star Zoom American Optical 7x – 30x twin microscope; Micronta illuminated 30x microscope; stereo microscope S/ST series; universal DigiScoping adapter; numerous magnifying devices; protractor and metric measuring devices; Pentax ME camera; Pentax macro 1.4, 50mm flat copy lens; overhead projector; light table, and transparencies.

## Curt Baggett's Education and Training in Handwriting and Document Examination Include:

An in person two-year apprenticeship with Dr. Ray Walker as a handwriting expert and questioned document examiner. Dr. Walker's qualifications have been affirmed in the Court of Appeals, Fifth District of Texas at Dallas, and had historical rulings in his favor. A leading authority in the field of handwriting analysis and document examination, Dr. Walker is the author of The Questioned Document Examiner and the Justice System.

The American Bureau of Document Examiners certifies Mr. Baggett. He also has a certificate of completion from the American Institute of Applied Science.



**Lectures, Conferences, and Classes Attended:**

2004 School of Forensic Document Examination's Annual Conference, Dallas, Texas
    Attended classes taught by Reed Hayes, QDE, Katherine Koppenhaver, QDE, Bill Koppenhaver, QDE

2004 School of Forensic Document Examination's Teleclass Curriculum
    Examination of Anonymous Writing by Reed Hayes, QDE
    Document Examination Terminology by Don Lehew, QDE
    Notary Public by Don Lehew, QDE
    Advanced Forgery Identification by Don Lehew, QDE
    Instructor

2005 School of Forensic Document Examination's Annual Conference, Dallas, Texas
    Attended the following lectures, in addition to general sessions:
    Tremors and line Quality taught by Reed Hayes, QDE
    Demonstrative Evidence taught by Katherine Koppenhaver, QDE, Bill Koppenhaver, QDE
    Photography through microscopes by David Babb, QDE
    Paper and Watermarks by John McGuire, QDE
    Lecturer

2005 School of Forensic Document Examination's Teleclasses
    Natural Variation taught by Reed Hayes, QDE
    The Discrimination of Handwriting by Don Lehew, QDE
    Procedures for Examining Signatures by Don Lehew, QDE
    Courtroom Procedures and Roles by Don Lehew, QDE
    Instructor

2006 School of Forensic Document Examination's Annual Conference, Dallas, Texas
    Attended the following lectures, in addition to general sessions:
    Deposition and Cross Examinations by Dr. Richard Frazier, QDE
    Medical Problems Affecting handwriting by Dr. Richard Frazier, QDE
    Legal Issues for Document Examiners by Dr. Richard Frazier, QDE
    Deposition and Cross Examinations by Dr. Richard Frazier, QDE
    Health Factors Affecting Handwriting by Dr. Joe Alexander, QDE
    Prescription Forgery and Medical Crimes by Diane King. Lecturer

2007 Handwriting University Annual Conference, Dallas, Texas
    Trainer and Instructor

2007 School of Forensic Document Examination's Teleclasses
    Instructor - Handwriting Basics and Exemplars
    Instructor - Multiple Classes on Case Studies and Examinations

2008 Handwriting University Annual Conference, Las Vegas, Nevada
    Trainer and Instructor

2009 School of Forensic Document Examination's Live Teleclasses
    Attended a variety of classes taught by Robert Baier, QDE, Police Instructor

2009 Handwriting University Annual Conference, Las Vegas, Nevada
    Critical Incident Stress: Statement Analysis and Interview v. Interrogation by Faith Wood

220

Forensic Document Examination Application by Robert Baier, QDE, Police Instructor
Trainer and Instructor for Introduction to Forensic Document Examination

2010 Handwriting University Annual Conference, Las Vegas, Nevada
Advanced Statement Analysis by Faith Wood
Identity Theft and Prevention by Robert Baier, QDE, Police Instructor
Trainer and Instructor for Introduction to Forensic Document Examination

2010 Speaker – "Introduction to the Science of Handwriting and Forensic Document Examination", Clear Lake High School

2011 Lecturer and Instructor, "How to Spot a Forgery", Denver Elections Division, Denver, Colorado

2012 Lecturer and Instructor, "How to Spot a Forgery", Denver Elections Division, Denver, Colorado

2012 Speaker – "How to Avoid a Forgery", Military Order of Purple Hearts Annual Meeting, Dallas, Texas

2013 Speaker – "Introduction to the Science of Handwriting and Forensic Document Examination";
Appointment as Guest Lecturer and Consultant by Stefanie Page, Instructor, Forensic Science Department, Jesuit College Preparatory School of Dallas

2013 Speaker – "Introduction to the Science of Handwriting and Forensic Document Examination", Irma Lerma Rangel Young Women's Leadership School, Dallas, Texas

2016 Speaker – Handwriting University International Handwriting Conference in Las Vegas, NV (Sept.)

2018 Instructor via written presentation at the 18th Wroclaw Symposium of Questioned Document Examination at University of Wroclaw in Poland June 6-8, 2018

**Past and Present Memberships**

American College of Forensic Examiners International
American Legion
Center of Forensic Profiling
Forensic Expert Witness Association
IMS Expert Services
Military Order of World Wars
National Questioned Document Association
Sheriff's Association of Texas
Texas Police Association
Veterans of Foreign Wars
World Federation of Handwriting Experts
National Association of Distinguished Professionals
SEAK-Expert Witness Resources

**Published Articles and Books**

Ethics for Experts
Handwriting Certification Course
How to Help Attorneys With Your Case
How to Spot a Forgery
Taking the Witness Stand

Rev 10/27/18

3

221

# SECTION 2

## Exhibits of Signatures

## Richard W. Hill

222

# QUESTIONED
# SIGNATURES

223

39US
M39



PNOTE

3013651298-057

## ADJUSTABLE RATE NOTE
### (12-MTA Index - Payment and Rate Caps)

3013651298

THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE
AND MY MONTHLY PAYMENT. MY MONTHLY PAYMENT INCREASES WILL HAVE LIMITS
WHICH COULD RESULT IN THE PRINCIPAL AMOUNT I MUST REPAY BEING LARGER
THAN THE AMOUNT I ORIGINALLY BORROWED, BUT NOT MORE THAN    115%    OF
THE ORIGINAL AMOUNT (OR $____1,099,687.50__  MY INTEREST RATE CAN NEVER
EXCEED THE LIMIT STATED IN THIS NOTE OR ANY RIDER TO THIS NOTE. A BALLOON
PAYMENT MAY BE DUE AT MATURITY.

__MAY 05, 2007_____CORONA_____, CALIFORNIA____
                                        CITY                              STATE

__1549 HEATHER LANE, RIVERSIDE, CA  92504_____
                          PROPERTY ADDRESS

## 1.  BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $      956,250.00      plus
any amounts added in accordance with Section 4 (G) below, (this amount is called "Principal") plus
interest, to the order of the Lender. The Lender is  __WASHINGTON MUTUAL BANK, FA__
will make all payments under this Note in form of cash, check or money order. I understand that the
Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled
to receive payments under this Note is called the "Note Holder".

## 2.  INTEREST

Interest will be charged on unpaid Principal until the full amount has been paid. Up until the first day
of the calendar month that immediately precedes the first payment due date set forth in Section 3 of this
Note, I will pay interest at a yearly rate of    7.925 %. Thereafter until the first Change Date (as
defined in Section 4 of this Note) I will pay interest at a yearly rate of    1.775  %. The interest rate
required by this Section 2 and Section 4 of this Note is the Rate I will pay both before and after any
default described in Section 7(B) of this Note.

## 3   PAYMENTS

**(A) Time and Place of Payments**

I will pay Principal and interest by making payments every month. In this Note "payments" refer to
Principal and interest payments only, although other charges such as taxes, insurance and or late
charges may be payable with the monthly payment.

I will make my monthly payments on __1ST__ day of each month beginning on
__JULY, 2007_____. I will make these payments every month until I have paid all of the
principal and interest and any other charges described below that I may owe under this Note. Each
monthly payment will be applied to interest before Principal. If, on   JUNE 01  203_ , I
still owe amounts under this Note, I will pay those amounts in full on that date, which is called the
"Maturity Date".

I will make my monthly payments at   P.O. BOX 78148 PHOENIX, AZ 85062-8148
_____, or at a different place if required by the Note Holder.

**(B) Amount of My Initial Monthly Payments**

Each of my monthly payments until the first Payment Change Date will be in the amount of U.S.
$   3,427.87     unless adjusted at an earlier time under Section 4(H) of this Note.

32460 (01-21)                          Page 1 of 6                  67780-USA (20-050-051-1)

*Identification Page    1*

QDE
EXHIBIT
21

*224*

*Adjustable Rate Note*

JC1565 1298

WITNESS THE HAND (S) AND SEAL (S) OF THE UNDERSIGNED.

RICHARD WAYNE HILL

32459/0100                              Page 3 of 3                    FACT00L00 (REV 01 98)

*Signature Page*

DDS
EXHIBIT
21

225

RECORDING REQUESTED BY
FIRST AMERICAN TITLE

Recording Requested By:
WASHINGTON MUTUAL BANK   FA

Return To:
WASHINGTON MUTUAL BANK   FA
2210 ENTERPRISE DR
FLORENCE , SC 29501
DOC OPS M/S FSCE 440

Prepared By
FRANCES DIAZ

3284940

ZCA1
M39

3013651298

DOC # 2007-0326394
05/16/2007 08:00A Fee:72.00
Page 1 of 22
Recorded in Official Records
County of Riverside
Larry W. Ward
Assessor, County Clerk & Recorder

ORIGINAL DEED

| S | R | U | PAGE | SIZE | DA | MISC | LONG | RFD | COPY |
|---|---|---|------|------|-----|------|------|-----|------|
| M | A | | 465 | 426 | PCOR | NCOR | SMF | NCHG | EXAM |

(Space Abo

# DEED OF TRUST

3013651298 057

T
002

DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined
in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this
document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated  MAY 05 , 2007
together with all Riders to this document.
(B) "Borrower" is  RICHARD WAYNE HILL A MARRIED MAN AS HIS SOLE AND
SEPARATE PROPERTY

Borrower's address is  1549 HEATHER LANE, RIVERSIDE, CA 92504
                                        Borrower is the trustor under this Security Instrument.
(C) "Lender" is  WASHINGTON MUTUAL BANK , FA

Lender is a  FEDERAL SAVINGS BANK
organized and existing under the laws of  THE UNITED STATES OF AMERICA

CALIFORNIA - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT      Form 3005  1/01

VMP-6(CA) (0207)
Page 1 of 15                Initials
VMP MORTGAGE FORMS  (800)521-7291

*Identification Page*

QDE
EXHIBIT
Q2

226

*Deed of Trust*

7CA2

Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

25  **Statement of Obligation Fee.** Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

(Seal)
-Borrower

RICHARD WAYNE HILL

(Seal)
-Borrower

(Seal)                                                    (Seal)
Borrower                                                  Borrower

(Seal)                                                    (Seal)
-Borrower                                                 -Borrower

(Seal)                                                    (Seal)
-Borrower                                                 -Borrower

-6(CA)                                                    Form 3005 1/01

*Signature Page*

DDS
EXHIBIT
2

227

# KNOWN SIGNATURES

When recorded mail to:
CITY OF ANAHEIM
DEPARTMENT OF PUBLIC WORKS
ENGINEERING RECORDS
200 SOUTH ANAHEIM BLVD
ANAHEIM, CA 92805

## CERTIFICATE OF COMPLIANCE
## COC2015-00152

**RECORD OWNER:** CENTRES ANAHEIM, LLC, A CALIFORNIA LIMITED LIABILITY
COMPANY
1341 W. LA PALMA AVENUE
ANAHEIM, CA 92801

**A.P. NO.:**           271-042-37
1341 W. LA PALMA AVENUE
D-81

**NUMBER OF PARCEL:**        1

At the request of the property owner, the City of Anaheim director of Public Works, as a City
Engineer has determined that the following real property, further described in Exhibit A and B
complies with applicable provisions of Subdivision Map Act of the State of California (Section
66410 et. Seq. of the California Government Code) and applicable provisions of the City of
Anaheim Municipal Code.

This certificate relates only to issues of compliance or noncompliance with the Subdivision Map
Act and local ordinances enacted pursuant thereto. The parcel described herein may be sold,
leased, or financed without further compliance with the Subdivision Map Act or any local
ordinances enacted pursuant thereto. Development of the parcel may require issuance of a permit
or permits, or other grant or grants of approval.

City of Anaheim

Richard W. Hill, LS 8588
City Surveyor
City of Anaheim

*K2*

Date

*K1*

*229*

PAGE 2 OF 5

## SURVEYOR'S STATEMENT

THIS DOCUMENT CONSISTING OF 5 PAGES WAS PREPARED BY ME OR UNDER MY DIRECTION.

SIGNATURE _____ L S NO. 8639                    DATE _____

MY REGISTRATION LICENSE EXPIRES: 12/31/2015
COMPANY NAME : HUNSAKER & ASSOCIATES INC.
ADDRESS : THREE HUGHES, IRVINE, CA 92618
PHONE NO : (949) 583-1010

## CITY APPROVAL

EXAMINED AND APPROVED BY:                         ← A 2

RICHARD W. HILL L.S. 8588                          DATE _____
CITY OF ANAHEIM
CITY SURVEYOR

C.D.E.
EXHIBIT
R2

D-108

230

*K3*

*231*

# SECTION 3

## Detailed Report
## Basis For Opinion

*232*

# CURT BAGGETT'S

## HANDWRITING EXPERT REPORT
## EXAMINATION OF QUESTIONED SIGNATURES OF
## Richard Wayne Hill
## AND
## BASIS AND REASONS FOR EXPERT OPINION

### EXAMINATION REQUESTED

This forensic document examiner was asked to conduct an examination of two (2) questioned signatures of **Richard Wayne Hill** to determine authenticity of the questioned signatures by comparing the questioned signatures to known signatures.

### EXHIBITS

Documents examined were transmitted via Internet and printed from an HP printer. The documents included three (3) documents with the eight (8) known signatures **Richard W. Hill**, labeled herein as 'K1' through 'K3' and two (2) documents which contain the questioned signatures of **Richard Wayne Hill**, labeled herein as 'Q1' and 'Q2'. All documents are exhibited with clear numbers for reference and for identification and there is no need to describe each document individually.

**'Q1' - ADJUSTABLE RATE NOTE dated May 05, 2007 for Property Address of 1549 Heather Lane, Riverside, CA 92504 and 'Q2' – DEED OF TRUST dated May 05, 2007 (Lender is Washington Mutual Bank, FA)**

### OBSERVATIONS, DESCRIPTIONS AND/OR LIMITATIONS

The identification of any signature/handwriting is based on the agreement, without unexplainable difference, of the handwriting characteristics displayed. These characteristics include the form of the letters, the beginning, connecting, and ending strokes, the proportions of letters, both inter-letter and intra-letter, the slope, size, and curvature of the

234

writing/printing. The outstanding significant features of the writing are other factors used to analyze, compare and evaluate. The elimination of an author is based on a lack of some or all of the above-noted characterizations.

The quality of documents and signatures were sufficient for examination. The exemplars of known samples of the signatures were compared one to another to verify that the same person authored each sample and to determine the natural variation in the regular normal design of signatures. The patterns of writing were verified under the microscope and by using other scientific instruments such as metric measuring devices, light table, and handheld magnifying devices. The handwriting characteristics displayed in the known signatures are all very similar. Original documents were requested, no originals were immediately available.

Handwriting is not only handwriting, but also 'brain' writing. Handwriting is formed by repeated habits of writing by the author, which are created by neuron-pathways established in the brain. These neuron-pathways control muscular and nerve movement for writing, whether the writing done is by the hand, foot, or mouth. An examination of handwriting includes establishing patterns of writing habits to help identify the author.

The signatures on the Q documents were enlarged and examined scientifically in a side-by-side comparison to the known samples, under a microscope and on a light table. Measurements of letter height, lateral expansion, angles, slant and line quality were examined under a microscope. Significant differences of the handwriting characteristics were displayed in the questioned signatures when compared to the known signatures. The questioned signatures, when compared to the known signatures, displayed dis-similar and irregular line quality, flow, size, shape, slants, positions of letters, stops and starts, end and beginning strokes.

No forensic lighting examination was conducted on the questioned documents since no originals were provided and no ink or paper examination could be conducted.

Indented writing is an impression created by the pressure of a writing instrument on a page on top of the questioned item. These impressions may be deciphered using various techniques, which include side lighting and electro static processing. No ESDA machine was used in this examination since no originals of the questioned documents were provided.

Some limitations are imposed on the examiners when originals are not available for an examination. However, the size, shape, form, beginning, ending, spacing, curves, angles, height, width, added or missing letters, or an absence of regular writing habits all can easily be detected from clear copies. Some indications of forgery were noted on the questioned signatures in the size, shape, line quality, letter distortion, and shaky starts and stops.

## METHODOLOGY

A Meticulous examination of the questioned signatures to the known signatures was conducted using a side-by-side comparison with the unaided eye, handheld magnifying loupes, microscope, photocopy enlargements, grids, a light table, and metric measuring devices. The scientific methodology used in this examination consists of the 'ACE' method, which means

235

'Analyze, Compare, and Evaluate'. The FBI, U.S. Treasury Department, and the US Postal Services reportedly use this reliable method in their questioned document laboratories. ASTM recommends this method as the standard in this field. This method was also accepted and affirmed by the District of Columbia Court of Appeals in Case No. 08-CF-1361, *Pettus v. United States*. In addition, this examiner adds the Peer Review Methodology, which requests a second independent examination by a qualified handwriting expert. The State and Federal Court qualified expert I selected to peer review this case confirmed my opinion.

## EXAMINATION

The questioned signatures were examined and noted to have significant dis-similarities present between the size, height, width of letters, angles, and connecting strokes when compared to the known signatures.

My hypothesis was formed without bias as to authorship of the questioned documents. My examination revealed significant differences, not likely seen by an untrained or poorly skilled examiner. My conclusion was logical and based on results of the above described reliable methodology, analysis, comparison and evaluation.

All tests were done with accepted scientific methodology, techniques, and scientific instruments, which I relied on to assist me in my decision to the questioned signatures.

My scientific examination revealed forgery in the questioned signatures of **Richard Wayne Hill**. In fact, the measurable distinctions of each letter, pattern, angle, and slant, and the results of my tests indicate that **Richard W. Hill** was not the author of the signatures on the questioned documents.

## CONCLUSION

The leading forefathers of document examination in the USA agree that one significant difference in the fundamental structure of a writing compared to another is enough to preclude common authorship. *Handwriting Identification, Facts and fundamentals*, Ray A. Huber and A.M. Headrick, CRC Press LLC, 1999, pp 50-51:

[Ordway] Hilton stated: "It is a basic axiom of identification in document problems that a limited number of basic differences, even in the face of numerous strong similarities, are controlling and accurately establish nonidentity."

[Wilson R.] Harrison made similar comments: "...the fundamental rule which admits of no exception when handwritings are being compared...is simple – whatever features two specimens of handwriting may have in common, they cannot be considered to be of common authorship if they display but a single consistent dissimilarity in any feature which is fundamental to the structure of the handwriting, and whose presence is not capable of

*236*

reasonable explanation."

[James V.P.] Conway expressed the same theme when he wrote:  "A series of fundamental agreements in identifying individualities is requisite to the conclusion that two writings were authored by the same person, whereas a single fundamental difference in an identifying individuality between two writings precludes the conclusion that they were executed by the same person."

And finally,

[Albert S.] Osborn and others have generally agreed that despite numerous similarities in two sets of writings, a conclusion of identity cannot be made if there are one or more differences in fundamental features of the writings.

Based on a significant number of differences of identifiable handwriting characteristics among the questioned and known signatures, it is my professional expert opinion that a different person wrote the name of **Richard Wayne Hill** on the questioned documents.  Someone did indeed forge the signatures of **Richard Wayne Hill** on the 'Q1' and 'Q2' documents.  I have a duty to the Court to present the truth and evidence to the best of my ability.

I have applied the generally accepted Questioned Document Examiner principles and methods reliable to the facts in this case.

I am willing to testify to facts herein stated in a court of law and I will provide to the Court exhibits to show that my testimony is based on sufficient facts or data and that my opinion is correct.  My Affidavit and Curriculum Vitae are attached and incorporated herein by reference.

Respectfully Submitted,

*Curt Baggett*

Curt Baggett, Expert Forensic Document Examiner

The above Letter of Opinion was sworn and subscribed before me by Curt Baggett this ____ day of ____October____, 2018.

State of Texas                          §
                                        §
                                        §
County of Dallas                        §
                                        _____
                                        Notary Public – State of Texas

237

# SECTION 4

## List of Differences
## And Enlarged Exhibits

*238*

***Handwriting Expert, LLC***
***Curt Baggett***
Expert Document Examiner
908 Audelia Road, Suite 200-245
Richardson, Texas 75081
Phone: 972.644.0285
Fax: 972.644.5233
cbhandwriting@gmail.com
*www.ExpertDocumentExaminer.com*

---

**List of Differences of the Questioned Signatures of Richard Wayne Hill Compared to the Known Signatures of Richard W. Hill**

### 'Q1' Signature

1. The location of the beginning stoke of the 'R' in Richard is wrong
2. The top fo the 'R' is not large enough
3. The letters after the 'R' in Richard are too short and mis shaped
4. The H letter is shaky
5. The last 'I' in Hill is wrong shape
6. The last 'I' in Hill is wrong size

### 'Q2' Signature

1. 'R' top too small
2. Shaky line
3. 'R' has an extra line between left side and right side
4. The letters following the 'R' are distorted and too tall
5. 'H' does not match
6. The 1st 'I' in Hill is too big and too short
7. The top of the 2nd 'I' is not curved
8. The end stroke stops at the 'H'
9. The right side of the 'H' is shaky

List of Differences – Richard W. Hill

Page 1 of 1

*239*



RICHARD WAYNE HILL

Q1

Q2

(Seal)

-Borrower

EXAMINED AND APPROVED BY:

K2

City of Anaheim

K1

Richard W. Hill LS 8588

K3

240



RICHARD WAYNE HILL

241



RICHARD WAYNE HILL

242

Q1

RICHARD WAYNE HILL

Q2

RICHARD WAYNE HILL

City of Anaheim

K1

Richard W. Hill, LS 8588

EXAMINED AND APPROVED BY:

K2

RICHARD W. HILL L.S. 8588

243

RICHARD WAYNE HILL

Q1

Q2

RICHARD WAYNE HILL



K3 — 1

K3 — 2

K3 — 3

244

Q1

RICHARD WAYNE HILL

Q2

RICHARD WAYNE HILL

K3 — 4

K3 — 5

K3 — 6

245

# SECTION 5

# Legal Data

United States V. Janet L. Thornton, Case No. 02-M-9150-01
To support accuracy of Handwriting Experts at 93.5%

*246*

LEGAL DATA

UNITED STATES v. JANET L. THORNTON

*Case No. 02-M-9150-01; decided January 24, 2003*

This issue is governed by Fed.R.Evid. 702, which states as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case. [This rule was amended in 2000 in response to *Daubert v. Merrell Dow Pharmaceuticals, Inc.* (1993) and *Kumho Tire Co. Ltd. v. Carmichael* (1999).]

In *Daubert*, the court, focusing on the admissibility of scientific expert testimony, held that the trial judge has the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand. In *Kumho Tire*, the court held that a trial judge's gatekeeping obligation applies not only to testimony based on scientific knowledge, but also to testimony based on technical and other specialized knowledge.

Among the studies cited by Mr. Hammond is a study by Professor **Sargur Srihari** on the individuality of handwriting. Using handwriting of 1500 individuals, his conclusions were that, using computer software, they were able to establish with a 98% confidence that the writer can be identified. Taking the results over the entire population, they were able to validate handwriting individuality with a 96% confidence. By considering finer features, Professor Srihari opined that they should be able to validate handwriting individuality with a near 100% confidence. A study by Dr. Moshe Kam indicates that professional document examiners had only a 6.5% error rate compared to an error rate of 38.3% for nonprofessionals. Dr. Kam concluded by stating that professional document examiners possess writer identification skills absent in the general population. Another study by Professor Kam indicated that professionals concluded that forgeries were genuine 0.49% of the time whereas laypersons did so 6.47% of the time. Professionals mistakenly concluded that genuine signatures were forgeries 7.05% of the time; laypersons did so 26.1% of the time. Another study by Jodi Sita, Brian Found and others found that forensic document examiners made errors in 3.4% of their opinions, while 19.1% of the control group gave erroneous opinions.

The above studies provide solid evidence that handwriting individuality can be validated with a very high degree of confidence, and that professional forensic document examiners have developed an expertise and training that allow them to correctly identify a person's handwriting with a much lower error rate than laypersons. On the other hand, the affidavit of Dr. Saks raises legitimate questions concerning the validity of these studies and the accuracy of handwriting identification in general.

However, in *Daubert*, the U.S. Supreme Court made it clear that "it would be unreasonable to conclude that the subject of scientific testimony must be known to a certainty; arguably, there are no certainties in science. . . . Science . . . represents a process for proposing and refining theoretical explanations about the world that are subject to further testing and refinement." It is sufficient if the proposed testimony can be supported by appropriate validation, i.e., good grounds, based on what is known.

247

# SECTION 6

# List of Trials and Other Testimonies

248

## CURT BAGGETT
## FORENSIC DOCUMENT EXAMINER
## SUMMARY OF CASES

I have been qualified or appointed and/or accepted by a State or by the Court as an Expert and/or have testified in trial or by deposition or made an appearance from 2013 through October 17, 2018 in the following cases and/or cities.

October 17, 2018    In the 11th Judicial Circuit Court , Miami-Dade County, FL
                    Case No. 2017-002035-CA-01 (11)  Civil Division
                    State Farm Mutual Automobile Insurance Company, Petitioner VS.  Elba Barquero,
                    individually, Respondents (Atty. for Respondent, Cam Justice)
                    Oral **DEPOSITION** of Curt Baggett taken in Plano, TX by Atty. Joel Bernstein

October 5, 2018     In the 44th Civil Judicial District Court, Dallas County, Dallas, TX 75202
                    Cause No. DC-18-00202 / Judge Bonnie Lee Goldstein / 5th floor
                    Paul W. McCowan, Plaintiff VS.  Santander Consumer USA Inc., et al, Defendant
                    **Curt Baggett made appearance at Hearing – Judge dismissed Defendant's Motion
                    to disqualify Curt Baggett as an Expert.**

September 18, 2018  In the 17th Judicial District Court of Tarrant County, Ft. Worth, TX 76196
                    No. 017-283888-16 / Judge Melody Wilkinson / PH: 817-884-1567 / 3rd floor
                    Ting Phetsalod, Plaintiff  VS.  Bounpanh Khounsaknarath, et al, Defendant
                    Attorney for Plaintiff, Rocky D. Crocker
                    **Curt Baggett Approved as Expert by Court and Testified** (for Plaintiff)

September 6, 2018   In the 6th NH Circuit Court – Probate Division, Concord, New Hampshire
                    Docket No. 317-2017-EQ-00967
                    Jonathan S. Stankatis Revocable Trust, As Amended
                    Atty. for Jonathan S. Stankatis Revocable Trust:  Robert D. Hunt, Esq.
                    Oral **DEPOSITION** of Curt Baggett taken in Plano, TX by Atty. Kevin M. O'Shea

September 4, 2018   In the 4th Judicial Circuit Court of Duval County  Div. FM-C  Room 742
                    Case No.  / Judge John I. Guy / Jacksonville, FL  32202
                    Esther L. Ash, Pro Se
                    Court Testimony by Affidavit and APPEARANCE by Curt Baggett

August 27, 2018     Hearing In the United States of America Southern District of Ohio Western Division
                    Case No. 1:17-cr-117 / Honorable Judge Michael Barrett / Cincinnati, OH  45202
                    USA, Plaintiff  VS.  Qian Williams, Defendant / Atty. for Defendant: Bill Gallagher
                    **Court Appointed Curt Baggett as Expert and Curt Testified** (for Defendant)

August 23, 2018     In the 73rd Judicial District Court of Bexar County, San Antonio, Texas  78205
                    No. 2017C118687 /
                    Christie Martinez-Encinas, et al, Plaintiff  VS.  Connie M. Mercado, Defendant
                    Atty. for Defendant:  David Conrad Beyer
                    Order signed by Judge to Disallow QDE Expert Wendy Carlson's Testimony for
                    Plaintiff
                    **Curt Baggett Court Appearance Only** for Hearing.  Trial scheduled for 11-5-18.

Page 1 of 17

Curt Baggett -- Court Case Summary

**Curt Baggett – Expert Document Examiner**

| | |
|---|---|
| August 21, 2018 | In the 325th Judicial District Associate Court of Tarrant County, Ft. Worth, TX 76196 No. 325-625377-17 / Judge Lori L. DeAngelis  5th floor In the Matter of the Marriage of Ronald Wayne Hice, Jr. and Jessica Doris Hice Atty. Andrew Howard & Atty. Ronald Harden for Jessica Hice **Curt APPEARED,** and opposition attorney admitted to the court that Curt was right that the Notary falsified the document because she never saw or administered the oath to the signer. |
| August 9, 2018 | In the United States Middle District Court of Florida, Jacksonville Division Case No. 3:17-00348-CIV-HES/MCR  /  Benjamin Michael DuBay, Plaintiff VS. Stephen King; Media Rights Capital; Imagine Entertainment; Sony Pictures Entertainment; Marvel Entertainment; Simon & Schuster, Defendants Attorney for Plaintiff: Rob Cook, Esq in St. Augustine, FL Oral **DEPOSITION** of Curt Baggett taken in Dallas, TX by Atty. Vincent Cox |
| July 30, 2018 | **Curt Baggett APPOINTED by Dept. of Justice, Federal Bureau of Prisons** RE:  18875078, Buholtz, Kenneth for Buholtz Analysis System Document Number  T5141754 / United States Treasury |
| July 27, 2018 | In the 160th Judicial District Court of Dallas County, Texas Cause No. DC-17-11515 /  Eva Shiells, Plaintiff  VS.  Ryan Hamilton, Mathew Hamilton, and American General Life Insurance, Defendants Attorney for Eva Shiells (wife of attorney): Theodore Shiells Attorney for Defendants:  Atty. Lauren Cadilac represented at Depo by Atty. Willie Joseph for Defendants  /  Oral **DEPOSITION** of Curt Baggett taken at George Allen Courts Building, Court 5B by Attorney Theodore Shiells |
| July 5, 2018 | In the Circuit Court of Cook County, Illinois / County Department-Chancery Division Case No. 2015 CH 02216  /  Sherry Spellers, Plaintiff  VS.  Metropolitan Life Insurance Co., et al, Defendant taken at Hyatt Place, Dallas, TX 75243 Eric M. White, Atty. for Plaintiff via cell phone / Phyllis Y. Price, Atty. for Defendant Oral **DEPOSITION** of Curt Baggett taken in Dallas, TX by Atty. Phyllis Price. Trial set for Sept. 10th & 11th, 2018 / **CASE SETTLED on 9-10-18.** |
| July 3, 2018 | In the Superior Court of the State of Arizona, Count of Maricopa in Phoenix, Arizona Case No.: CV 2015-013305 / Judge Margaret R. Mahoney / PH: 602-506-0387 Juan Thomas, Plaintiff, Pro Se  VS.  B.H. Madera At Metro LLC & Morrison, Ekre, & Bart Management Services, Inc.  /  **Curt Baggett Approved as Expert by Court and Testified (for Plaintiff) via SKYPE on Computer** |
| July 1, 2018 | **COURT APPOINTED** In the United State of America Southern District of Ohio Western Division / Case No. 1:17-cr-117 / Honorable Judge Michael Barrett USA, Plaintiff  VS.  Qian Williams, Defendant Bill Gallagher, Attorney for Defendant **Order from Judge Barrett to Appoint Curt Baggett as Handwriting Expert** |
| June 27, 2018 | In the 17th Judicial Circuit Court of Broward County, Ft. Lauderdale, FL 33301 Case No. CACE15018890 / Judge Barry Stone / Courtroom 4150, 4th floor US Bank Nat. Assn., Plaintiff  VS.  Derelle W. Bunn, Defendant |



**Curt Baggett – Expert Document Examiner**

Attorney Mark Klein for Defendant
Oral **DEPOSITION** of Curt Baggett taken in Courtroom

June 12, 2018        In the 15th Judicial Circuit Court of Palm Beach County, West Palm Beach, FL 33401
Case No.: 2018-CA-000154 / Judge Dana M. Santino / PH: 561-355-2431
Joshua Blanchard, Trustee, Plaintiff VS. John LeBeau; Unknown Tenant, Defendant
Atty. Labeed A. Choudhry for Defendant / Room 6A, 6th floor
Judge Dismissed in favor of Defendant
**Curt Baggett Approved as Expert by Court and Testified** (for Defendant)

June 6, 2018        In the 24th Judicial District Court of Victoria County, Texas  77902
Cause No. 16-10-80111-A / Court PH: 361-575-0581
Warren V. Alkek  VS.  Gary Branfman
Attorney Charlie J. Cilfone for Plaintiff
Court Ruled in favor of Plaintiff, Warren Alkek
**Curt Baggett Approved as Expert by Court and Testified** (for Plaintiff)

May 29, 2018        For the 24th Judicial District Court of Victoria County, Texas  77902
Cause No. 16-10-80111-A
Warren V. Alkek  VS.  Gary Branfman
Attorney Charlie Cilfone for Plaintiff
Oral and Videotaped **DEPOSITION** of Curt Baggett at the offices of Werner Law
Group in Victoria, Texas

May 23, 2018        In the Superior Courts of the Cordele Judicial Circuit, State of Georgia
Fitzgerald, GA / 2nd floor
Case No.          / Judge David Hobby
Atty. Kyle C. Cook for Estate of McDonald
**Curt Baggett Approved as Expert by Court and Testified**

May 17, 2018        In the 55th District Civil Court of Harris County, Houston, Texas 77002
Cause No. 2016-40009 / Judge Jeff Shadwick / 9th floor PH: 832-927-2650
Fajardo, Miguel VS.  Hernandez, Francisca Aida and Miguel
Attorney for Plaintiff, Louis A. McWherter / **Court Appearance Only**.  When Curt
showed up to testify, Defendant admitted to forgery and so stipulated in court.

April 19, 2018        In the 17th Judicial Circuit Court of Broward County, Ft. Lauderdale, FL 33301
Case No. 14-018936  / Judge Joel Lazarus  / Courtroom 14160, 14th floor
HSBC Bank USA, Plaintiff V. Cary O. Lopez; Camille Lopez; et al, Defendants
Diana Ho-Yen, Esq. Attorney for Defendants / **Curt Testified**.

April 18, 2018        In the 17th Judicial Circuit Court of Broward County, Ft. Lauderdale, FL  33301
Case No. 14 008519 CF 10A / Judge Ernest A. Kollra / Courtroom 5750, 5th floor
State of Florida, Plaintiff  V. John B. Robinson, Defendant
JURY Trial / Court PH: 954-831-7721 / Bruce Raticoff, Esq. Atty. for Defendant
**Curt Baggett Approved as Expert by Court and Testified** (for Defendant).

April 10 & 11, 2018        In the 422nd Court of Kaufman County / 100 W. Mulberry, Kaufman, Texas 75142
Case No. 99505-422 / Tracy Gray  V.  Dennis Jones / Visiting Judge Martin Lowry

*251*

**Curt Baggett – Expert Document Examiner**

Atty. Elizabeth Alvarez for Tracy Gray
**Curt Baggett Approved as Expert by Court and Testified** (for Judicial Candidate Tracy Gray). Baggett's testimony helped the court rule for a Special Election and Tracy Gray won 2,253 to 1,849.

| | |
|---|---|
| April 5, 2018 | In the 301st Judicial District Court of Dallas County, Dallas, Texas |
| | No. DF-1614244 / Judge Mary Brown |
| | In the Matter of the Marriage of Dawn Weeks Spalding and Stephen G. Spalding |
| | Oral **DEPOSITION** of Curt Baggett recorded at Office of Robert Wood, Esq., |
| | Atty. for Steve Spalding / 6688 N. Central Expy. #1000, Dallas TX 75206 |

| | |
|---|---|
| March 29, 2018 | International Chamber of Commerce / International Court of Arbitration |
| | ICC Case 22192/RD/MK    Jack J. Grynberg (U.S.A.) and RSM Production |
| | Corporation (U.S.A.), Claimants V. Rodeo Resources. L.P. (U.S.A.) and Jim Ford |
| | (U.S.A.), Respondents / Arbitration Hearing at Office of Gary McGowan, 5009 |
| | Caroline St., Suite 100, Houston, TX 77004 |
| | Attorneys E. F. Mano DeAyala and Andrew C. Wright for Respondents |
| | **Curt Baggett Approved as Expert by Court and Testified** (for Respondents). |

| | |
|---|---|
| March 26, 2018 | In the 303rd District Court, Dallas District Court, Dallas, Texas 75201   4th floor |
| And Feb. 26, 2018 | Cause No. DF-17-18700  In the Matter of the Marriage of Patrice Dianne Jennison |
| | and Raymond Jennison  /  Judge Dennise Garcia |
| | Anthony Green, Esq for Raymond Jennison |
| | **Curt Baggett Sworn in as Expert Witness on 2-26-18 and present to testify on 3-26-18.  Case settled on 3-26-18 before Curt testified.** |

| | |
|---|---|
| February 15, 2018 | In the 95th Judicial District Court of Dallas County, TX |
| | No. DC-17-16812 |
| | Marsha Lee, Executrix of the Estate of Josephine Dennis, Plaintiff |
| | VS. Brack Nelson and Herbert Harris, Defendants |
| | Attorney for Plaintiff: Michael E. Robinson |
| | Oral **DEPOSITION** – Curt testified in Plano, Texas – Collin County |

| | |
|---|---|
| February 12, 2018 | Curt was **Court Appointed** and Court Approved as an Expert to render an opinion |
| | In the United Stated District Court of South Dakota Western Division |
| | United States of America, Plaintiff VS.  Frank Gallardo, Defendant |
| | Case No.  CR 15-50061 |
| | Expert Opinion Letter on signatures of Frank Thunder Hawk Gallardo |
| | Date: February 12, 2018 |

| | |
|---|---|
| February 8, 2018 | In the 15th Judicial Circuit Court in Palm Beach County, WBP, FL 33401 |
| | Case No. 50-2009-CA-025627 (AF)  /  Judge Edward L. Artau   PH: 561-355-2431 |
| | JP Morgan Chase Bank, Plaintiff VS.  Yolette E. Sanguinetti, et al, Defendant |
| | Attys. For Defendant:  Brian Korte & Daniel Bialczak  -  9th floor, Courtroom 9D |
| | **Curt Baggett Approved as Expert by Court and Testifled** (for Defendant). |

| | |
|---|---|
| January 5, 2018 | In the Probate Court of Dekalb County, State of Georgia |
| | Estate No. 2016-2288 / In the Estate of Jean Mitchell Jones, Deceased |
| | Thomas F. Jones, attorney for Jacqueline Woods |

**Curt Baggett – Expert Document Examiner**

Oral **DEPOSITION** (Curt testified via skype)

December 20, 2018
And Dec. 27, 2018

In the 418th Judicial District Court of Montgomery County, Conroe, Texas 77301
Suite 217 / Court PH: 936-538-3618
Judge Tracy A. Gilbert / Associate Judge Scharlene R. Overstreet
No. 17-03-04143 / In the Matter of the Marriage of Kathryn M. Danner and
George Earl Danner / Robert Clements Atty. for Kathryn Danner
**Curt Baggett Approved as Expert by Court and Testified** (for Kathryn Danner).
Curt's client, Kathryn Danner won over 2 million dollars.

December 13, 2017

In the Justice of the Peace Court, Precinct 3, Place 1, Dallas County, TX
Docket Number: JS-16-00417-A / Judge Al Cercone / PH: 214-321-4106
James Elbaor, Plaintiff VS. The Manning Group, Defendant
Plaintiff's Atty. Matt McKool / Plaintiff won case.
**Curt Baggett Approved as Expert by Court and Testified** (for Plaintiff).

November 29, 2017

In the Department of Workforce Development Equal Rights Division
ERD Case No. CR 201503242 / EEOC Case No. 26G201600194C
Administrative Law Judge Alice DeLaO
819 N. 6th St. room 723, Milwaukee, WI 53203-1687
Client: Kelvin Goodwin
**Curt Attended Mediation.**

October 17, 2017

In the New York Supreme Court in Kings County, Brooklyn, NY
Courtroom 461 / Judge Katherine A. Levine / PH: 347-404-9636
Case No. 5118215 LNT / Fredrick Rufrano V. Michael Yovino
Atty. Gerald Slotnik for Michael Yovino / Continued from 7-31-17
**Curt Baggett Approved as Expert by Court and Testified.**

October 3, 2017

In the Justice of the Peace Court Precinct 1, Place 2, Lancaster, TX
Case No. JS-1700096K / Judge Valencia Nash / PH: 972-228-2272
Paul McCowan, Pro Se Plaintiff VS. Santander Consumer USA, Defendant
**Court Appearance Only.**

September 13, 2017

In the Court of Common Pleas, Ross County, Chillicothe, OH
Case No. 17CI000227 / Judge Scott W. Nusbaum / Court Ph: 740-702-3032
Todd Holdren et al, Plaintiff VS. Ingle-Barr, inc. et al, Defendant
Plaintiff Attorney Mark A. Preston
**Curt Baggett Approved as Expert by Court and Testified.**

August 11, 2017

In the Sixth Judicial Circuit of Pinellas County, St. Petersburg, Florida
Case No. 15 004281 CI 11 / Judge Pamela A.M. Campbell
Daisy Datin VS. Arty Joe's, Inc. / Courtroom E, 3rd floor
Defendant Attorney Jawdet I. Rubaii / Non-Jury Trial
Case Continued from 7-27-17 / **Court Appearance only.**
Directed Verdict in Favor of Arty Joe's, Inc. before Curt was to take the stand as
Expert Witness for Arty Joe's, Inc.

July 31, 2017

In the New York Supreme Court in Kings County, Brooklyn, NY



**Curt Baggett – Expert Document Examiner**

Courtroom 461  /  Judge Katherine A. Levine  /  PH: 347-404-9636
Case No. 5118215 LNT  /  Fredrick Rufrano  V.  Michael Yovino
Atty. Gerald Slotnik for Michael Yovino  /  Continued from 3-2-17
**Curt Baggett Approved as Expert by Court and Testified.**  Continued to 10-17-17

July 27, 2017      In the Sixth Judicial Circuit of Pinellas County, St. Petersburg, Florida
Case No. 15 004281 CI 11  /  Judge Pamela A.M. Campbell
Daisy Datin  VS.  Arty Joe's, Inc.  /  Courtroom E, 3ʳᵈ floor
Defendant Attorney Jawdet I. Rubaii  /  Non-Jury Trial
**Court Appearance only.**  Case Continued to 08-11-17

July 14, 2017      In the 134ᵗʰ Judicial District Court of Dallas County, Dallas, Texas
George L. Allen, Sr. Courts Building, 6ᵗʰ Floor West (old)
Cause No. DC09-13760  Judge Dale Tillery / Court PH: 214-653-6995
Comerica Bank  VS.  Emmanuel Mainoo
Defendant Attorney Rachel Khirallah
**Curt Baggett Approved as Expert by Court and Testified.**

June 20, 2017      In the Guadalupe County Court At Law, Seguin, Texas
Cause No. 2006-PC-0273   Judge Robin V. Dwyer / PH: 830-303-8869
In the Estate of Raymond Oatman Whipple, Jr., Deceased
Attorney John A. Mead  -  Jury Trial
**Curt Baggett Approved as Expert by Court and Testified.**

June 15, 2017      In the 153ʳᵈ District Court of Tarrant County, Ft. Worth, Texas  76196
Tom Vandergriff Civil Courts Building, 3ʳᵈ floor – 100 N. Calhoun Street
Judge Susan Heygood McCoy   PH: 817-884-2691
Case No.
Metro Mobile electronic LLC  VS.  Collie Duran
Defendant Attorney: Frank Newman, Jr., Esq.
**Curt Baggett Approved as Expert by Court and Testified.**  Continued from 6-9-17

June 15, 2017      In Dallas County Court at Law No. 2, Dallas, Texas
George L. Allen, Sr. Courts – 5ᵗʰ floor
Cause No. CC-17-01445-B         Judge King Fifer
Rafael Rivera, Plaintiff  VS.  Nenidia Guillen Robles and all
other occupants, Defendants
Attorney for Defendant, Thomas Jackson
**Curt Baggett Approved as Expert by Court and Testified.**

June 14, 2017      In the 431ˢᵗ Judicial District Court of Denton County, Denton, Texas
Cause No. 2011-70623-431    Judge Brody Shanklin
In the Matter of the Marriage of Farah Diba Deendar-Yacoob
And Tabrez Yacoob
Atty. Andrew Howard
**Curt Baggett Approved as Expert by Court and Testified.**  Case Continued

June 13, 2017      In the 322ⁿᵈ Judicial District Court of Tarrant County, Ft. Worth, Texas
No. 322-614688-17   Judge Nancy L. Berger

254

**Curt Baggett – Expert Document Examiner**

|  |  |
|---|---|
|  | In the Matter of the Marriage of Maria Delgado Lopez Yammine<br>And Imad Joseph Yammine / **Court Appearance Only.**<br>Atty. Ryan Hardy   NO SHOW by other attorney – CONTINUED to 9-20-17 |
| June 9, 2017 | In the 153rd District Court of Tarrant County, Ft. Worth, Texas  76196<br>Tom Vandergriff Civil Courts Building, 3rd floor – 100 N. Calhoun Street<br>Judge Susan Heygood McCoy     PH: 817-884-2691<br>Case No.<br>Metro Mobile electronic LLC  VS.  Collie Duran<br>Defendant Attorney: Frank Newman, Jr., Esq.<br>**Curt Baggett Approved as Expert by Court and Testified.** / Continued to 6-15-17 |
| May 26, 2017 | In the 15th Judicial Circuit Court in Palm Beach County, WPB, FL  33401<br>JPMorgan Chase Bank, National Association Successor in Interest to Washington<br>Mutual Bank, Plaintiff V. Yolette E. Sanguinetti, et al, Defendants<br>Case No. 50-2009-CA-025627 (AF) / Court PH: 561-355-2431<br>Brian Korte, Esq. – Attorney for Defendants<br>Oral **DEPOSITION** (Curt Testified via Skype from Dallas, TX) |
| April 11, 2017 | In the Tarrant County Court at Law No. 1 in Fort Worth, Texas  76196<br>Case: 2017-000668-1 /  Judge Don Pierson  /  Court PH: 817-884-1457<br>TFHSP, LLP as Trustee  V.  Edgar Acosta and all occupants<br>4th Floor, Room 490 /  Moses, Palmer, & Howell, LLP for Defendants<br>**Appearance Only.**  Mediation Ordered by Judge. |
| March 2, 2017 | In the New York Supreme Court in Kings County, Brooklyn, NY<br>Courtroom 461 /  Judge Katherine A. Levine  /  PH: 347-404-9636<br>Case No. 5118215 LNT /  Fredrick Rufrano  V.  Michael Yovino<br>Atty. Gerald Slotnik for Michael Yovino<br>**Curt Baggett Approved as Expert by Court and Testified.**  Continued to 7-31-17 |
| Feb. 24, 2017 | In the Circuit Court of the Eleventh Judicial Circuit<br>for Dade County, Miami, Florida<br>US Bank NA  V.  The Estate of Orestes Guirola Et Al<br>Case No. 12-24740 CA  /  Job #: 2549280 PH: 817-456-3327<br>Attorneys Carlos D. Lerman & Steven Liberty<br>Oral **DEPOSITION** (Curt testified via Skype in Dallas, TX) |
| Feb. 2, 2017 | In the Superior Court of Washington for King County, Seattle, WA<br>Case No. 15-2-03115-5 SEA /  Hipps vs. Virginia Mason Medical Center<br>Clerk of Court PH: **(206) 296-9300**<br>Defendant Attorneys William J. Leedom & David M. Norman<br>BENNETT BIGELOW & LEEDOM P.S. | BBLLAW.COM<br>Oral **DEPOSITION** (Curt testified via Skype in Plano, TX) |
| January 4, 2017 | In the 310th Judicial District Court, Harris County, Houston, Texas<br>Cause No. 2015-24273 /  Judge Lisa Millard<br>Sylvia Jimenez Scott  VS.  Angel Fidencio Trevino<br>Atty. Duana Boswell-Loechel - Litigation Director- Lone Star Legal Aid<br>Curt Baggett Approved as Expert by Court and Testified |

Page 7 of 17

**Curt Baggett – Expert Document Examiner**

| | |
|---|---|
| Oct. 20, 2016 | In the Ninth Judicial Circuit Court, Orange County, Orlando, FL<br>Probate Division / Court Room 20A / Case Continued from 8-2-16.<br>Case No. 15-CP-1939 / Judge Jose R. Rodriguez<br>In Re: Estate of Donald Leroy Hall<br>Petitioner Attorney Daniel de Paz<br>**Curt Baggett Approved as Expert by Court on 8-2-16 and Testified**<br>via Skype from Richardson, TX |
| Sept. 8, 2016 | In The Supreme Court of the Commonwealth of the Bahamas<br>Ansbacher House, Nassau, Bahamas<br>2013/CLE/gen/007823 / Justice Ian Winder<br>Clayton Hillgrove Taylor  V.  Bank of the Bahamas<br>Attorney Arthur L. Minns<br>**Curt Baggett Approved as Expert by Court and Testified.** |
| Aug. 10, 2016 | In the 18th District Court Johnson County, Cleburne, Texas<br>Guinn Justice Center, Room 204, 3rd floor<br>Case No. F50740 / Judge John Neill / PH: 817-556-6820<br>Def. Attorney Don W. Bonner / Jury Trial<br>**Curt Baggett Approved as Expert by Court and Testified.** |
| Aug. 3, 2016 | In the Probate Court No. 1 Dallas County, Dallas, Texas<br>No. PR-13-968-1  Old Criminal Courts Building 2rd floor<br>Judge Brenda Hull Thompson  /  PH: 214-653-7236<br>Joe Davis Trial  /  Attorney Michael Todd<br>**Curt Baggett Approved as Expert by Court and Testified.** |
| Aug. 2, 2016 | In the Circuit County for Orange County, Orlando, FL<br>Probate Division / Court Room 20A<br>Case No. 15-CP-1939 / Judge Jose R. Rodriguez<br>In Re: Estate of Donald Leroy Hall<br>Petitioner Attorney Daniel de Paz<br>**Curt Baggett Approved as Expert by Court to testify on 10-20-16 via Skype.**<br>Case Continued to 10-20-16. |
| June 23, 2016 | In the 201st Judicial District, Travis County, Austin, Texas<br>345th District Courtroom, 4th floor, #412  PH: 512-854-9457<br>Cause No. D-1-FM-14-005909 / Judge Stephen Yelenosky<br>In the Matter of the Marriage of<br>Estela Trevino Dyer and Donald Edmund Dyer<br>Attorneys Cristi Trusler & Rebekah Duke Jury Trial.<br>**Curt Baggett Approved as Expert by Court and Testified.** |
| June 8, 2016 | In the Supreme Court of the Commonwealth of the Bahamas<br>Probate Side,  No. 2015/PRO/cpr/00006 / Justice Ian Winder<br>Eleanor Brennen  v.  Carlton McMinns<br>Michael W. Horton, Esq.  /  Nassau, Bahamas<br>**Curt Baggett Approved as Expert by Court and Testified.** |

Page 8 of 17

256

**Curt Baggett – Expert Document Examiner**

| | |
|---|---|
| June 6, 2016 | In the Supreme Court, Commonwealth of the Bahamas<br>Family Division, No. 00145 / Madam Justice Rhonda Bain<br>Steven Bernard D'Alewyn and Rosalyn Vanessa D'Alewyn<br>Alexander P. Maillis II, Esq. / Nassau, Bahamas<br>**Curt Baggett Approved as Expert by Court and Testified.** |
| June 2, 2016 | In the Tarrant County Family Law Center / Ft. Worth, TX<br>Case No. 360-5933-76-16 / Judge Cynthia Mendoza<br>360th Court / Ph: 817-884-2720<br>Tanner J. Lippert V. Savannah Rhea<br>Jeff Branch, Esq.<br>**Curt Baggett Approved as Expert by Court and Testified.** |
| May 16, 2016 | In the 18th Judicial Circuit Court / Brevard County, Florida<br>Case No. 2010 CA 033662 / Judge Lisa Davidson<br>Moore Justice Center / Courtroom 2b / Ph: 321-617-7281<br>PNC V. Courtney Roberts<br>**Curt Baggett Approved as Expert by Court and Testified.** |
| April 15, 2016 | In The County Court at Law No. 1 / Tarrant County, Texas<br>Cause No. 2014-000426-1 / Judge Don Pierson<br>Court Clerk Ph: 817-884-2418 / 817-212-7074<br>David Hart v. Harley Davidson / Jack Peacock, Esq.<br>**Appearance. Case Continued.** |
| April 13, 2016 | Eighth Judicial District Court / Clark County, Las Vegas, Nevada<br>Regional Justice Center / Ph: 702-671-4344<br>Case # P-15-086345-E / Judge (Commissioner) Wesley Yamashita<br>Probate Estate of Wright, Charles Lowell / David C. Johnson, Esq.<br>**Curt Baggett Approved as Expert by Court and Testified.** |
| February 10, 2016 | In The Essex County Superior Court / Newark, New Jersey<br>Case No. DC 010854-15 / Judge Frank Covello<br>NJ Higher Education V. Manuel F. Ponte<br>Jose B. Moreira, Esq. Law Firm<br>**Immediately after Judge Covello approved Curt Baggett to<br>testify in his court, the opposition attorney settled.** |
| January 14, 2016 | In The Probate Court No. 1 of Dallas County, Texas<br>Cause No. PR-15-03152-1 / Judge Brenda Hull Thompson<br>Estate of David Clemmons, Deceased<br>Susan M. Herndon, Esq. |
| December 17, 2015 | Justice of the Peace, Precinct 3, Place 1 / Dallas, Texas<br>Case # JS-1431021A / Judge Albert B. Cercone<br>Carol M. Kam V. Western Surety / Pyke, David<br>**Appearance only.** |

257

**Curt Baggett – Expert Document Examiner**

| December 15, 2015 | Harris County 308th Judicial District Court / Houston, Texas<br>No. 2011-15816 / Associate Judge Alyssa Lemkuil<br>Bishop V. Burroughs / Catherine Herrington Hale, Esq. |
|---|---|
| December 14, 2015 | Cameron County Court at Law No 2 / Brownsville, Texas<br>Judge Laura L. Betancourt<br>Robert Robertson, Esq. |
| November 30, 2015 | Woods County Courthouse / Alva, Oklahoma<br>CF-2013-87 / Judge Justin Eilers<br>The State of Oklahoma V. Michael Lynn Freeman<br>Tim Pool, Esq. / **Appearance only.** Testimony filed. |
| November 19, 2015 | In the County Court at Law No. 1 / Dallas County, Texas<br>No. CC-15-04952-A / Judge D'Metria Benson<br>Investors Mgs. Center V. John Dobbins |
| November 18, 2015 | Court of Common Pleas in Franklin County, Ohio<br>Case No. 14 JU 11807 / Magistrate Sanchez<br>Criminal Division / State of Ohio V. Cassius Crome, Jr.<br>Byron Potts, Esq. / Columbus, Ohio |
| November 13, 2015 | The Circuit Court of Taney County / Branson, Missouri<br>Estate No. 10AF-PR00229 / Division 1 Judge Tony Williams<br>Regions Bank V. Ron Davis - Appearance only.<br>Diana Brazeale, Esq. and Kelley Webb, Esq. |
| October 14, 2015 | Harris County Civil Courts at Law #2, (Houston) Texas<br>No. 947381 / Judge Theresa W. Chang<br>Dixie Farm Texaco, Inc. V. Darinder Pal Singh, et al<br>Carl A. Parker, Esq. |
| October 8, 2015 | County Court at Law in Kerr County, Texas<br>Cause No. CCL 15-3 / Judge Susan Harris<br>In the Matter of the Estate of Antonio Ayala, Jr.<br>Samira Mery Lineberger, Esq. |
| September 21, 2015 | State of Texas V. Judge Alfred Isassi<br>Case No. 15-CRF-0182 / Judge Robert Flores<br>105th District Court of Kleberg County Texas (Kingsville)<br>Eric Flores Esq. Attorney of Record |
| September 14, 2015 | Circuit Court of Taney County, Missouri / Probate Division<br>Page G. Schumacher Trust V. Regions Bank<br>Estate No. 10AF-PR00229<br>Branson, Missouri / Ron Davis Attorney of Record<br>Diana Brazeale, Esq. and Kelley Webb, Esq. |
| September 10, 2015 | Court of Common Pleas in Franklin County, Ohio |



**Curt Baggett – Expert Document Examiner**

|  |  |
|---|---|
|  | Criminal Division / State of Ohio V. Cassius Crome, Jr.<br>Case No. 14 JU 11807 / Judge Preisse<br>Byron Potts, Esq. / Columbus, Ohio |
| September 2, 2015 | 246th District Court of Harris County, (Houston) Texas<br>Case No. 2014-01759 / Judge Charley E. Prine, Jr.<br>Zuraima Newson V. Frank Newsom<br>Edmond N. O'Suji, Esq. |
| August 17, 2015 | Appearance: Virginia In the Circuit Court of Orange<br>CL 13000165 Judge Gaylord Fincus<br>Robert Mayo, Plaintiff and Pro Se |
| August 12, 2015 | Herman Lee Gibbons Case Lee and Roman Gibbons Client<br>Dallas County Probate Court #3<br>Judge Margaret Jones Esq.<br>Bryan Bethune Attorney of record |
| July 30, 2015 | Betty Tillis Bankruptcy / Case No. 15-04059<br>Judge Michael D. Lynn<br>Northern District of Texas / Fort Worth, Texas<br>Andrew Dunlap Attorney of Record<br>**Curt Baggett Approved as Expert by Court and Testified** for Betty Tillis<br>Court ruled in favor of Curt's testimony for Betty Tillis |
| May 7, 2015 | Judge Clay Poynor<br>James Reed Level VS Jesse Sayles Level<br>Attorney George R. Bienfang<br>County court of law No. 2 / Case No 14-04-258<br>Wise County Richport, Texas |
| May 15, 2015 | Deutsche Bank National Trust Company, As Trustee For American<br>Home Mortgage Assets Trust 2006-6, Mortgage-Backed Pass-<br>Through Certificates Series 2006-6 vs. Diane Mandel, et al.<br>Judicial Officer James R. Thompson<br>Case No. 2011-CA-055212<br>Twentieth Circuit Court, Lee County, Florida |
| March 27, 2015 | Dakota Land and Cattle Company and DesLacs Valley Land Corp.<br>V Jonathon Lochthowe<br>Case # 51-2013-CV00456 / Judge Richard L. Hager<br>North Central Judicial District / Ward County Court House<br>315 SE 3rd St P.O Box 5005 / Minot, ND 58702 |
| January 26, 2015 | AET Enterprises Inc. vs. AET Enterprise, LLC<br>Case No. CJ-2013-144 and Julie Pitts d/b/a AET Enterprise, LLC vs.<br>The Coves et al.,Case No. CJ-2013-145<br>Dale Marler and Mark Antinaro Attorneys of Record<br>501 West 1st Street Claremore, Oklahoma 74017 |

259

**Curt Baggett – Expert Document Examiner**

| | |
|---|---|
| January 8, 2015 | Elaine Lett Murphy<br>Cause # 231-558967-14 / Judge Sullivan presiding<br>Laurie Robinson R.N. Attorney of Record<br>Arbitration Sisemore Law Firm<br>Prenuptial Agreement and Property Dispute |
| December 8, 2014 | Farrell v. Farrell et All Cause # G -2010-992-T/I<br>Judge Dewayne Farrell<br>Jackson, Mississippi<br>Ross Barnett Attorney of Record |
| December 4, 2014 | Mallard Point Golf Course Cause # 2013-449<br>Lonoke County Circuit Court / Lonoke Arkansas<br>Judge Sandy Huckabee<br>Jeff Moore Attorney of Record<br>Fraudulent Conveyance Suit |
| November 6, 2014 | Kenneth Bryson V Kenneth Allison<br>207th District Court / Judge Bruce Boyer<br>Comal County Courthouse<br>New Braunfels, Texas<br><br>David Conrad Beyer Attorney of Record |
| October 23, 2014 | Arapahoe County Elections<br>How To Spot A Forgery Lecture and Seminar<br>Corene Henage Interim Deputy of Elections<br>5334 Prince Street Littleton, Colorado 80120 |
| October 10, 2014 | Olympia Alvarado Vs Marla Alvarado Wolters et al.;<br>Cause No. 2013-CL-09746<br>150th Judicial District Court<br>Bexar County Texas<br>John Mead Attorney of Record  210-710-0981 |
| October 3, 2014 | Leonardo Hernandez Cause # 314-CV-02818-P<br>95th Judicial Court Dallas Texas<br>Judge Ken Molberg<br>Dallas County Court<br>600 Commerce Dallas, Texas<br>Sara Scott Attorney of Record |
| September 29, 2014 | Elaine Lett Murphy<br>Laurie Robinson R.N. Attorney of Record<br>Cause # 231-558967-14 / Judge Jesus Navarez<br>231st Judicial Court<br>Fort Worth, Texas |

*260*

**Curt Baggett – Expert Document Examiner**

| | |
|---|---|
| September 19, 2014 | National Union Fire Insurance<br>Company of Pittsburgh, PA<br>Through its attorney of record Jeffrey R. Parsons<br>Dallas, Texas<br>Calvin Leavelle Deposition |
| September 18, 2014 | Sate of Oklahoma County of Delaware<br>Jay, Oklahoma<br>Angela Girdner Deposition<br>Betty Cartwight Attorney of Record |
| September 17, 2014 | Delaware County Court<br>Judge Berry Benney<br>13th Judical District Court<br>Cause # PB-06-84<br>327 5th Street Jay Oklahoma<br>John Watermelon /Edna Sultzer |
| September 16, 2014 | District Court of Gregg County<br>188th Judical Court<br>Judge Daniel Brabham<br>Hope McPherson v. Johnnie Gunn,Carolyn Gunn and John C.<br>Gunn Cause # 2011-2012A |
| August 13, 2014 | NYI9879 Civil Court The City of New York<br>County of Richmond<br>Judge Teresa Cippoteal<br>Attorney of Record Gary Pillersdorf<br>Celina Pawlowska V.<br>New York City Transit Authority The Metropolitan Transportation<br>Authority and the City of New York |
| August 1, 2014 | United States District Court for the District of Montana<br>Ahmed A. Al-Aissa V Sears, Roebuck and Co.<br>Law Office of Urgin, Alexander, Zadick and Higgins P.C.<br>Deposition |
| July 16, 2014 | Surrogates Court of New York<br>Judge Diane A. Johnson<br>2 Johnson Street<br>Brooklyn, New York 11201<br>Cause # 2065/A-207<br>Respondent John James Rollins<br>In The Matter of the Proceeding of Raymond Rollins as<br>Administrator of the Estate of Pearl James |
| June 2, 2014 | Surrogates Court of New York<br>Judge Diane A. Johnson<br>2 Johnson Street |



**Curt Baggett – Expert Document Examiner**

Brooklyn, New York 11201
Cause # 2065/A-207
Respondent John James Rollins
In The Matter of the Proceeding of Raymond Rollins as
Administrator of the Estate of Pearl James

May 19, 2014
Cause No ESPR018476
Joanne Crew Probate
In The Iowa Probate Court in and for Cedar County
Judge Mike Lawson
Tipton, Iowa

May 15, 2014
Cause No DC-13-290
Israel Garcia V Zulema Gonzalez A.K.A Zulema Morin
In the District Court
229th Judical Distict
Duval County, Texas
Deposition

May 11, 2014
San Antonio, Texas
No 2728;Cause No. 2012-CI-19200 Court 57 / Judge Phyllis Speedlin
In the Matter of the Marriage of Gobel
Attorney James E. Monnig

May 12, 2014
Cause DC-13-13137-D
Leonardo Hernandez Garcia V. General Packaging Corp.
Dallas County, Texas
95th Judical, District
Arnold, Arnold, & Itkin LLP Paul Skrabanek

April 22, 2014
In the County Court at Law, Harris County, Texas
Case No. 1035401
Angle Salon Corporation V. Dung Chau, Oanh Bui, Vi Phuong
Pham D/B/A Pro Salon Defendants
Attorney Allan Cease
Deposition

April 14, 2014
George Risner V. Harris County Republican Party
269 District Court
Harris County, Houston
Case 2014-02621 / Judge Don Burgess
Appeals Court Judge from Beaumont, Texas

March 10, 2014
The 42nd Judicial District of the *Louisiana* District Court
Mansfield, Louisiana at the DeSoto Parish Annex Bldg.
Judge Robert Burgess presiding
Cause # 74275 In Succession Kattie Russell –vs.-Ben Russell
Attorney of Record: Christopher Sices

**Curt Baggett – Expert Document Examiner**

| | |
|---|---|
| March 5, 2014 | Court of Common Place<br>Harrison County, OH<br>Case No. CVH 20130022 / Judge Lintons Lewis Jr.<br>Sharon Stitt vs. Jamie |
| February 13, 2014 | Eastern Caribbean Supreme Court<br>Tortola British Virgin Islands<br>Robert J. Tarlecky case<br>Attorney of Record: Bob W. Lentz . |
| January 30, 2014 | In the Circuit Court of the First Judicial Circuit<br>Santa Rosa County, Florida<br>Case No. 2011 CA 000054<br>Deposition<br>Wells Fargo Bank, NA vs. Douglas Paul Perryman, Tricia Rene<br>Simon / Attorney   Farrar |
| January 22, 2014 | In the Federal Court<br>New Orleans, LA<br>Hale Boggs Federal Building<br>Docket Number 2013-0190 / Judge Bruce T. Smith<br>United States Coast Guard vs. Nelson G. Hopper<br>Attorney Bill Hidalgo (985) 249-5195 |
| January 16, 2014 | In the 138th District Court<br>Cameron County, Texas<br>Cause No. 2012-DCL-4772-B / Judge Arturu C. Nelson<br>Michelle Atkinson vs. Orlando Robles |
| January 10, 2014 | In the 302nd District Court<br>Dallas County, Texas<br>Cause No. 1200649-V / Judge Tena Callahan<br>In the interest of Elva Steele |
| January 9, 2014 | In the Branch 1 Court<br>Marathon County<br>Cause No. 2013-SC-669 / Judge Jill Falstad<br>Stanley Miller Estate vs. Diane Story, Wausau, Wisconsin<br>Attorney Andrew Schmidt (715) 845-9621 |
| December 16, 2013 | Appeal Hearing<br>State of Georgia Employment Commission<br>Adam Carson vs. The State of Georgia<br>Hearing Officer: Jacqueline Kennedy Dvorak |
| November 5, 2013 | In the 224th District Court<br>Bexar County, Texas<br>Kader Solomon v. Wael M. Sulieman |

263

**Curt Baggett – Expert Document Examiner**

|  | Cause No. 2013-CI-06053 / Judge Larry Noll |
|---|---|
| October 31, 2013 | In the 251ˢᵗ District Court<br>Randall County, Texas<br>Cause No. 63,887-C<br>Lawrence Schaeffer and Estelle Archer: Plaintiffs,<br>Counter-Defendants v. David Allison and Austin Equity Investor:<br>Ltd., Defendants, Counter-Plaintiffs and Richard K. Archer:<br>Intervenor and Eileen Allison: intervenor |
| October 4, 2013 | In the 219ᵗʰ District Court<br>Collin County, Texas<br>Cause No. 219-02861-2013<br>Ex Parte V. Allison Moore / Judge Scott. J. Becker |
| October 2, 2013<br>Sparta, Tennessee<br>Attorney Doug Fields | In the Chancery Court<br>White County, Tennessee<br>Cause No. 2012-CV-39<br>Robinson V. Robinson / Judge Ronald Thurman |
| August 27, 2013<br>Attorney Dantone, Frank | In the Chancery Court<br>Washington County, Mississippi<br>Cause No. 20120419 / Judge Franklin S. Thackston |
| July 23, 2013<br>Attorney Walter L. Taylor | In the 20ᵗʰ Judicial District<br>Milam County, Texas<br>Shannon Farr v. Terry Nevitt Farr, et al.<br>Cause No. CV-35-208 / Judge John W. Youngblood |
| July 19, 2013<br>Attorney Noaman Azhar | U. S. Department of Justice,<br>Executive Office for Immigration Review<br>Dallas County, Texas<br>In the Matter of Md. Rafiqul Islam Khan in Removal Proceedings<br>Case No. A-203-278-078 / Judge Robert Wayne Kimball |
| July 8, 2013 | Taverna v. Fonseca<br>Miami Dade County, Florida<br>Judge Rosa I. Rodriguez |
| June 17, 2013 | In the County Court In and For Broward County Florida<br>Myriam Etienne v. Hope Health Career Institute<br>Case No. 11-11558 / Judge Luis H. Schiff |
| June 7, 2013<br>Attorney William H. Davie II | In the Small Claims Division of the County Court<br>In and For Clay County, Florida<br>Tiffany Raye Gaskell v. Alexandra Bethany Crystal Day<br>Case No. 2012-SC-000157 |
| May 13, 2013 | Thirteenth Judicial Circuit Court |

Page 16 of 17

**Curt Baggett – Expert Document Examiner**

| | |
|---|---|
| Attorney Jim Erwin | County of Pickens, South Carolina<br>James Earl Shivers v. Mary Eugena Shivers<br>Case No. 2008-DR-39-253 / Judge Alvin Johnson |
| April 30, 2013<br>Attorney Andres Reyes | County Court at Law 1<br>Webb County, State of Texas<br>In the Estate of Rosa Maria Mares, Deceased<br>Case No. 2012PB5000008-L1 / Judge Alvino Ben Morales |
| April 22, 2013<br>Attorney Cyndi Nahas<br><br>* Court Appointed Expert | Collin County, State of Texas<br>State of Texas v. Allison Faye Moore<br>File No. 416-81602-2012<br>Judge Chris Oldner |
| March 23, 2013<br>Attorneys Fred Koenke and<br>Scott Collier | 19th Judicial District Court<br>Parish of East Baton Rouge<br>State of Louisiana<br>State of Louisiana v. Dominique Smith<br>No. 08-08-0005 / Judge Anthony J. Marabella |
| February 11, 2013<br>Attorney Robert C. Allen | Circuit Court for Escambia County<br>Probate Division, State of Florida<br>In Re: Estate of Erma Averhart<br>File No. 1972-CP-3767 / Judge J. Scott Duncan |

265

# SECTION 7

# List of Publications

# List of Publications

1.   Ethics for Experts

2.   Handwriting Certification Course

3.   How to Help Attorneys With Your Case

4.   How to Spot a Forgery

5.   Taking the Witness Stand